## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUPERMEDIA LLC, | ) | Case No. 13-10546 (KG) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| SUPERMEDIA LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| vs. | ) | Adversary Proceeding |
| | ) | No. 15-50044 (KG) |
| YELLOW PAGES PHOTOS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SUPERMEDIA LLC'S RESPONSE IN OPPOSITION TO
## YELLOW PAGES PHOTOS, INC.'S MOTION FOR CONTEMPT AND SANCTIONS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    The January 29, 2014 hearing. ............................................................... 4

    B.    The February 12, 2014 hearing. .............................................................. 5

    C.    YPPI's third-party subpoenas to Hostopia and Web.com. ..................... 7

    D.    The April 2014 trial. .............................................................................. 8

    E.    SuperMedia initiates this adversary proceeding. ................................. 10

    F.    The Court's May 7, 2015 sanctions order............................................ 11

    G.    SuperMedia completes and produces the results of the TinEye search. ............... 13

    H.    YPPI's renewed motion for contempt and sanctions. ........................... 14

ARGUMENT ................................................................................................................ 15

I.    YPPI HAS NO LEGAL OR FACTUAL BASIS TO SEEK AN ADVERSE
    INFERENCE OR ANY OTHER SANCTIONS. ....................................... 15

    A.    SuperMedia had no duty to preserve the documents comprising its digital
        products because those documents were not within its control. .......................... 15

    B.    YPPI's claim that the so-called "lost" evidence is relevant contradicts its
        own representations to this Court. ....................................................... 17

    C.    YPPI has not even attempted to show that SuperMedia intentionally
        withheld or suppressed any of the evidence at issue............................. 19

    D.    SuperMedia cannot preserve documents it does not "control."........................... 21

    E.    YPPI does not have any evidence, let alone "concrete" evidence, as to
        what the alleged "lost" evidence here might have shown................................... 22

II.    YPPI HAS NOT EVEN ATTEMPTED TO SATISFY THE STANDARD
      FOR A CONTEMPT ORDER.................................................................. 24

III.    YPPI'S MOTION FOR CONTEMPT AND SANCTIONS IS FRIVOLOUS. ......... 25

CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. to End Repression v. City of Chicago*,
   899 F.2d 582 (7th Cir. 1990) ...................................................................25

*Bond v. Am. Med. Ass'n*,
   764 F. Supp. 122 (N.D. Ill. 1991) ...........................................................25

*Brewer v. Quaker State Oil Ref. Corp.*,
   72 F.3d 326 (3d Cir. 1995)..............................................15, 17, 19, 21

*Bull v. United Parcel Serv., Inc.*,
   665 F.3d 68 (3d Cir. 2012)..............................................15, 17, 19, 21

*Fromm v. MVM, Inc.*,
   371 F. App'x 263 (3d Cir. 2010) ............................................................16

*Gumbs v. Int'l Harvester, Inc.*,
   718 F.2d 88 (3d Cir. 1983)......................................................................19

*Harman v. City of Univ. Park*,
   No. 3:94-CV-2450-P, 1997 WL 53120 (N.D. Tex. Feb. 3, 1997)...........25

*Hicks v. Wegmans Food Mkt.*,
   No. CIV.A. 09-624 JEI/AM, 2011 WL 499368 (D.N.J. Feb. 10, 2011) ................21

*In re Adams Golf, Inc., Sec. Litig.*,
   618 F. Supp. 2d 343 (D. Del. 2009)..............................................15, 22

*In re DaimlerChrysler AG*,
   No. CIV.A. 00-993-JJF, 2003 WL 22951696 (D. Del. Nov. 25, 2003) ................23

*In re Hechinger Inv. Co. of Delaware, Inc.*,
   489 F.3d 568 (3d Cir. 2007)......................................................19, 22

*In re Mariner Post-Acute Network*,
   329 B.R. 481 (Bankr. D. Del. 2005) .......................................................24

*Jacobs v. City of Pittsburgh*,
   No. CIV.A. 08-470, 2015 WL 7009443 (W.D. Pa. Nov. 12, 2015) .........21

*McAdams v. United States*,
   297 F. App'x 183 (3d Cir. 2008) .............................................................15

*Muzzleman v. Nat'l Rail Passenger Corp.*,
   839 F. Supp. 1094 (D. Del. 1993) ............................................................................19

*R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13 (S.D.N.Y.)
   *opinion adopted,* 271 F.R.D. 55 (S.D.N.Y. 2010) ...................................................16

*Robocast, Inc. v. Microsoft Corp.*,
   No. CV 10-1055-RGA, 2014 WL 789086 (D. Del. Feb. 25, 2014) .......................19

*Schmid v. Milwaukee Elec. Tool Corp.*,
   13 F.3d 76 (3d Cir. 1994) ........................................................................................22

*Scott v. IBM Corp.*,
   196 F.R.D. 233 (D.N.J. 2000)...................................................................................21

*St. Clair Intellectual Prop. Consultants, Inc. v. Toshiba Corp.*,
   No. CV 09-354-LPS, 2014 WL 4253259 (D. Del. Aug. 27, 2014) .......................21

*United States v. Nelson*,
   481 F. App'x 40 (3d Cir. 2012) ...............................................................................19

**Statutes**

Chapter 11 of Title 11 of the United States Code ..........................................................3

**Rules**

Fed.R.Civ.P. 30(b)(6) ...................................................................................................11

Fed. R. Civ. P. 37 .........................................................................................................26

Fed. R. Civ. P. 60(b) ......................................................................................................9

Rule 9011 .....................................................................................................................26

## PRELIMINARY STATEMENT

YPPI's perpetual motion for contempt and sanctions is a rather transparent attempt to elide the fact that YPPI has no evidence to support its claims.  Throughout the April 2014 trial, Trent Moore, the principal of YPPI, testified that he had "lost control" of his images as a result of SuperMedia's transfers.  As we now know, that was not true.  In fact, SuperMedia recently learned that YPPI's expert has been scouring the Internet for YPPI's images on a regular basis since 2012, and in all that time he has not found more than 60 YPPI images in SuperMedia's digital products.  And when SuperMedia retained TinEye to search through SuperMedia's digital products for YPPI's images, they found only 57 individual images.  Faced with an evidentiary record that directly contradicts Mr. Moore's "loss of control" accusations, YPPI again falls back on its tired refrain of spoliation.  This strategy does not work.

The Court has already ruled that SuperMedia's retention of TinEye to search for YPPI's images "will fully satisfy SuperMedia's compliance obligations under the Court's Discovery Order," [D.I. 323], and that "there would not be additional sanctions, if that search is performed," (June 9, 2015 Tr. 31:8-10).  YPPI offers no reason why the Court should revisit its prior ruling.  If anything, YPPI's motion confirms that there is absolutely no basis to impose sanctions (or a contempt order) against SuperMedia.

<u>First</u>, as a threshold requirement for spoliation sanctions, YPPI must show that the documents at issue are within SuperMedia's control, and it cannot make such a showing.  To the contrary, the undisputed evidence shows that the files comprising SuperMedia's digital ads reside on servers owned and operated by independent third parties, such as Web.com, Hostopia, Facebook and Google.  YPPI's oft-repeated conclusory assertion that these files are within our control is not sufficient to satisfy its heavy evidentiary burden on a motion for an adverse inference.

Second, YPPI must demonstrate that the evidence at issue is relevant, and YPPI previously conceded that it is not. At the conclusion of the April 2014 trial, the Court instructed YPPI to submit "a list of the types of documents they didn't receive" and would need for the damages trial. (Apr. 16, 2014 Tr. 19:25-20:11.) YPPI never did so. In fact, when the Court held a conference to discuss scheduling for the damages trial, Mr. Timmerman represented that YPPI did not need any additional fact discovery: "Quite frankly, fact discovery is done. I think all that's left here is expert discovery . . . ." (Jan. 30, 2015 Tr. 78:6-7.) On this record, YPPI cannot credibly argue that any files comprising SuperMedia's digital ads are critical to its damages case.

Third, YPPI must show that SuperMedia intentionally withheld or destroyed the evidence in question, and YPPI has not even attempted to make such a showing. Indeed, the very notion that SuperMedia intentionally withheld or destroyed the files comprising its digital ads flies in the face of logic. As noted, these documents reside on servers of third-party web hosts, so YPPI would have to prove that SuperMedia conspired with these third parties to provide SuperMedia with access to its servers so that SuperMedia could search tens of thousands web sites and social media pages to locate, and then *delete*, YPPI's images. Such a scenario is not only unsupported in the record, it is absurd on its face. This scenario is all the more absurd because the web sites and social media pages at issue belong to SuperMedia's paying customers, and SuperMedia is not in the business of destroying its customers' ads.

Fourth, YPPI must show that SuperMedia's duty to preserve documents comprising its digital ads was reasonably foreseeable. Again, YPPI falls short of the mark. SuperMedia did not, and could not, anticipate that it had a duty to preserve documents beyond its control that reside on third-party servers.

## BACKGROUND

On March 18, 2013, SuperMedia and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, together with a prepackaged Chapter 11 plan. On May 30, 2013, YPPI filed a Motion for Allowance and Payment of Administrative Expense Claim [D.I. 213, Case No. 13-10545 (KG)] (the "Admin. Expense Motion").[1] By that Motion, YPPI sought an administrative expense claim for damages resulting from SuperMedia's alleged violation of the parties' license agreement and federal copyright law during the 43-day period after the Petition Date and before the effective date of SuperMedia's confirmed Chapter 11 plan.

Notably, the Admin. Expense Motion that YPPI filed on May 30, 2013 did not include any reference to any of SuperMedia's digital advertisements. (*Id.*) The only third-party contractors or transferees referenced in YPPI's original Admin. Expense Motion were SuperMedia's print contractors—namely, Tata, ASEC, and MPS. (*Id*. at 5.) Likewise, none of the demand letters YPPI's counsel sent to SuperMedia prior to May 30, 2013 contained any reference to digital advertisements. [*See, e.g.,* D.I. 128-1, Adv. No. 15-50044 (KG)]. YPPI did not specifically allege that SuperMedia had transferred any of YPPI's images to digital contractors or social media platforms until YPPI amended its Admin. Expense Motion on February 19, 2014. [D.I. 58].

On December 30, 2013, in connection with its Admin. Expense Motion, YPPI served discovery requests, asking SuperMedia to identify all advertisements it had created that contained a YPPI image. In response, SuperMedia engaged in a diligent search to locate any

---

[1]    Unless otherwise indicated herein, internal citations and quotations are omitted, emphasis is added, docket citations are to the docket in this adversary proceeding, Case No. 13-10546 (KG), and all citations to "Ex. __" refer to the exhibits attached hereto. Citations to "YPPI Mot." are to YPPI's November 4, 2015 Motion for Contempt and Sanctions as a Result of SuperMedia, LLC's Failure to Preserve and Spoliation of Evidence. [D.I. 128, Adv. No. 15-50044(KG)].

YPPI images that had been used in its print advertisements.  On January 21, 2014, SuperMedia

responded to YPPI's discovery requests stating that SuperMedia had located YPPI images in

roughly 600 sold print ads, copies of which were produced to YPPI.  SuperMedia was unable to

a search of its digital advertisements because, as explained in SuperMedia's May 29, 2015 letter

to the Court, (Ex. A, May 29, 2015 Letter from E. Leon to Court ("Clarification Letter") [D.I. 40,

Adv. No. 15-50044(KG)]), SuperMedia does not have possession, custody, or control of the

actual files underlying its digital products.  (*Id.* at 2-3.)  Those files are created, and reside, on

servers owned by third parties.  (*Id.* at 3.)  SuperMedia does not have internal access to such

servers or the files on those servers such that it could search through its digital ads.  (*Id.*)

### A.    The January 29, 2014 hearing.

YPPI complained about SuperMedia's failure to include digital ads in its discovery

responses and, on January 29, 2014, the Court heard argument on this and other discovery issues.

As to the issue of digital ads, the Court instructed SuperMedia as follows:

> THE COURT: Well, it seems to me that SuperMedia ought to be making some
> effort and ***at least exploring how such information could be obtained and if it
> turns out that it's overly burdensome or there's simply not a way to do this***, at
> least YPPI will be able to explore in a deposition what efforts were made and
> either be satisfied with those efforts or have the information necessary to say that
> the effort was insufficient.  So, I do think that at least some effort has to be made
> other than to say that it's not possible because as Mr. Timmerman points out, it is
> SuperMedia that has control of at least the necessary computer information that
> might be able to produce such information.

(Ex. B, Jan. 29, 2014 Tr. 15:10-22; *id.* at 15:24-16:3 ("So, I think the effort has to be there and ***if

it's unsuccessful, then at least YPPI will have had the opportunity to explore the effort made***

and perhaps make some determination as to whether or not such effort was sufficient.").)  The

Court did not order SuperMedia to search through its digital ads for YPPI's images during the

January 29, 2014 hearing.  Nor did the Court find that the files comprising those ads are within

SuperMedia's possession, custody, or control.   Instead, the Court instructed SuperMedia to

"explor[e]" whether it could supplement its responses to include digital advertisements, leaving open the possibility that it could be "overly burdensome" or "there's simply not a way to do this." (*Id.* at 15:10-16:3.) In response, SuperMedia's prior counsel agreed to investigate "whether there's any way of doing that." (*Id.* at 16:7-9.)

Thereafter, SuperMedia confirmed that it did not have the capability to search through its digital ads for YPPI's images. (Ex. A, Clarification Letter at 2.) On February 28, 2014, SuperMedia served a supplemental interrogatory response, explaining that SuperMedia "does not have copies of videos created for its customers by its contractors, nor of websites created for its customers by contractors, nor of social media pages it has created for its customers" and that it "does not retain the content of those ads on its system." (*Id.* at Exhibit E.)

**B.     The February 12, 2014 hearing.**

On February 12, 2014, the Court held a second telephonic hearing regarding various outstanding discovery issues. During that conference, SuperMedia reported to the Court that "the entire creation" of its websites is handled by third-party contractors such that SuperMedia "could not tell" the source of images used on such sites; SuperMedia simply "did not have the technology [or] the content that would have enabled us to do that." (Ex. C, Feb. 12, 2014 Tr. 11:6-21.) SuperMedia further explained to the Court that it does not have possession, custody, or control of the files underlying its digital ads: "[W]e do not supply artwork for these online advertising. Nor do we have them. The websites are hosted on the vendor's websites in the main. The Facebook Pages are on Facebook. The Google Plus are on Google. We don't have them." (*Id.* at 26:1-17.)

The Court did not order SuperMedia to search through its digital ads for YPPI's images during the February 12, 2014 hearing. To the contrary, the Court acknowledged the difficult situation SuperMedia was in with respect to information belonging to its third-party contractors:

THE COURT: Well, let me ask you this. I cannot impose upon SuperMedia an obligation to obtain the cooperation of their independent contractors. They don't control those people. So, I don't know how I could possibly impose that.

* * *

All right. Well, I don't think - I just don't know what more I can do to order discovery from SuperMedia that is not being accomplished and is in their [contractors'] hands . . . .

* * *

Well, the problem - the third parties are not SuperMedia's problem . . . .  I don't think that SuperMedia is in a position, they don't have control over these contractors sufficient to compel them to attend a deposition and answer your questions. I don't think there's any doubt about that.

(*Id.* at 16:22-17:4, 26:24-27:2, 29:6-12.)

In its present motion, YPPI claims that the Court "again ordered" SuperMedia at the February 12 hearing to search through its digital advertisements and produce responsive documents by February 19.  (*See* YPPI Mot. at 6.)  This is simply not true.  The brief exchange that YPPI cites for this proposition relates only to the production of certain documents that SuperMedia had in its possession. (*See* Ex. C, Feb. 12, 2014 Tr. 29:23-30:12 ("THE COURT: Mr. Cone, by what date would you be in a position to produce ***these documents that you have in your possession***?").)  The hearing transcript makes clear that the Court is referencing a particular set of 75,000 documents that SuperMedia's counsel had discussed earlier in the hearing.  (*Id.* at 11:21-12:1, 13:23-14:1 ("MR. CONE: . . . I am now currently looking at 75,000 pages of documents . . . ."; "When we finish our review of this very large collection of documents . . ."). The Court instructed SuperMedia to review and produce these 75,000 documents, but never instructed SuperMedia to search its digital ads for YPPI's images.

Nevertheless, on March 7, 2014, YPPI filed a motion seeking sanctions for SuperMedia's alleged failure to produce "documents pertaining to the websites and social media pages

containing Yellow Pages' images." [D.I. 67 at 9]. Among other things, YPPI requested that the Court "draw a negative inference" that "SuperMedia has been and is using Yellow Pages' images for digital advertising and has transferred those images to further vendors and Dex Media, as well as customers." (*Id.* at 21.)

On March 21, 2014, the Court issued a ruling on various discovery matters, but withheld ruling on YPPI's motion for sanctions, tabling that issue until after trial. [D.I. 74].

### C.    YPPI's third-party subpoenas to Hostopia and Web.com.

On March 3, 2014, prior to filing its sanctions motion, YPPI served subpoenas on SuperMedia's current and former web contractors, Web.com and Hostopia, requesting documents and testimony on the alleged use of YPPI's images in SuperMedia's website products. In response, both Web.com and Hostopia informed YPPI that they did not have any evidence that SuperMedia had sent them YPPI images. In fact, the only reliable evidence they did have suggested that no such transfers took place. For instance, Web.com's March 14, 2014 subpoena response stated that "Web.com Group, Inc. never imported any images from the SuperMedia partner into our gallery." (Ex. D, Web.com Response at 1.) Web.com's representative, Joan Oklevitch, confirmed this fact at her deposition on March 19, 2014:

> Q.    . . . Web.com Group, Inc., never imported any images from the SuperMedia partner into our gallery. Is that a correct statement, to the best of your knowledge?
>
> A.    Yes, to my knowledge.
>
> * * *
>
> Q.    Does Web.com have access to any stock libraries owned by SuperMedia or controlled by SuperMedia?
>
> A.    Not to my knowledge.

(Ex. E, Mar. 19, 2014 J. Oklevitch Dep. Tr. ("<u>Oklevitch Dep.</u>") at 29:21-30:7, 43:1-5, 44:1-4.)

Likewise, on March 26, 2014, Hostopia's representative, Susan Mays, confirmed that Hostopia only used three "stock image channels" to produce websites for SuperMedia:

> [W]e had three stock image channels that SuperMedia asked us to use so they were indicated in our contract with SuperMedia and I believe that they were licensed through SuperMedia and we used them on their behalf.

(Ex. F, Mar. 26, 2014 S. Mays Dep. Tr. ("Mays Dep.") at 39:19-40:18.)   Importantly, these channels did *not* include YPPI's images:

> Q.    . . . Was Yellow Pages Photo, Inc. one of the channels?
>
> A.    No.

(*Id.* at 40:15-18; *see also id.* at 58:16-59:4 (listing the three channels as "Jupiter Images, Art Today and the Animation Factory").)   In addition, both Web.com and Hostopia informed YPPI that they do not have the ability to search their systems or files to find the use of any particular stock images.   (*Id.* at 92:11-17 ("I would not say that it's possible to search for -- like do an image search the way you do Google Images."); Ex. D, Web.com Response at 1 (stating Web.com does not have "any way to identify/search for [images]").)

### D.    The April 2014 trial.

Trial of YPPI's Admin. Expense Motion was scheduled to begin on April 9, 2014.   On April 2, 2014, YPPI asked the Court to bifurcate the trial into separate liability and damages phases.  [D.I. 93].   According to YPPI, SuperMedia's failure to provide discovery "regarding use of Yellow Pages' images on other websites or social media pages" prevented YPPI from gathering the evidence it needed to put on a damages trial.   (*Id.* at 3.)   On April 4, 2014, the Court bifurcated the trial on YPPI's Admin. Expense Motion.  [D.I. 103].

On April 9, 10, and 11, 2014, the Court conducted a trial on the liability phase of YPPI's Admin. Expense Motion.   To convince the Court that there had been infringing uses of its images in SuperMedia's digital ads, YPPI introduced dozens of videos created by a SuperMedia

contractor named bieMedia. (Apr. 9, 2014 P.M. Tr. 28:15-38:24.) During the trial, YPPI

showed the Court numerous screenshots of bieMedia videos containing YPPI images, claiming

they were infringing uses of its images caused by SuperMedia's transfer of YPPI's images to

bieMedia. (*id.*; April 10, 2014 P.M. Tr. 48:21-52:16.) SuperMedia, however, has since learned

that YPPI previously licensed those very same images to bieMedia in 2005. Thus, these

bieMedia videos were not infringing uses at all.[2]

In addition to the bieMedia videos, YPPI called a computer forensics expert, Adam

Sharp, to testify about his Internet searches for YPPI's images across the websites and social

media sites of SuperMedia's customers. (*See id.* at 46:19-47:16.) Mr. Sharp claimed that he had

found "probably fifty" SuperMedia websites containing YPPI images:

> Q.   And switching gears to websites in the websites that you were able to
>       locate with YPPI images, did you see anything tying any of those websites
>       to SuperMedia?
>
> A.   Yes.
>
> Q.   About how many would you say?
>
> A.   I would say ***probably fifty*** -- fifty or so.

(*Id.* at 52:17-22.) Neither Mr. Sharp nor YPPI has identified or produced that list of 50 websites.

On April 16, 2014, the Court held a conference to address post-trial briefing and pending

discovery matters. At the hearing, the Court stated that, after it ruled on YPPI's Admin. Expense

Motion, YPPI could submit "a list of the types of documents that they didn't receive":

> Then, ***after I've made a ruling on this portion of the case*** and we begin to focus
> on the damages and perhaps as well the prepetition period, ***then we can talk
> about discovery again*** and we can decide, perhaps that ***YPPI submits, for
> example, a list of the types of documents they didn't receive.*** And I will

---

[2]   SuperMedia later filed a Rule 60(b) motion concerning material misrepresentations that YPPI and its counsel
made at the April 2014 trial regarding this and other matters. [D.I. 315]. On August 10, 2015, the Court
granted SuperMedia's Rule 60(b) motion, finding that YPPI's principal, Trent Moore, as well as YPPI's
lawyers, "hid" key documents and made material misrepresentations to the Court. [D.I. 356].

understand better having had held the trial, I will understand what types of information now YPPI is claiming it hasn't received and the significance of that evidence. *I will be able to understand, perhaps better, why SuperMedia says that just doesn't exist.* I just think that makes all the sense in the world at this point.

(Ex. G, Apr. 16, 2014 Tr. 19:25-20:11.)

On December 29, 2014, the Court issued an opinion and order denying YPPI's request for an administrative expense claim but finding that SuperMedia had breached its license during the pre-petition period. [D.I. 220].

### E.    SuperMedia initiates this adversary proceeding.

On January 12, 2015, SuperMedia filed an Adversary Complaint, initiating an adversary proceeding and formally objecting to YPPI's pre-petition Proof of Claim. [D.I. 1, 5, Adv. Proc. No. 15-50044 (KG)]. With the Court's December 29, 2014 opinion in hand, YPPI now took a very different attitude toward discovery, abandoning its prior demands for discovery on SuperMedia's digital ads. At the January 30, 2015 scheduling hearing for this proceeding, YPPI's counsel represented to the Court that no further discovery on SuperMedia's digital ads was needed because that issue had been rendered "moot" by the Court's December 29 opinion:

> So if the argument today is we need tons of discovery[,] the argument in opposition to our motion to compel discovery was they can't give us any information. And quite frankly, *I think that issue [the digital ads] is moot* largely because of your fact findings with respect to the violations.

(*See* Ex. H, Jan. 30, 2015 Tr. 34:23-36:1.)

YPPI's counsel went one step further, taking the position that there should be no additional fact discovery in connection with the damages trial and this adversary proceeding. As Mr. Timmerman stated: "Quite frankly, fact discovery is done. I think all that's left here is expert discovery . . . ." (*Id.* at 78:6-7; *see also id.* at 56:3-6 ("I don't hear any reason that justifies further fact discovery. I think fact discovery has all been done and I think the handout really clarifies that.").) As SuperMedia now knows, YPPI's "no discovery" position was designed to

prevent SuperMedia from learning the truth about YPPI's misrepresentations and false testimony during the April 2014 trial.

Despite YPPI's protestations, the Court allowed the parties to proceed with fact discovery, which began in early February 2015.  Notably, for months, YPPI never issued a *single* discovery request concerning the use of YPPI's images in SuperMedia's digital ads.  (*See* Ex. I, YPPI Discovery Requests.)  Nor did YPPI provide SuperMedia with a "list of the types of documents" that SuperMedia allegedly failed to produce during the first trial, as the Court had suggested.  In fact, YPPI sought no discovery in this proceeding concerning SuperMedia's digital ads until well after the Court resuscitated this issue with its May 7, 2015 sanctions order.

### F.    The Court's May 7, 2015 sanctions order.

On May 7, 2015, the Court issued a sanctions order, finding that SuperMedia had "produced a witness for deposition pursuant to Fed.R.Civ.P. 30(b)(6) who did not have the knowledge required and who lacked the information which the Court had ruled was relevant." [D.I. 297 at 1-2].  The Court also adopted YPPI's position that SuperMedia "failed to produce documents which the Court had ordered it to produce"—specifically, documents relating to the use of YPPI images in digital ads.  (*Id.*)  The order contained two sanctions: first, it compelled "compliance" with the Court's prior orders; second, it allowed YPPI to make an application for a "reasonable amount" of attorneys' fees and expenses to be imposed against SuperMedia.  (*Id.*)

On May 29, 2015, SuperMedia filed a letter with the Court seeking clarification as to its May 7, 2015 sanctions order.  (*See* Ex. A, Clarification Letter.)  In that letter, SuperMedia again explained to the Court that it does not have possession, custody, or control of the files underlying its digital ads, so it cannot collect, search, or produce documents relating to its digital ads.  (*Id.* at 2-3.)  To that end, in order to comply with the Court's May 7, 2015 order, SuperMedia offered to

retain, at its sole expense, a third-party vendor to search through SuperMedia's all of existing digital ads for YPPI's images. (*Id.* at 3-4.)

On June 5, 2015, YPPI submitted its own letter regarding SuperMedia's proposal. [D.I. 321]. Surprisingly, YPPI asked the Court to reject SuperMedia's proposed search of its digital ads. (*Id.* at 2 ("The Court should reject SuperMedia's request.").) Even though SuperMedia was offering to obtain, at its own expense, the very discovery that YPPI had requested, YPPI took the position that it no longer wanted this discovery. Instead, YPPI argued, again, that the Court should simply draw an adverse inference that SuperMedia "transferred all of Yellow Pages' images at issue in this matter to Web.com, Hostopia, Facebook, Google, SuperMedia's customers, and the general public." (*Id.* at 6.)

On June 9, 2015, the Court held a telephonic hearing to discuss SuperMedia's proposed search. During that hearing, the Court specifically asked YPPI whether SuperMedia's proposed search was acceptable: "I wonder if YPPI has had an opportunity to review that proposal and whether that would be acceptable." (Ex. J, June 9, 2015 Tr. 5:6-11.) YPPI ignored the Court's question and instead demanded sanctions. (*Id.* at 7:10-16, 31:4-5). In response, SuperMedia walked the Court through the record, showing definitively that the Court had never before ordered SuperMedia to search its digital ads, (*id.* at 8:25-9:5, 10:10-12:19, 29:5-21), and that the files comprising those ads are not within SuperMedia's possession, custody, or control, (*id.* at 8:6-9:15, 28:8-19). At the conclusion of the hearing, the Court rejected YPPI's request for an adverse inference, and found that SuperMedia's proposed search would fully satisfy the Court's sanctions order: "As far as the Court is concerned, let me be clear because I know Mr. Timmerman didn't answer the question, but as far as the Court is concerned, having read your proposed search, Mr. Leon, I am satisfied that it is in compliance with the sanctions order." (*Id.*

at 31:4-8.)  The Court then ruled that "***there would not be additional sanctions, if that search is performed***."  (*Id.* at 31:8-10.)

On June 9, 2015, the Court issued an Order stating that the proposed search "will fully satisfy SuperMedia's compliance obligations under the Court's Discovery Order." [D.I. 323].

### G.    SuperMedia completes and produces the results of the TinEye search.

Per the Court's ruling, SuperMedia retained one of the world's leading reverse image search vendors, Idée Inc. ("TinEye"), to search for YPPI's images in SuperMedia's digital ads. SuperMedia paid TinEye roughly $70,000 to perform the search.  On August 17, 2015, TinEye completed its search of SuperMedia's digital ads.  In accordance with the Court's prior orders, SuperMedia turned those results and related documentation over to YPPI.

TinEye's results confirmed what SuperMedia had long suspected: YPPI's images have been used in only a trivial number of SuperMedia's digital advertising products.  Out of roughly 60,000 SuperMedia websites and social media sites—which together contained 1,974,840 individual web pages and 1,078,877 images, (Ex. K, TinEye Report at 4)—TinEye found a grand total of only *57* distinct YPPI images:

| Website type | Number of stock images found | Number of websites the images appear on | Number of pages the images appear on |
|---|---|---|---|
| Small-business | 54 | 42 | 113 |
| Facebook page | 7 | 7 | 50 |
| Google+ page | 6 | 3 | 6 |
| **Total** | **57** | **52** | **169** |

(*Id.* at 6.)  All told, YPPI images account for less than ***0.0053%*** of the images used in SuperMedia's digital ads.

As it turns out, YPPI already knew that the results of the TinEye were not going to be good for YPPI. SuperMedia recently learned that Adam Sharp, YPPI's expert, has been regularly searching for YPPI's images on the Internet since 2012. (Ex. L, Oct. 29, 2015 A. Sharp Dep. Tr. ("Sharp Dep.") at 78:15-18, 83:16-23.) The search tool that Mr. Sharp uses, Google's reverse image platform, scours the billions of sites that appear on Google for any images that match the image submitted. (*Id.* at 57:23-58:6.) Using this tool, Mr. Sharp has searched for all 5,000 YPPI images at issue at regular intervals going all the way back to 2012. (*Id.* at 78:10-14.) Throughout all of those searches, Mr. Sharp testified that he has never seen more than ***60 YPPI images*** used in SuperMedia digital products. (*Id.* at 171:9-18, 214:4-7.) Notably, (and, ironically, in light of YPPI's spoliation allegations), Mr. Sharp admitted that he did not retain the ***vast majority*** of the webpages reflecting the results of his Internet searches—a sum he estimates to be "probably hundreds of thousands" of pages. (*Id.* at 40:7-12, 86:24-87:17.) That is, Mr. Sharp discarded results pages that contained "no results" (i.e., no uses of the particular YPPI image being searched) or "false positives." (*Id.* at 88:3-15.)

On June 22, 2015, weeks after Tin Eye completed its search, YPPI for the first time in this proceeding served discovery requests seeking information about SuperMedia's digital ads. YPPI has never served SuperMedia with a "list of the types of documents" that it supposedly did not receive from SuperMedia in connection with the first trial.

**H.  YPPI's renewed motion for contempt and sanctions.**

On November 4, 2015, just days before the start of the damages trial on YPPI's pre-petition Proof of Claim, YPPI filed the instant sanctions motion. (*See* YPPI Mot.) YPPI's motion parrots the same arguments it made in its June 5, 2015 letter brief, where it also sought an adverse inference because of SuperMedia's alleged spoliation of its digital ads. (*Compare id.* with [D.I. 321].) Notwithstanding that the Court considered, and denied, YPPI's sanctions

request at the June 9, 2015 hearing—and notwithstanding the Court's express admonition that there "would not be additional sanctions" if SuperMedia performed the TinEye search, (Ex. J, June 9, 2015 Tr. 31:8-9)—YPPI has renewed its request that the Court sanction SuperMedia in the form of an adverse inference.  Specifically, YPPI seeks an inference that all 5,000 YPPI images at issue were transferred to each of Hostopia, Web.com, Facebook, Google, SuperMedia's customers, and the general public as well as an order holding SuperMedia in contempt.  (*See* YPPI Mot. at 18.)  YPPI's frivolous motion should be denied.

## ARGUMENT

### I.    YPPI HAS NO LEGAL OR FACTUAL BASIS TO SEEK AN ADVERSE INFERENCE OR ANY OTHER SANCTIONS.

"An adverse negative inference is an extreme remedy."  *McAdams v. United States*, 297 F. App'x 183, 187 (3d Cir. 2008).  In the Third Circuit, a party seeking an adverse inference for spoliation must show that (1) "the evidence was in the party's control"; (2) "the evidence is relevant to the claims or defenses in the case"; (3) "there has been actual suppression or withholding of evidence"; and (4) "the duty to preserve the evidence was reasonably foreseeable to the party."  *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).  In addition, the moving party must point to "concrete evidence" that "suggests that the lost documents would have been favorable to their case."  *In re Adams Golf, Inc., Sec. Litig.*, 618 F. Supp. 2d 343, 352 (D. Del. 2009).  YPPI cannot satisfy a single one of these elements, let alone all of them.

### A.    SuperMedia had no duty to preserve the documents comprising its digital products because those documents were not within its control.

A party seeking spoliation sanctions must first show that the evidence in question was "within the [non-moving] party's control."    *Brewer*, 72 F.3d at 334.  Where, as here, the documents are in the physical possession of a third party, courts have defined "control" to mean

"evidence that the party has the legal right, authority, or practical ability to obtain by virtue of its relationship with the party in possession of the evidence." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y.) *opinion adopted,* 271 F.R.D. 55 (S.D.N.Y. 2010).

The record here is undisputed that SuperMedia does not have the legal or practical ability to obtain the documents comprising SuperMedia's digital products. Chuck Ward, SuperMedia's former Senior Manager for Operations for Digital Creative Fulfillment, previously submitted a declaration to this Court stating that the actual documents that "make up" SuperMedia's websites "reside on webservers owned and operated by the vendors." (Ex. A, Clarification Letter at Ex. C ¶ 4.) Critically, "***SuperMedia does not have internal access to the webservers owned by the vendors***, which house the documents that comprise these website products." (*Id.*) Nor does SuperMedia have the right to access the servers housing its social media products, which are owned by Facebook and Google. (*Id.* ¶ 5.) Because SuperMedia does not have access to these files, it is unable to collect and search those files through conventional means. (*Id.* ¶¶ 4-5.)

Mr. Ward's declaration remains unrebutted. YPPI does not, and cannot, point to any evidence that SuperMedia has control over digital ads that indisputably reside on third-party servers. Instead, YPPI ***insists***, without any support, that SuperMedia "has access to its website contractors' systems, owns the work product created by them, and has the right to their work product." (YPPI Mot. at 9.) But this is argument, not evidence. *Fromm v. MVM, Inc.*, 371 F. App'x 263, 270 (3d Cir. 2010) ("[A]rguments are not evidence."). The only evidence YPPI cites for its conclusory assertion is two short, vague passages from Web.com and Hostopia's third-party depositions, and unexplained excerpts from two outdated vendor agreements relating to copyright ownership. (YPPI Mot. at 9 n.4.) Taken together, this evidence stands for the unremarkable propositions that (i) SuperMedia owns copyrights in certain work created by some

of its former web contractors, and (ii) SuperMedia might have access to one of Web.com's online design tools. (*Id.*) Tellingly, YPPI never explains why having a contractual right to copyrights or access to some online design tool somehow bestows upon SuperMedia the right to access its contractors' internal servers or obtain documents from those servers.

During the November 2015 damages trial, YPPI called Adam Sharp to testify as to SuperMedia's alleged failure to preserve its digital ads. (Ex. M, Nov. 18, 2015 Trial Tr. 113:15-20, 121:3-17.) Yet, when questioned regarding the bases for his belief that SuperMedia had failed to preserve digital ads, Mr. Sharp admitted that he did not know who SuperMedia's contractors were, what sorts of arrangements they had with SuperMedia (if any), where the files comprising SuperMedia's digital ads actually sit, who owns the computers on which they sit, and whether SuperMedia had any right to access those files. (*Id.* at 127:25-128:4; 129:14-130:10.) Thus, there is no evidence that SuperMedia had "control" over these documents such that the Court could ever find spoliation or draw an adverse inference. *Brewer*, 72 F.3d at 334.

If SuperMedia had the ability to obtain the documents underlying its digital ads from the third party servers on which they reside, it would have done so in response to the May 7, 2015 sanctions order. Indeed, that would have been a much less expensive alternative than hiring TinEye to perform a search for YPPI's images across all of SuperMedia's digital ads. SuperMedia, however, was forced to hire TinEye precisely because it does not have the ability to access these third party servers.

## B.    YPPI's claim that the so-called "lost" evidence is relevant contradicts its own representations to this Court.

In support of its sanctions motion, YPPI must also credibly demonstrate that the evidence at issue is relevant to the claims or defenses in the case. *Bull*, 665 F.3d at 73. YPPI cannot make

such a showing. Indeed, YPPI's own prior representations make clear that the evidence concerning SuperMedia's digital ads is of no import in this case.

While YPPI now claims that the documents comprising SuperMedia's digital ads are "unquestionably relevant," (YPPI Mot. at 14-15), that is not what YPPI told the Court earlier this year. On January 30, 2015, at the scheduling conference for this proceeding, YPPI's counsel represented to the Court that discovery relating to the use of YPPI's images in SuperMedia's digital ads was "moot." (Ex. H, Jan. 30, 2015 Tr. 35:24-36:1.) In fact, YPPI told the Court that the *only* discovery it needed for its damages case was a "brief," "limited" period of expert discovery. (*Id.* at 36:9-13.) As Mr. Timmerman stated:

> I don't hear any reason that justifies further fact discovery. I think fact discovery has all been done . . . . I think all that is left, and Mr. Berman said this is to the extent that the experts need to do any updates based on the Court's findings and depositions of those experts . . . . That is about it. I think everybody should be ready for trial.
>
> * * *
>
> Quite frankly, fact discovery is done. I think all that's left here is expert discovery.

(*Id.* at 56:3-14, 78:6-7.)

Even after the Court permitted the parties to conduct fact discovery, YPPI did not pursue any discovery relating to SuperMedia's digital ads. YPPI did not provide SuperMedia with a "list of the types of documents" relating to SuperMedia's digital ads as the Court had suggested. (Ex. G, Apr. 16, 2014 Tr. 19:25-20:11.) And YPPI did not issue a single interrogatory or document request concerning SuperMedia's digital ads until well after the Court issued its May 7, 2015 sanctions order. (*See* Ex. I, YPPI Discovery Requests.)

The results of the TinEye search further undercut any claims of relevance here. YPPI's images represent just 0.0053% of the images used in the 60,000 digital ads that TinEye searched.

While the likelihood that there are digital ads that once used a YPPI image but have now been "lost" is not exactly zero, it is hard to get much closer.

### C.    YPPI has not even attempted to show that SuperMedia intentionally withheld or suppressed any of the evidence at issue.

In the Third Circuit, "no unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise accounted for." *Brewer*, 72 F.3d at 334. A showing of "actual suppression or withholding" requires evidence that "***indicates fraud and a desire to suppress the truth*** . . . ." *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983). Evidence of this sort of "bad faith" is "***pivotal*** to a spoliation determination." *Bull*, 665 F.3d at 79. Thus, the failure to present evidence of fraudulent intent is fatal to any claim of spoliation. *See In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d 568, 579 (3d Cir. 2007) (no spoliation where "[t]here is no evidence that Hechinger intentionally destroyed documents that it knew would be important or useful to UFP in defending against a preference action"); *Muzzleman v. Nat'l Rail Passenger Corp.*, 839 F. Supp. 1094, 1098 (D. Del. 1993) ("Plaintiff has proffered no evidence Amtrak has actually suppressed or withheld the requested work and inspection records. Absent such a showing, the Court will deny the requested adverse inference jury instruction.").

YPPI does not even attempt to meet this burden. Nowhere in YPPI's 22-page motion does YPPI even argue, let alone offer evidence, that SuperMedia intentionally suppressed or withheld any documents relating to its digital ads to "prevent it from being used" by YPPI. For this reason alone, YPPI's motion should be denied. *See United States v. Nelson*, 481 F. App'x 40, 42 (3d Cir. 2012) ("[W]here there is no showing that the evidence was destroyed in order to prevent it from being used by the adverse party, a spoliation instruction is improper."); *Robocast, Inc. v. Microsoft Corp.*, No. CV 10-1055-RGA, 2014 WL 789086, at *2 (D. Del. Feb. 25, 2014)

("[I]n order for a spoliation instruction to be proper in this case, there must be a showing that Microsoft destroyed, or was willfully blind to the destruction of, the Sports Channel source code, in order to prevent its use by Robocast.").

YPPI's failure to show the intentional destruction of evidence is no accident.  As noted, the documents comprising SuperMedia's digital ads reside on servers owned by third parties. (Ex. A, Clarification Letter at Exhibit C ¶¶ 4-5.)  It is difficult to imagine how SuperMedia could have intentionally withheld, suppressed, or destroyed such documents when they were not in its possession, custody, or control in the first place.  In order to cause the destruction or suppression of such documents, SuperMedia would have had to reach out to the actual third parties that own these servers, and *request* that those third parties destroy or withhold those documents from YPPI.  There is no evidence in the record that anything like that ever occurred.

Putting aside the fact that the documents at issue were not within SuperMedia's control, the very notion that SuperMedia would intentionally destroy or suppress any of the documents relating to its digital ads in order to hide such evidence from YPPI defies reason.  It is important to remember that SuperMedia's digital ads are ordered and paid for by ***SuperMedia's customers***. It would be bad for business, to say the least, if SuperMedia started unilaterally removing or deleting the ads of its paying customers.  The notion that SuperMedia would torpedo its own customer relations in this way becomes even more nonsensical considering that, even according to YPPI's own sky-high valuation of its images, the penalty for using one of YPPI's images in a digital ad would be, at most, $132 per image.  It is patently absurd to think that SuperMedia would intentionally delete the ad of a paying customer to avoid paying, at most, $132.  That explains why YPPI has not, and cannot, offer any evidence that SuperMedia destroyed or suppressed any documents relating to its digital ads.

To the extent YPPI is suggesting that SuperMedia's web contractors ever modified or deleted any of the documents in the course of creating or managing the digital ads they host, that does not amount to spoliation.  Courts in this Circuit have universally held that documents lost in the course of "normal activities of a business"—absent some other affirmative evidence of fraud—cannot amount to spoliation.  *See St. Clair Intellectual Prop. Consultants, Inc. v. Toshiba Corp.*, No. CV 09-354-LPS, 2014 WL 4253259, at *5 (D. Del. Aug. 27, 2014) ("[T]he Court is not persuaded that St. Clair and Vadem's destruction of the boxes of information was due to anything worse than inadvertence, negligence, inexplicable foolishness, or part of the normal activities of business or daily living."); *Hicks v. Wegmans Food Mkt.*, No. CIV.A. 09-624 JEI/AM, 2011 WL 499368, at *2 (D.N.J. Feb. 10, 2011) (no spoliation where "Defendant destroyed the File pursuant to its ordinary document retention practices" and there was "no evidence that the destruction was in bad faith"); *Brewer*, 72 F.3d at 334 (no spoliation "where the destruction was a matter of routine with no fraudulent intent"); *Jacobs v. City of Pittsburgh*, No. CIV.A. 08-470, 2015 WL 7009443, at *19 (W.D. Pa. Nov. 12, 2015) (same).

### D.    SuperMedia cannot preserve documents it does not "control."

Next, YPPI must show that SuperMedia had a "duty to preserve" the evidence in question and that that duty was "reasonably foreseeable."  *Bull*, 665 F.3d at 73.  But, as SuperMedia has already explained, the documents in question were never in its possession, custody, or control to begin with.  Thus, SuperMedia had neither the duty nor the ability to preserve them.  YPPI's only retort is that, even if these ads were not in SuperMedia's control, SuperMedia could have used its "thousands of employees" and "manually" visited each site and preserved them one-by-one.  (YPPI Mot. at 21.)  This argument is specious.  Even if these documents were within SuperMedia's possession (which is not the case), "a litigant is under no duty to keep or retain every document in its possession . . . ."  *Scott v. IBM Corp.*, 196 F.R.D. 233, 249 (D.N.J. 2000),

as amended (Nov. 29, 2000).  SuperMedia's 60,000 digital ads contain, at a minimum, 1,974,840

individual web pages and 1,078,877 images, which amounts to 3,053,717 documents.  (Ex. K,

TinEye Report, at 4.)  Nothing in the case law required SuperMedia to "manually" make copies

of millions of publicly-available documents beyond its possession, custody and control.

> **E.** **YPPI does not have any evidence, let alone "concrete" evidence, as to what the alleged "lost" evidence here might have shown.**

In order to obtain a spoliation inference, YPPI must also provide evidence that the

allegedly spoliated evidence would have been "useful" or "favorable"; failure to do so means

there is no "prejudice" to the movant and no basis for such a sanction.  *In re Hechinger Inv. Co.*

*of Delaware, Inc.*, 489 F.3d 568, 579 (3d Cir. 2007) (no spoliation where "there is no evidence

that any of the documents destroyed would have been useful to UFP"); *see also Schmid v.*

*Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994) (no spoliation where movant "has not

come forward with plausible, concrete suggestions as to what that [lost] evidence might have

been").  Mere speculation as to what the lost material might have been is not enough.  Rather, the

movant must provide "concrete evidence" that the evidence would have been favorable.  *In re*

*Adams Golf, Inc.*, 618 F. Supp. 2d at 351-52 ("The plaintiffs have failed to point to any concrete

evidence that suggests that the lost documents would have been favorable to their case.").

There is no such evidence here.  YPPI has made no showing whatsoever as to what the

allegedly "lost" evidence might have been.  To the contrary, YPPI's expert, Mr. Sharp, conceded

at his deposition that he has no idea what has actually been "lost."  Among other things, Mr.

Sharp admitted that he does not know how many websites or social media sites SuperMedia had

from year to year, (Ex. L, Sharp Dep. at 204:14-17, 205:6-8); how many such sites have been

added or created each year, (*id.* at 204:19-21, 205:9-11, 205:21-24, 206:1-4); how many sites

have gone down each year, (*id.* at 204:25-205:4, 205:12-14); how many digital artists work on

such sites, (*id.* at 205:15-20); how many stock images the digital artists have access to or where those images come from, (*id.* at 206:6-20); or even if any digital artists ever had access to YPPI's images, (*id.* at 207:2-7 ("I don't have a clue what you're talking about")).  Nevertheless, YPPI now demands that the Court infer that SuperMedia transferred "***all of Yellow Pages' images at issue*** in this matter to Web.com, Hostopia, Facebook, Google, SuperMedia's customers, and the general public . . . ."  (YPPI Mot. at 18.)  There is simply no basis for such an inference.  YPPI's "fertile imagination" alone is not enough.  *In re DaimlerChrysler AG*, No. CIV.A. 00-993-JJF, 2003 WL 22951696, at *2 (D. Del. Nov. 25, 2003) (party asserting spoliation "must show a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the [lost material] would have produced evidence favorable to his cause").

Far from supporting an inference that SuperMedia transferred all 5,000 images to its web hosts, the record evidence specifically contradicts it.  Both Web.com and Hostopia confirmed that SuperMedia never transferred or gave them access to YPPI's images.  (Ex. E, Oklevitch Dep. at 29:21-30:7, 43:1-5; Ex. F, Mays Dep. at 39:19-40:18.)  And TinEye found only 57 YPPI images across all of SuperMedia's digital products.  (Ex. K, TinEye Report at 6.)  The evidence likewise refutes any notion that SuperMedia transferred all 5,000 YPPI images to Facebook, Google, SuperMedia's customers and the general public.  The only way for such a transfer to occur would be if SuperMedia actually published all 5,000 YPPI images on both Google+ and Facebook.  After searching SuperMedia's roughly 30,000 social media sites, however, TinEye found exactly ***seven*** YPPI images on Facebook and ***six*** on Google+.  (*Id.* at 4-6.)

YPPI's requested inference is most directly belied by the testimony of its own expert, Mr. Sharp, who recently admitted that he has been diligently searching for YPPI's images online since 2012.  (Ex. L, Sharp Dep. at 76:13-77:1, 77:25-14, 84:13-86:23, 100:15-102:11, 143:20-

144:9.)  In all that time, Mr. Sharp has found no more than 60 YPPI images in SuperMedia digital ads.  (*Id.* at 171:1-18, 213:25-214:7.)  YPPI cannot credibly ask the Court to make an inference that contradicts the evidence adduced by its own expert.

## II.  YPPI HAS NOT EVEN ATTEMPTED TO SATISFY THE STANDARD FOR A CONTEMPT ORDER.

Based on the caption of its motion, YPPI also appears to be asking the Court to enter a contempt order against SuperMedia.  (*See* YPPI Mot. at 1.)  Despite the drastic nature of this request, YPPI has not even bothered to cite the standard it must satisfy for the Court to enter such an order; instead, YPPI has simply peppered in the word "contempt" from time to time throughout its motion.  (*See generally id.*)  This half-hearted effort fails.  A party seeking a civil contempt order must demonstrate that "(1) there is a valid order of the court; (2) the person charged with contempt had actual knowledge of the order; and (3) the person disobeyed the order" and that he did so "willfully."  *In re Mariner Post-Acute Network*, 329 B.R. 481, 486-87 (Bankr. D. Del. 2005).  Notably, these elements must be established by "clear and convincing evidence."  *Id.* at 486.

Again YPPI does not even come close.  The only potential basis for YPPI's request is its belief that "SuperMedia was twice ordered—at the conclusion of telephonic discovery hearings conducted in January and February of 2014—to search for and produce documents" relating to the use of YPPI's images in SuperMedia's digital ads.  (YPPI Mot. at 1.)  As discussed above, the Court did not order any such search at any point prior to the first trial.  The only specific order relating to SuperMedia's digital products issued by the Court was the May 7, 2015 sanctions order.  In response to that order, SuperMedia proposed to engage TinEye to perform a search across all of SuperMedia's digital products.  [D.I. 311].  The Court approved SuperMedia's proposal.  (Ex. J, June 9, 2015 Tr. 31:4-9.)  In accordance with the Court's order,

SuperMedia completed and turned over the results of the TinEye search on or about August 17, 2015. (*See* YPPI Mot. at 12.) On this record, there is no basis for YPPI to seek any type of contempt order. YPPI's decision to include such a request is not well taken.

## III.    YPPI'S MOTION FOR CONTEMPT AND SANCTIONS IS FRIVOLOUS.

At some point, this chapter of the case has to end. YPPI is requesting the very same relief, and relying on the very same arguments, that this Court already rejected just six months ago at the June 9, 2015 hearing. (Ex. J, June 9, 2015 Tr. 31:1-9.) Notwithstanding the Court's express admonition at that hearing that there "would not be additional sanctions" if SuperMedia performed the TinEye search, (*id.* at 31:8-10), YPPI is now seeking the exact same relief based on the exact same arguments.

YPPI's motion pushes the bounds of ethical advocacy. Courts have held that "[i]t is essential to maintain the line between vigorous advocacy [] and frivolous conduct." *All. to End Repression v. City of Chicago*, 899 F.2d 582, 583 (7th Cir. 1990). "Hair-trigger motions for sanctions by lawyers who do not recognize this difference are themselves sanctionable." *Id.* (awarding attorneys' fees ***against*** the prevailing party for improperly seeking sanctions against the losing party); *Bond v. Am. Med. Ass'n*, 764 F. Supp. 122, 126 n.3 (N.D. Ill. 1991) ("[A] frivolous motion for sanctions is, in itself, sanctionable."); *Harman v. City of Univ. Park*, No. 3:94-CV-2450-P, 1997 WL 53120, at *1 (N.D. Tex. Feb. 3, 1997) ("A motion for sanctions that crosses the line of vigorous advocacy into frivolous conduct is itself sanctionable."). This is the third time YPPI has asked for this particular adverse inference. And, by SuperMedia's count, this is at least the ***nineteenth*** time in this case that YPPI has accused SuperMedia in a pleading or at argument of disobeying a Court order, hiding documents, or some other allegedly

sanctionable conduct.[3]   This has to stop.   YPPI's motion should be denied, and SuperMedia should be awarded the fees and costs incurred in responding to YPPI's frivolous motion.

## CONCLUSION

For the foregoing reasons, SuperMedia respectfully requests that the Court deny YPPI's Motion for Contempt and Sanctions in full and award SuperMedia its fees and costs in connection with opposing this motion.

---

[3]   Ex. C, Feb. 12, 2014 Tr. 15:23-17:11 (accusing SuperMedia of colluding with bieMedia to cause delay and seeking "some sort of adverse inference against SuperMedia about that" despite having no evidence; "MR. TIMMERMAN (TELEPHONIC): Yeah, I do not have any [evidence] of that."); D.I. 67 (Rule 37 motion for default, adverse inference, fees, and other sanctions); D.I. 96 (Rule 37 motion to exclude); D.I. 93 (accusing SuperMedia of not producing documents "ordered by this Court"); D.I. 131 (accusing SuperMedia of withholding discovery "notwithstanding this Court's orders"); D.I. 206 ("SuperMedia refused to comply with the Court's [orders]."); Mar. 24, 2015 Tr. 13:3-5, 27:21-28:3 (claiming SuperMedia "didn't provide us any discovery" and "didn't share any of [documents] with us in violation of [the Court's] orders"); D.I. 194 (Rule 37 motion to exclude); Ex. N, May 5, 2015 Tr. 22:2-21, 23:6-26:22 (accusing SuperMedia of "slow-rolling" documents that had already been produced); D.I. 47, Adv. No. 15-50044 (KG) (spoliation); D.I. 61, Adv. No. 15-50044 (KG) (spoliation); Ex. J, June 9, 2015 Tr. 31:4-5 (seeking adverse inference for spoliation); July 15, 2015 Tr. 7:5-18 (spoliation); D.I. 83, Adv. No. 15-50044 (KG) (accusing SuperMedia of violating Bankruptcy Rule 9011); D.I. 91, Adv. No. 15-50044 (KG) (accusing SuperMedia of violating Bankruptcy Rule 9011); D.I. 95, Adv. No. 15-50044 (KG) (Rule 37 motion to strike documents SuperMedia allegedly withheld); D.I. 102, Adv. No. 15-50044 (KG) (withdrawing its own prior Rule 37 motion because YPPI had at least one of the documents); D.I. 142, Adv. No. 15-50044 (KG) (spoliation); D.I. 128, Adv. No. 15-50044 (KG) (contempt and sanctions for spoliation); Ex. O, Nov. 16, 2015 Trial Tr. 6:9-12:6, 144:6-145:13 (accusing SuperMedia of withholding document that YPPI itself had requested and received from Hostopia).

Dated: December 11, 2015
      Wilmington, Delaware

KIRKLAND & ELLIS LLP
Eric F. Leon, P.C.
Kuan Huang
Andrew C. Orr
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

/s/ Patrick A. Jackson
Pauline K. Morgan (Bar No. 3650)
Patrick A. Jackson (Bar No. 4976)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Counsel to SuperMedia LLC*