## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SuperMedia LLC, | ) Case No. 13-10546 (KG) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| SuperMedia LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Adv. Proc. No. 15-50044 (KG) |
| Yellow Pages Photos, Inc., | ) |
| | ) **Re: Docket No. 171** |
| Defendant. | ) |

## YELLOW PAGES PHOTOS, INC.'S ANSWERING POST-TRIAL BRIEF

Lucian B. Murley (DE Bar No. 4892)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6898
Facsimile: (302) 421-5873
lmurley@saul.com

Steven M. Berman
Hugo S. "Brad" deBeaubien
J. Todd Timmerman
Mindi M. Richter
SHUMAKER, LOOP & KENDRICK, LLP
Bank of America Plaza
101 E. Kennedy Boulevard, Suite 2800
Tampa, FL  33602
Telephone:  (813) 229-7600
Facsimile:  (813) 229-1660
sberman@slk-law.com
bdebeaubien@slk-law.com
ttimmerman@slk-law.com
mrichter@slk-law.com

*Co-Counsel to Yellow Pages Photos, Inc.*

Dated:  January 28, 2016

649002.1 01/28/2016

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND AND PROCEDURAL POSTURE ................................................ 5

STATEMENT OF FACTS ........................................................................................ 7

ARGUMENT ............................................................................................................ 23

    A.    Yellow Pages' Damages ................................................................. 23

        1.    Actual Damages ................................................................. 23

            a.    The value of SuperMedia's violative transfers of Yellow Pages' images is $132.00 per image ........................................ 24

            b.    Yellow Pages is entitled to actual damages in the amount of $132.00 per image for each improper transfer .................... 29

            c.    In proving actual damages, Yellow Pages is not required to show lost sales or licensing opportunities ........................... 32

            d.    SuperMedia has no testimony, expert or otherwise, to counter Mr. Oscher's valuation of damages for any infringement that occurred prior to 2010 ................................ 35

            e.    Ellen Boughn's extreme assertions that Yellow Pages' images are essentially worthless fall quickly when compared with the actual facts ................................................. 36

            f.    Ellen Boughn's subjective opinions on the quality of Yellow Pages' images lack credibility ...................................... 39

            g.    Yellow Pages' images cannot be compared to images in the general stock photography industry as a whole ............. 43

            h.    Ms. Boughn's opinion that the value of a hypothetical license fee to add the right to transfer is $0.00 is nonsensical . 45

        2.    Statutory Damages ................................................................. 47

            a.    SuperMedia is judicially estopped from asserting that there was any default under the Service Agreement prior to its assumption in the Idearc Bankruptcy ............................. 49

i.  Idearc took the position in the Idearc bankruptcy that there were no uncured monetary or non-monetary defaults under the Service Agreement, and no other compensation for actual pecuniary loss was owed, and thus Idearc was permitted to assume the Service Agreement ................................................................... 51

ii.  SuperMedia is judicially estopped from now taking the position that there *were* monetary or non-monetary defaults under the Service Agreement prior to assumption of the Service Agreement in the Idearc bankruptcy ................................................................... 53

b.  All of SuperMedia's breaches occurred after the registration of Yellow Pages' copyrights in the Licensed Images ..................................................................................... 55

c.  SuperMedia's copyright infringement was willful, and statutory damages should be enhanced .................................... 61

B.  Yellow Pages is a party to the Service Agreement and entitled to damages for SuperMedia's breaches of the Agreement, as well as attorneys' fees and costs under the Agreement ........................................................................ 64

C.  No claims for SuperMedia's breaches of the Service Agreement and ensuing infringement were discharged in the Idearc bankruptcy ................... 68

1.  Neither Yellow Pages nor AdMedia received adequate notice of Idearc's intent to assume the Service Agreement nor of the cure amount proposed in connection with such assumption ................ 68

2.  Even if Yellow Pages or AdMedia did receive adequate notice of Idearc's intent to assume the Service Agreement and the cure amount proposed, they were not otherwise aware of the potential existence of defaults which Idearc needed to cure in order to assume the Service Agreement and thus cannot be bound by the $0.00 cure amount .......................................................... 72

3.  SuperMedia's contention that Idearc's proposed $0.00 cure amount is binding on Yellow Pages or AdMedia is also belied by a plain reading of the Bankruptcy Code ......................................... 74

D.  Neither Yellow Pages nor AdMedia knew, or had reason to know, of any of SuperMedia's or its predecessors' breaches or ensuing copyright infringement until 2011 ................................................................ 75

CONCLUSION ............................................................................................................. 77

ii

# TABLE OF AUTHORITIES

**Page**

## Cases

A & N Music Corp. v. Venezia,
    733 F.Supp. 955 (E.D. Pa. 1990) ..................................................................48

AFL Telecomms. LLC v. SurplusEQ.com Inc.,
    946 F. Supp. 2d 928 (D. Ariz. 2013) ...........................................................25

Baker v. Urban Outfitters, Inc.,
    254 F. Supp. 2d 346 (S.D.N.Y. 2003).......................................................25, 32

Banff Ltd. v. Express, Inc.,
    921 F. Supp. 1065 (S.D.N.Y. 1995)..............................................................32

Berckeley Inv. Group, Ltd. v. Colkitt,
    455 F.3d 195 (3d Cir. 2006)..........................................................................55

Bishop v. Wick,
    No. 88 C 6369, 1988 WL 166652 (N.D. Ill. Dec. 29, 1988) .....................30

Broadcast Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.,
    555 F. Supp. 2d 537 (E.D. Pa. 2008) ...........................................................62

Bruce v. Weekly World News, Inc.,
    310 F.3d 25 (1st Cir. 2002)...........................................................................46

Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,
    259 F.3d 1186 (9th Cir. 2001) ......................................................................63

Cottman Trans. Sys., LLC v. FVLR Enter., LLC,
    295 S.W.3d 372 (Tex. App. 2009).................................................................67

Deltak, Inc. v. Advanced Systems, Inc.,
    767 F.2d 357 (7th Cir. 1985) ...............................................................passim

Eckland Consultants, Inc. v. Ryder, Stilwell Inc.,
    176 S.W. 3d 80 (Tex. App. 2004).................................................................68

F.E.I. Pub., Ltd. v. Catholic Bishop of Chicago,
    754 F.2d 216 (7th Cir. 1985) .......................................................................30

F.W. Woolworth Co. v. Contemporary Arts, Inc.,
    344 U.S. 228 (1952)................................................................................47, 48

Getaped.com, Inc. v. Cangemi,
    188 F. Supp. 2d 398 (S.D.N.Y. 2003).......................................................23, 24

iii

*Hoover v. Gregory,*
   835 S.W.2d 668 (Tex. App. 1992)..................................................................75

*Inmuno Vital, Inc. v. Telemundo Grp., Inc.,*
   203 F.R.D. 561 (S.D. Fla. 2001)...................................................................63

*In re Cellnet Data Sys., Inc.,*
   313 B.R. 604 (Bankr. D. Del. 2004) ................................................52, 53, 72, 73

*In re Claremont Acquisition Corp., Inc.,*
   113 F.3d 1029 (9th Cir. 1997) ......................................................................51

*In re Empire Equities Capital Corp.,*
   405 B.R. 687 (Bankr. S.D.N.Y. 2009)..........................................................51

*In re Hathaway,*
   401 B.R. 477 (Bankr. W.D. Wash. 2009).....................................................72

*In re Idearc Inc., et al.,*
   Case No. 09-31828(BJH) (Bankr. N.D. Tex. 2009) ...................................18

*In re National Gypsum,*
   208 F.3d 498 (5th Cir. 2000) ...................................................................69, 71

*In re Oparaji,*
   698 F.3d 231 (5th Cir. 2012) .......................................................................51

*In re Paoli R.R. Yard PCB Litig.,*
   35 F.3d 717 (3d Cir. 1994)...........................................................................41

*In re Sportsman's Warehouse, Inc.,*
   2013 WL 492554 (Bankr. D. Del. Feb. 7, 2013) ...................................72, 73

*In re Texas Rangers Baseball Partners,*
   521 B.R. 134 (Bankr. N.D. Tex. 2014).........................................................69

*Int'l Korwin Corp. v. Kowalczyk,*
   855 F.2d 375 (7th Cir. 1988) ........................................................................49

*Jacobson v. DP Partners Ltd. P'ship,*
   245 S.W. 3d 102 (Tex. Ct. App. 2008).........................................................66

*Jarvis v. K2 Inc.,*
   486 F.3d 526, 535 (9th Cir. 2007) ...............................................................26

*Joseph J. Legat Architects, PC v. United States Development Corporation,*
   1991 WL 38714 (N.D. Ill. March 20, 1991)............................................24, 33

iv

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003)....................................................................50, 53, 54, 55

*Leonard v. Stemtech Health Sciences, Inc.*,
    2011 WL 6046701 (D. Del. Dec. 5, 2011)................................................................49

*Leonard v. Stemtech Health Sciences, Inc.*,
    2013 WL 5311295 (D. Del. Sept. 23, 2013)......................................................*passim*

*Leonard v. Stemtech Health Sciences, Inc.*,
    2015 WL 4778827 (D. Del. Aug. 13, 2015) .........................................................23, 24, 32

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
    306 F. App'x 781 (3d Cir. 2009) ............................................................................41

*Microsoft Corp. v. Gonzales*,
    2007 WL 2066363 (D.N.J. July 13, 2007).............................................................48

*Multitherm Corp. v. Fuhr*,
    1991 WL 146233 (E.D. Pa. July 24, 1991)............................................................32

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001)...............................................................................*passim*

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) .................................................................................25

*Ringgold v. Black Enter. Television*,
    126 F.3d 70 (2d Cir. 1997).....................................................................................33

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996).....................................................................................50

*Semerdjian v. McDougal Littell*,
    641 F. Supp. 2d 233 (S.D.N.Y. 2009).....................................................................25

*Smith v. Stericycle, Inc.*,
    538 F. Supp. 2d 960 (W.D. Tex. 2008)....................................................................67

*Sun Exploration and Production Co. v. Benton*,
    728 S.W.2d 35 (Tex. 1987).....................................................................................67

*Sundaram v. Nemeth*,
    2008 WL 80017 (E.D. Tex. Jan. 7, 2008)...............................................................66

*Szekely v. Eagle Lion Films, Inc.*,
    242 F.2d 266 (2d Cir. 1957)...................................................................................33

*Taylor v. Meirick,*
    712 F.2d 1112 (7th Cir. 1983) .................................................................77

*Teri Woods Pub., LLC v. Williams,*
    2013 WL 6179182 (E.D. Pa. Nov. 25, 2013) ......................................47

*Universal City Studios, Inc. v. Ahmed,*
    1994 WL 185622 (E.D. Pa. May 13, 1994) ................................. 48-49

*Webloyalty.com, Inc. v. Consumer Innovations, LLC,*
    388 F. Supp. 2d 435 (D. Del. 2005) ...................................................62

*William A. Graham Co. v. Haughey,*
    646 F. 3d 138 (3d Cir. 2011) ...................................................... 75, 76

*Williams v. Metzler,*
    132 F.3d 937 (3d Cir. 1997) ...............................................................66

*Withrow v. Spears,*
    967 F. Supp. 2d 982 (D. Del. 2013) ...................................................41

**Statutes**

11 U.S.C. § 365 ................................................................................................68

11 U.S.C. § 365(b) ...........................................................................................74

11 U.S.C. § 365(b)(1)(A) ..........................................................................51, 74

11 U.S.C. § 365(b)(1)(B) ..........................................................................51, 53

17 U.S.C. § 106 .............................................................................................1, 30

17 U.S.C. § 504 ................................................................................................47

17 U.S.C. § 504(a) ...........................................................................................23

17 U.S.C. § 504(c) ...........................................................................................23

17 U.S.C. § 507 ................................................................................................75

Federal Rule of Civil Procedure 32(a)(3) .......................................................61

Tex. Civ. Prac. & Rem. Code Ann. § 16.004 .................................................75

## I.    INTRODUCTION

One of the exclusive rights granted to owners of copyrighted works under 17 U.S.C. § 106 is the right to distribute copies of the works. After the first trial in April 2014 ("2014 Trial"), this Court concluded that SuperMedia LLC ("SuperMedia") and its predecessors Verizon Directories, Inc. ("Verizon") and Idearc Media, Inc. ("Idearc") willfully violated both their license and Yellow Pages Photos, Inc.'s ("Yellow Pages") exclusive right of distribution by transferring copies of the 5,000 copyrighted photographic images at issue ("Licensed Images") to numerous third parties. Yellow Pages' business model is to charge a licensee fee for the right to have and use copies of its images. This is a common model, and Yellow Pages is entitled to compensation for each of these violative transfers. The evidence conclusively demonstrated that from 2001 through the end of 2008, licensees with a market penetration similar to SuperMedia consistently paid from $100-195 per image for a license, and Yellow Pages' damages expert, Steven Oscher, set Yellow Pages' damages at $132 per image for each violative transfer—which equates to a damages range of $2,668,248 to $5,940,000, depending on how the Court determines to sanction SuperMedia for its failure to preserve and destruction of evidence.

SuperMedia tries to obfuscate by claiming that its contractors already had a right to use the Licensed Images under SuperMedia's license, and that this Court only needs to determine what the value is of a right to transfer the images to the contractors. This is incorrect. As this Court already concluded, SuperMedia only had permission to allow its contractors to use the images, within the limited scope of SuperMedia's license, in a SuperMedia-controlled environment, and not otherwise. They would not have had the right to use copies of the images that were illegally transferred to them from SuperMedia or any other source. And subcontractors, Facebook, Google, customers, and the general public never had a right to use the

images. The case law is abundantly clear that the correct focus when assessing damages for an illegal transfer is on the value of that which was wrongfully received by each transferee, without payment to the copyright owner, as a result of each infringing transfer—in other words the value of the infringing transfer. Here, the evidence amply demonstrates that an appropriate price to apply to the violative transfers of the Licensed Images is $132 per image for each unlawful transfer.

SuperMedia, on the other hand, takes the extreme position that Yellow Pages "did not suffer any damage as a result of SuperMedia transferring YPPI's images to its ad production contractors," (Post-Trial Brief at 1), and spends much of its brief pointing out how Yellow Pages did not show economic damages under damages approaches that Yellow Pages did not use. SuperMedia does not offer the opinion of any damages expert, but rather the testimony of an industry expert, Ellen Boughn, who provides two limited opinions that are so extreme they lack any credibility. First, she inexplicably places a zero dollar value on a transfer right that Yellow Pages never gives. This makes zero sense, because if Yellow Pages granted a license with no transfer restriction, it could in essence create a competitor licensor for its own images.

Second, she asserts that the fair market value of a new license for the images is only $1 to $15 per image. Ms. Boughn's only justifications for this range are what she calls radical changes in the stock photography market and her subjective critique of the quality of the images. Neither holds water. Yellow Pages is not part of the mass stock photography market, and while Ms. Boughn criticizes every detail of the images, her opinions cannot trump the undisputed facts that SuperMedia, after an extensive vetting process, paid $132 per image; SuperMedia has continuously used the images for 15 years; and large amounts of the images, including hundreds that Ms. Boughn claimed were "unmarketable" and of poor quality, are in use in SuperMedia's

2

current directories. These are not indicia of unmarketable or near valueless images. As if that was not enough, it turns out Ms. Boughn, in providing her opinions, did not even review Yellow Pages' actual images, did not consider Yellow Pages' licensing history, and did not even consider the appropriate time frame for the violative transfers. Her opinions are of no value.

With respect to SuperMedia's so-called "gating issues," they all fail. <u>First</u>, Yellow Pages is entitled to statutory damages and fees under Section 412 of the Copyright Act. It was represented to the Idearc bankruptcy court that there were no monetary or non-monetary defaults of the license with Yellow Pages prior to the Idearc bankruptcy petition in 2009, and thus that there was no cure owed. As a result, SuperMedia was permitted to assume the license without curing any default. Irrespective of any factual issue of when the first breach occurred, since SuperMedia received a benefit from the Idearc bankruptcy court based on this representation, it is now judicially estopped from claiming there was a pre-Idearc bankruptcy petition breach to avoid statutory damages and attorneys' fees.

To the extent, though, this Court does consider the factual question of when the first breach occurred, SuperMedia is faced with the conundrum of trying to reconcile its shifting litigation positions. SuperMedia has told so many stories that its sworn interrogatory answers, witnesses' testimony, and documents conflict. Even the testimony of SuperMedia's star witness at the recent trial in November 2015 ("<u>Damages Trial</u>"), Valerie Dale, who was suddenly found after years of litigation, conflicts with her own 30(b)(6) testimony, which was designated for trial and by which SuperMedia is bound. When this Court considers all the evidence, particularly in light of Ms. Dale's inconsistent testimony, it will find that the weight of the evidence indicates there was no transfer before the date of Yellow Pages' copyright registrations. This Court already found SuperMedia's infringement to be willful, allowing the amount of statutory

3

damages to be enhanced. The current record does not change, but only strengthens Yellow Pages' case for willfulness.

Second, SuperMedia claims that Yellow Pages was not substituted as a party to the 2001 Service Agreement by the 2007 Amendment and thus cannot utilize the attorneys' fee provision therein. However, the evidence shows that by July 2007, Idearc knew that Mr. Moore's original company named "Yellow Pages Photos, Inc." had changed its name to "AdMedia Systems, Inc.," and then drafted and entered into the Amendment with a different company named "Yellow Pages Photos, Inc." There was only one "Yellow Pages Photos, Inc." in existence on that date, and that is the claimant in this action. The Amendment on its face substituted Mr. Moore's new "Yellow Pages Photos, Inc." for the old, and it makes no sense to argue about "assignments," "anti-assignment provisions," and "requests for consent to assignment" because the parties together consensually accomplished by amendment what they might otherwise have done by request, consent, and assignment. Opportunistically, SuperMedia claims that use by its contractors was authorized by the 2007 Amendment in one breath, but in the next disavows a contractual relationship with Yellow Pages. SuperMedia cannot have it both ways. It obviously intended to enter into the Amendment with the copyright holder, i.e. the current Yellow Pages, and that is the way it must be construed.

Third, Yellow Pages is not bound to a zero dollar cure amount for liabilities that Idearc concealed. The only notice of Idearc's intention to assume the Service Agreement served on Yellow Pages in the Idearc bankruptcy was the Notice of Non-Voting Status, which failed to alert Yellow Pages to Idearc's contention that $0 was to be paid on account of any monetary defaults, and was similarly silent on the issue of any curative measures to be taken as a result of non-monetary defaults such as Idearc's unauthorized transfers of the Licensed Images to third

parties. Further, even if this Court determines that Idearc did give adequate notice of its intent to assume the Service Agreement and proposed cure, Yellow Pages was not aware of any violative transfers at the time of the Idearc bankruptcy and had no reason to dispute Idearc's $0 cure proposal. Thus, *res judicata* cannot bind Yellow Pages to the $0 cure amount proposed by Idearc in connection with its assumption of the Service Agreement.

<u>Fourth,</u> SuperMedia's statute of limitations defense, on which it carries the burden of proof, fails because Yellow Pages neither knew, nor had reason to know, of any violative transfers prior to 2011. The record is undisputed that Yellow Pages' first knowledge that SuperMedia or its predecessors transferred the Licensed Images to any third party was in the spring of 2011, when Yellow Pages discovered them on the servers of ASEC, and neither SuperMedia nor its predecessors did anything prior to 2011 that would have caused Yellow Pages to suspect that violative transfers were occurring.

## II.   BACKGROUND AND PROCEDURAL POSTURE

On March 18, 2013, SuperMedia and certain of its affiliates filed voluntary chapter 11 petitions in this Court. On May 30, 2013, Yellow Pages filed its proof of claim against SuperMedia, as later amended ("<u>Proof of Claim</u>"), along with its Motion for Allowance and Payment of Administrative Expense Claim (SuperMedia Inc. D.I. 213),[1] as later amended ("<u>Motion for Admin. Expense</u>"), in both of which Yellow Pages alleged that SuperMedia violated the transfer restriction in its license from Yellow Pages and infringed Yellow Pages' copyrights by transferring the Licensed Images to third parties without authorization.

---

[1]   Reference to items appearing in the docket of the lead bankruptcy case of SuperMedia Inc., Case No. 13-10545(KG), shall be designated (SuperMedia Inc. D.I. __); reference to items appearing in the docket of the bankruptcy case of SuperMedia LLC, Case No. 13-10546(KG), shall be designated (SuperMedia LLC D.I. __); and reference to items appearing in the docket of Adversary Proceeding No. 15-50044 shall be designated (Adv. D.I. __).

This Court ultimately set and conducted a trial on the Motion for Admin. Expense on April 9, 10, and 11, 2014, as well as an additional day of trial at SuperMedia's request on September 3, 2014. In advance of the 2014 Trial, as a result of discovery violations by SuperMedia for which SuperMedia has now been sanctioned,[2] Yellow Pages filed a Motion to Bifurcate Issues of Liability and Damages (SuperMedia LLC D.I. 93) ("Motion to Bifurcate"). After a hearing, and over SuperMedia's objection (SuperMedia LLC D.I. 99), this Court entered an Order granting the Motion to Bifurcate (SuperMedia LLC D.I. 103), and as a result the 2014 Trial proceeded only on liability.

Following the 2014 Trial and post-trial briefing, on December 29, 2014, this Court entered its Post-Trial Opinion on Yellow Pages Photos, Inc.'s Motion for Admin. Expense (SuperMedia LLC D.I. 220) ("Post-Trial Opinion") holding that Yellow Pages established at trial, clearly and by a preponderance of the evidence, that SuperMedia willfully "breached the License on numerous times and in several ways." (Post-Trial Opinion at 31.) This Court found that the license "clearly states on its face that none of the images are to be transferred to anyone for any reason without YPPI's authorization" and that SuperMedia's breaches and infringement were "certainly willful." (*Id.* at 32 & 46.) Although denying the administrative claim due to the timing of SuperMedia's actions, this Court further ruled that SuperMedia's breaches and willful infringement took place pre-petition and concluded that it would allow Yellow Pages' Proof of

---

[2]    In fact, the requested discovery concerning SuperMedia's digital advertising products was never produced in advance of the 2014 Trial, ultimately resulting in this Court's entry of a Memorandum Order (SuperMedia LLC D.I. 297) on Yellow Pages' request for sanctions against SuperMedia ("Sanctions Order"). The Sanctions Order compelled SuperMedia's compliance with this Court's prior discovery orders, thus requiring SuperMedia to produce the information pertaining to its use of the Licensed Images in connection with its digital advertising products. As Yellow Pages has since discovered, not only did SuperMedia fail to produce discovery related to its digital advertising products when originally requested and when previously ordered by this Court, SuperMedia altogether failed to *preserve* and *destroyed* evidence. These failings are the subject of Yellow Pages' Motion for Contempt and Sanctions (Adv. D.I. 128), which is now fully briefed and ripe for decision. The arguments set forth in that motion will not be restated here, but are incorporated herein by reference.

Claim "in an amount to be determined." (*Id.*)  Following entry of the Post-Trial Opinion, this Court conducted a Damages Trial on November 16, 17, and 18, 2015 ("Damages Trial").

The violative transfers for which Yellow Pages sought economic damages, and included in its presentation at the Damages Trial, were those to:

- AMDOCS
- Office Tiger[3]
- Tata
- MPS
- Web.com
- Hostopia
- Facebook
- Google
- SuperMedia's customers
- The general public

## III.    STATEMENT OF FACTS

### A.    Yellow Pages' Damages

1.      This Court found after the 2014 Trial that "SuperMedia breached the License on numerous times and in several ways." (Post-Trial Opinion at 31.)  More specifically, this Court found that SuperMedia violated its license and thereby infringed Yellow Pages' copyrights by transferring the Licensed Images to numerous third parties.

2.      The formula employed by Yellow Pages for calculating economic damages for each violative transfer is:

# images transferred x $ value per image transferred = economic damages

#### *Number of Images Transferred*

3.      With respect to print contractors and subcontractors, this Court made a liability finding after the 2014 Trial that SuperMedia transferred all 5,000 of the Licensed Images to

---

[3]      It was revealed at trial that AMDOCS and Office Tiger are two separate companies.  They had up to that point been identified by SuperMedia as a single company.

AMDOCS, MPS, and Tata. Post-Trial Opinion 33, 35. In addition, SuperMedia admitted at the Damages Trial to an additional transfer of all 5,000 of the Licensed Images to Office Tiger. (11/16/15 Tr. at 77:2-5, 85:1-8.)

      4.     With respect to digital advertising, the evidence shows that 1) 85 unique images were located on SuperMedia customer websites, 2) 10 unique images were located on Facebook pages built by SuperMedia for its customers, and 3) 11 unique images were located on Google+ pages built by SuperMedia for its customers. This evidences the following violative transfers:

| Transferee | Number of Images |
| --- | --- |
| Web.com/Hostopia | 85 |
| Facebook | 10 |
| Google | 11 |

(Trial Ex. 705-G.) This likewise evidences the following transfers to SuperMedia's customers and the general public:

| Transferee | Number of Images |
| --- | --- |
| SuperMedia Customers[4] | 90 |
| General Public[5] | 18 |

(Trial Ex. 705-G.) As explained more fully in Yellow Pages' Motion for Contempt and Sanctions (Adv. D.I. 128), the actual numbers for these digital advertising-related transfers are without a doubt higher, but Yellow Pages and this Court cannot know how much higher due to

---

[4]     This Court found that "individual customers have access to Web.com's website creation tool, and can make changes to their sites, including accessing or removing images that are on the site. ...The same is true for Hostopia." (Post-Trial Opinion at 38.) This Court further found that "[w]hen SuperMedia posts images on social media pages, it is transferring the images to the customers in breach of the License." (*Id.* at 39.) This number is derived by adding together the unique images found on SuperMedia customer websites and SuperMedia-created customer social media pages.

[5]     This Court found that "[p]osting YPPI's images on social media pages results in a transfer to the general public...." (Post-Trial Opinion at 39.) This number is derived by adding together the unique images found on SuperMedia-created customer Facebook and Google+ pages.

8

SuperMedia's failure to preserve and destruction of evidence. As a result, Yellow Pages has requested that this Court sanction SuperMedia with an adverse inference, and suggested that the inference be that all of the Licensed Images were transferred to each of these classes of transferees.

### The Dollar Value of Each Transfer on a Per Image Basis

5.    As discussed in detail below, Yellow Pages' damages expert, Steven Oscher, after considering various data, including documents produced in this case (11/18/15 Tr. at 291:9-10, 295:1-7, 301:24-302:17, 305:17-23), background information provided by the client and counsel (*Id.* at 291:9-10), this Court's Post-Trial Opinion (*Id.* at 293:24-294:2), SuperMedia's damages expert Christian Tregillis' damages report (*Id.* at 298:8-18), SuperMedia's other damages expert Ellen Boughn's damages report (*Id.* at 311:1-3), along with additional testimony and documents, placed a per image value of $132 on each violative transfer. (*Id.* at 299:23-308:8.)

6.    The economic damages that Yellow Pages is seeking for these violative transfers, based on a $132 per image rate, are as follows:

| Transferee | Number of Images without Adverse Inference[6] | Damages without Adverse Inference | Number of Images with Adverse Inference | Damages with Adverse Inference |
|---|---|---|---|---|
| AMDOCS | 5,000 | $660,000 | 5,000 | $660,000 |
| Office Tiger | 5,000 | $660,000 | 5,000 | $660,000 |
| Tata | 5,000 | $660,000 | 5,000 | $660,000 |
| MPS | 5,000 | $660,000 | 5,000 | $660,000 |
| Web.com/Hostopia | 85 | $11,220 | 5,000 | $660,000 |
| Facebook | 10 | $1,320 | 5,000 | $660,000 |
| Google | 11 | $1,452 | 5,000 | $660,000 |

---

[6]    Yellow Pages requested that the Court enter an adverse inference in its Motion for Contempt and Sanctions as a Result of SuperMedia's Failure to Preserve and Spoliation of Evidence (Adv. D.I. 128).

| | | | |
|---|---|---|---|
| SuperMedia Customers | 90 | $11,880 | 5,000 | $660,000 |
| General Public | 18 | $2,376 | 5,000 | $660,000 |
| Total | | $2,668,248 | | $5,940,000 |

7.      In the event this Court determines that statutory damages are available to Yellow Pages such that Yellow Pages is able to elect between actual damages and statutory damages, the range within which this Court has the discretion to set statutory damages is as follows:

| Number of Works for Statutory Damages for All Infringement | Low End for Statutory Damages ($750/work) | High End for Statutory Damages if Infringement Is Not Found Willful ($30,000/work) | High End for Statutory Damages if Infringement Is Found Willful ($150,000/work) |
|---|---|---|---|
| 100 | $75,000 | $3,000,000 | $15,000,000 |

### B.      Yellow Pages Business

8.      This Court stated in its Post-Trial Opinion:

> The product at issue, YPPI's collection and index of photo images, is of substantial value.

(Post-Trial Opinion at 31.)  SuperMedia and its expert Ellen Boughn take issue with this Court's conclusion.

### *Yellow Pages' Licensing Methodology*

9.      Yellow Pages and its predecessor AdMedia Systems, Inc. (f/k/a Yellow Pages Photos, Inc.) ("AdMedia") have licensed their images directly to yellow pages publishers of all sizes. (4/9/14 A.M. Tr. at 38:8-11, 49:11-22; 11/18/15 Tr. at 211:25-212:3.)  Yellow Pages does not approach other stock image licensing companies about taking its images into their collections. (11/18/15 Tr. at 212:4-7.)

10

10.    In determining the price to charge for a license, Yellow Pages' President Trent

Moore looks primarily at the amount of "market penetration" by the licensee, taking into account

such factors as 1) the size of the company, 2) the number of artists employed by the company,

3) the number of directories published by the company, and 4) the breadth of the company's

directory distribution. (*Id.* at 213:8-22.) Generally, the larger the expected "market penetration"

or "market saturation" by a licensee, the higher price Mr. Moore quoted. (*Id.* at 213:16-22.)

11.    Mr. Moore had no standard pricing or price list based upon the size of a company

with which he was dealing. (*Id.* at 75:4-5, 76:12-78:16.) However, Mr. Moore testified that as a

general matter, the bigger a company was, and the bigger its anticipated "market penetration" or

"market saturation" was, the more he charged. (*Id.* at 76:12-17, 213:16-22.)

12.    For example, Yellow Pages licensed a company named Romfab for an unlimited

number of users to use certain of its images. (*Id.* at 214:5-14; Trial Ex. 518 (Bates No. YPPI-

SuperMedia 000613).) The price charged to Romfab was approximately $7.00 per image. (*Id.* at

214:15-20)

13.    Yellow Pages also licensed AT&T Services, Inc. ("AT&T") for an unlimited

number of users to use certain of its images. (*Id.* at 214:21-215:4; Trial Ex. 509 (Bates No.

YPPI-SuperMedia 000072).) The price charged to AT&T, a much larger company than Romfab,

was $195.00 per image. (*Id.* at 215:5-6.)

14.    To arrive at the different prices for Romfab and AT&T, Mr. Moore looked at the

expected market penetration of the companies' respective uses, which he derived from looking at

the size of the companies, the number of users, the number of directories, and the breadth of the

companies' directory distribution. (*Id.* at 215:22-216:3.). AT&T was much larger than Romfab,

which was a small startup, and as a result the amount charged to AT&T was much higher than the amount charged to Romfab. (*Id.* at 215:11-216:6.)

### *Yellow Pages' Licenses*

15.     The only Yellow Pages license records that are a part of the trial record are those with 1) AT&T (Trial Ex. 509), 2) SBC (Trial Ex. 519), 3) Verizon (Trial Ex. 55), 4) Phone Directories Company (Trial Ex. 502), 5) Romfab (Trial Ex. 518), and 6) Clarke (Trial Ex. 512). In addition, there is 7) a summary prepared by Ellen Boughn that includes information on the foregoing and a handful of other licensees (Trial Ex. 566) and 8) an invoice to BieMedia (Trial Ex. 405).

16.     SuperMedia's Post-Trial Brief includes two figures, Figure 1 (p. 21) and Figure 2 (p. 23), that contain information on many other Yellow Pages licenses that are not in the trial record, as evidenced by lack of a record cite.    Figure 1 purports to convey partial (and inaccurate) information on licenses with Ad-Ventures and ASEC Columbia that is not in the record.    Figure 2 purports to convey partial information on 31 license records that are not in the record to create new evidentiary support for a new argument regarding a fundamentally flawed average license price to try to fill a tremendous gap in Ms. Boughn's analysis.    These figures, the information in them, and the arguments based on them (*see* pp. 20-21, 23-24, 43, 48) must be disregarded by this Court.

17.     Turning to the licenses that are in the record, Mr. Moore testified at trial that the only other companies to which AdMedia and Yellow Pages licensed images whose market penetration was similar to that of Verizon were SBC Services, Inc. ("SBC") and AT&T. (*Id.* at 216:10-14.)

18.    In 2001, Verizon licensed the right for 600 users to use the Licensed Images for $6,600 per 50-image collection, or $132 per image. (Trial Ex. 55.)

19.    From 2003 through 2005, SBC licensed the right for 500 users to use AdMedia's images for $5,000 per 50-image collection, or $100 per image. (*Id.* at 220:13-15; Trial Ex. 519 (Bates No. 000630).) SBC carefully vetted the images and signed an agreement with AdMedia after a 6-month negotiation. (*Id.* at 219:19-220:12.)

20.    In December of 2007, AT&T entered into an agreement with Yellow Pages. (Trial Ex. 509 (Bates Nos. YPPI-SuperMedia 000071).) At around that time, SBC and two other companies, Bell South and L.M. Berry, merged to become AT&T. (Nov. 18 Tr. at 217:23-218:2.) All three companies had previously licensed the right to use certain of Yellow Pages' images, and AT&T wanted to continue using the images it was receiving by virtue of the merger. (*Id.* at 218:2-16, 280:3-12.) So AT&T paid Yellow Pages an additional $35,000.00 for an unlimited number of users to have the right to continue using the 2,150 images that it received by virtue of the merger. (Trial Ex. 509 (Bates Nos. YPPI-SuperMedia 000072-73).) This took the total price paid for the 2,150 images, including the previously licensed images, up to $195 per image. (Nov. 18 Tr. at 218:5-7, 272:22-25, 279:8-280:12.)

21.    In October of 2008, AT&T also entered into an amendment to the 2007 agreement whereby it licensed the right to download additional images from Yellow Pages for $195 per image. (*Id.* at 218:19-23, 279:8-12; Trial Ex. 509 (Bates Nos. 000080-91).) Through the end of 2008, AT&T downloaded 157 additional, individual images from Yellow Pages at the price of $195/image. (*Id.* at 218:24-219:4, 273:15-24; Trial Ex. 509 (Bates No. 000070).)

22.    Yellow Pages' licenses do not permit the licensee to transfer copies of the images to others. (4/9/14 A.M. Tr. at 50:10-12.) The purpose of this restriction is to enable Yellow

13

Pages to be in contractual privity and have contractual control over those who possess its images in an effort to control their dissemination. (*Id.* at 50:13-24, 66:14-22.)

C.    **Negotiation of the Agreement with Verizon**

23.    Like the SBC transaction, AdMedia's license with Verizon involved a lengthy negotiation. (4/9/14 A.M. Tr. at 52:3-53:25; 11/18/15 Tr. at 224:20-225:3.) Mr. Moore first approached Verizon about a potential business relationship in the summer of 2000, and ultimately signed an agreement with Verizon in November of 2001. (*Id.*)

24.    More than 10 people from Verizon were involved in the negotiation, and Mr. Moore's business and its product were carefully vetted prior to the consummation of the agreement. (*Id.* at 225:4-15.) Prior to signing the agreement with AdMedia, Verizon vetted about 1,000 images, 20% of the Licensed Images that were ultimately delivered. (*Id.* at 225:22-226:4.) After vetting these 1,000 images, Verizon entered into the Service Contractor Agreement with AdMedia ("Service Agreement"). (*Id.* at 226:10-12; Trial Ex. 55.)

25.    Over the next several years, AdMedia delivered the remaining 4,000 Licensed Images to Verizon. (*Id.* at 226:5-7.) In all, Verizon received approximately 5,000 images in 100 collections. (4/9/14 A.M. Tr. at 41:25-45:7; Trials Exs. 2, 3 & 4.)

26.    Mr. Moore viewed Verizon as a very good customer and consulted with them extensively. (11/18/15 Tr. at 226:19-227:14.)

27.    The Service Agreement contained service requirements, and Verizon had the right to reject images if they did not meet up to its standards, specifications, requirements, and satisfaction. (*Id.* at 228:13-229:25.) Verizon never rejected any image delivered by AdMedia, paid the full contract price of $660,000 to AdMedia, did not hold any money back, and never accused AdMedia of breaching the Service Agreement. (*Id.* at 230:1-15.)

14

28.    The Service Agreement also contained an early termination provision that would have permitted Verizon to have terminated the Service Agreement prior to receiving and having to pay for all 100 collections of 5,000 images.  (4/9/14 A.M. Tr. at 61:13-62:18; Trial Ex. 55 (¶ 13(a)).)  Verizon never exercised the early termination provision.  (*Id.* at 62:19-20.)

29.    AdMedia fulfilled its obligations under the Service Agreement.  (*Id.* at 61:11-12.)

**D.    AdMedia's Assignment of Copyrights to Yellow Pages**

30.    On November 3, 2006, Mr. Moore changed the name of the original "Yellow Pages Photos, Inc." to "AdMedia Systems, Inc." and incorporated the new "Yellow Pages Photos, Inc." (11/18/15 Tr. at 8:5-9:2, 9:9-20, 231:20-25; Trial Exs. 401 & 477.)  Also on November 3, 2006, AdMedia transferred all of its right, title, and interest in and to all images it owned, including copyrights, to Yellow Pages.  (*Id.* at 14:1-9, 232:1-3; Trial Ex. 501.)

31.    AdMedia did not at the time of the assignment of copyrights in November of 2006 assign the Service Agreement to Yellow Pages—insofar as Mr. Moore was concerned the contract was completed and so long as both sides lived up to their obligations they were done. (*Id.* at 227:15-16, 228:8-12.)

32.    Although there was a change in ownership of the "Yellow Pages Photos" business from AdMedia to Yellow Pages as a result of this assignment, there was no change to the business itself, and Mr. Moore was the sole owner, officer, and director of both AdMedia and Yellow Pages.  (*Id.* at 190:7-17, 233:11-18.)

33.    Mr. Moore testified at trial that he did not know whether he specifically discussed the assignment, but he did recall conversations "about the name changes and the new companies." (*Id.* at 12:11-22.)

15

34.     Mr. Moore told both Gary Hruska and Russ Dixon of Idearc that the original "Yellow Pages Photos, Inc." had changed its name to "AdMedia Systems, Inc." (*Id.* at 234:3-8.) Gary Hruska was a top-level executive at Idearc in charge of graphics and printing, while Russ Dixon was Idearc's graphics services administrator/manager. (*Id.* at 234:9-22.)

**E.     2007 Amendment to the Service Agreement**

35.     By May 31, 2007, Lori Lawless of Idearc, in addition to Gary Hruska and Russ Dixon, was also aware that the original "Yellow Pages Photos, Inc." had changed its name to "AdMedia Systems, Inc." (11/17/15 Tr. at 71:11-16, 83:9-23; Trial Ex. 612.)

36.     In July of, 2007, Ms. Lawless contacted Mr. Moore about amending the Service Agreement. (*Id.* at 40:13-16.)

37.     Ms. Lawless testified at the Damages Trial that when she spoke with Mr. Moore in July 2007, he specifically told her that "Yellow Pages Photos, Inc. had changed its name to AdMedia Systems, Inc." (*Id.* at 42:25-43:2, 49:1-2.)

38.     Ms. Lawless and SuperMedia's counsel Sue Harris initially set the Amendment up to be with "AdMedia Systems, Inc., f/k/a Yellow Pages Photos, Inc.", further reflecting their knowledge of the name change. (*Id.* at 83:24-84:13; Trial Ex. 614.)

39.     After Ms. Lawless sent the Amendment to Mr. Moore set up to be signed on behalf of AdMedia Systems, Inc., Mr. Moore called her and asked her to change the name of the contracting party in the Amendment to "Yellow Pages Photos, Inc." (*Id.* at 50:21-24.)

40.     Mr. Moore signed the Amendment on behalf of "Yellow Pages Photos, Inc." (*Id.* at 52:17-18, 88:12-25; Trial Ex. 55.)

41.     The only Florida corporation in existence on July 18, 2007 named "Yellow Pages Photos, Inc." is the current Yellow Pages. (11/18/15 Tr. at 8:5-10:13; Trial Exs. 401, 477.)

16

**F.    SuperMedia's Continued Use of and Revenue from the Licensed Images**

42.    Mr. Moore reviewed 61 currently published directories out of the over 1,700 directories published annually by SuperMedia and its affiliates (less than 4%) for ads containing Yellow Pages' images. (*Id.* at 163:16-18, 164:14-165:11, 171:11-15; Trial Exs. 657 &705-A.)

43.    In those 61 directories alone, Mr. Moore identified over 600 additional instances of current use of the Licensed Images. (*Id.* at 165:12-21, 176:21-177:2; Trial Exs. 657 & 705-B.)

44.    At least some of these ads were newly created since 2011. Mr. Moore compared the 2011-12 St. Petersburg, FL directory to the 2015 St. Petersburg, FL directory and found ads containing the Licensed Images in the 2015 directory that were not in the 2011-12 directory. Furthermore, only a small handful of the ads identified in the 61 current directories reviewed were in SuperMedia's production. (*Id.* at 164:2-3, 165:22-24, 172:7-173:6; *compare* Trial Exs. 654, 657 & 659.)

45.    In this print ad review Mr. Moore identified 437 unique images from 74 of the 100 collections of the Licensed Images. (*Id.* at 177:5-179:3; Trial Exs. 705-B, 705-C & 705-D.)

46.    Of the 437 images identified by Mr. Moore, Ms. Boughn had opined a day earlier that 274 of them were unacceptable by industry standards and unusable. (*Id.* at 180:16-181:20; Trial Ex. 705-D.)

47.    SuperMedia's revenue for the ads identified in the 61 directories reviewed by Mr. Moore was approximately $11,709,761.30. (*Id.* at 188:14-190:1; Trial Ex. 705-E.)

### G.    The Idearc Bankruptcy

48.    On March 31, 2009, Idearc filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Texas. *See In re Idearc Inc., et al.,* Case No. 09-31828(BJH) (Bankr. N.D. Tex. 2009) ("Idearc bankruptcy").

49.    Idearc's First Amended Joint Plan of Reorganization of Idearc Inc., et al, Debtors (As Modified) ("Plan") provided, in pertinent part, that "any contract or lease to which a Debtor is a party as of the Petition Date shall be deemed to be and treated as though it is an executory contract or unexpired lease, as applicable, subject to Section 365 of the Bankruptcy Code [and] each Debtor shall be deemed to have assumed such contracts and leases to which it is a party unless [certain exceptions applied] ." (Trial Ex. 423, Sec. 6.1(a).)

50.    The Plan also provided, in pertinent part, that "[a]ny monetary amounts by which each contract and lease to be assumed pursuant to the Plan is in default shall be satisfied, under Section 365(b)(1) of the Bankupty Code, by payment of the Cure amount." (Trial Ex. 423, Sec. 6.2 (emphasis added).)

51.    The Plan made no provision for the cure of any non-monetary defaults of executory contracts and unexpired leases. (Trial Ex. 423.)

52.    The Plan was not served on either Yellow Pages or AdMedia. (Trial Ex. 563.)

53.    The only notification that Idearc served on Yellow Pages reflecting Idearc's treatment of the Service Agreement as an executory contract was a Notice of Non-Voting Status – Contract/Lease Counterparties ("Notice of Non-Voting Status"). (Trial Ex. 563, ¶ 15; see also Trial Ex. 563's Exhibit V at pg. 6-7.)

54.    The Notice of Non-Voting Status provided, in pertinent part:

> You are receiving this notice because you are a party to an executory contract or unexpired lease with the Debtors. Under the

terms of the Plan your executory contract or unexpired lease is being assumed by the Debtors, and thus, you have no Claim against the Debtors and are not entitled to vote on the Plan. *Accordingly, this notice and the "Notice of (I) Confirmation Hearing and Objection Deadline with Respect to the Debtors' Plan, and (II) Solicitation and Voting Procedures" are being sent to you for informational purposes only.*

(emphasis in original).

55.    The Notice of Non-Voting Status also provided, below the above-quoted paragraph, the following:

> **The proposed Cure amount for your executory contract or unexpired lease can be found (i) via the Internet at http://www.kccllc.com/Idearc/cureamounts.pdf, or (ii) by writing to Idearc, c/o Kurtzman Carson Consultants, LLC, 2335 Alaska Avenue, El Segundo, California 90245, by calling (866) 967-0670, or by emailing idearc@ckkllc.com. The proposed Cure amount for your executory contract or unexpired lease has also been filed with the Bankruptcy Court and can be located via the Internet at http://ecf.txnb.uscourts.gov.**

(emphasis in original).

56.    The Notice of Non-Voting Status went on to state a deadline for objecting to proposed cure amounts and to confirmation of the Plan.  (Trial Ex. 563, ¶ 11.)

57.    Idearc also filed a Notice of Proposed Cure Amounts for Assumption of Executory Contracts and Unexpired Leases ("Notice of Proposed Cure Amounts").  (Trial Ex. 563's Exhibit X.)

58.    The Notice of Proposed Cure Amounts was not served on Yellow Pages or AdMedia.  (Trial Ex. 563, ¶ 19.)

59.    On December 22, 2009, the court confirmed Idearc's Plan.  (Trial Ex. 563, ¶ 21.)

60.    The effective date of Idearc's confirmed Plan was December 31, 2009.  (Trial Ex. 563, ¶ 22.)

19

### H.     The Timing of the Violative Transfers

#### *Transfers to AMDOCS and Office Tiger*

61.     Idearc transferred all 5,000 of the Licensed Images to AMDOCS.   Post-Trial Opinion at 33.   Post-Trial Opinion at 33 (citing 4/10/14 A.M. Tr. 53:12-54:24; 4/11/14 A.M. Tr. 7:10-24; Trial Ex. 199 (Interrogatory Nos. 3 & 9); Second Amended Complaint (D.I. 80) at ¶ 25.)

62.     Idearc also transferred all 5,000 of the Licensed Images to Office Tiger.    (*Id.* at 77:2-5, 85:1-8.)

63.     There is a dispute of fact as to when the transfers to AMDOCS and Office Tiger occurred.   Yellow Pages argues they occurred after July 2007, while SuperMedia argues they occurred in late 2005 or early 2006.

#### *Transfer to ASEC*

64.     Idearc transferred all 5,000 of the Licensed Images to ASEC.   Post-Trial Opinion at 33.

65.     There is a dispute of fact as to when the transfer to ASEC occurred.   Yellow Pages argues it occurred after July 2007, while SuperMedia argues it occurred in 2006.

#### *Transfers to MPS and Tata*

66.     SuperMedia transferred all of the Licensed Images to MPS in February of 2010. (Kurth 2/3/14 Depo. 90:5-7; 11/16/15 Tr. at 118:11-14; Trial Ex. 404.)

67.     With respect to Tata, SuperMedia transferred the Licensed Images to Tata after it transferred them to MPS.  (Kurth 2/3/14 Depo. at 90:8-10.)

68.     Ms. Dale testified at the Damages Trial to G5 Mac computers being transferred to Tata in December of 2009, but not as to Licensed Images, and no other SuperMedia witness

testified as to when the Licensed Images were transferred to Tata at the Damages Trial. (11/16/15 Tr. at 103:1-106:8.) Ms. Dale did not know whether the Licensed Images were on the G5 Mac computers. (Dale 7/22/15 Depo. 82:10-12, 104:3-6.) The transfer of the Licensed Images was not a line item on the project plan for the Hemisphere project, nor did Ms. Dale know when exactly the transfer occurred. (*Id.* at 83:16-84:3.)

### *Transfers to Web.com, Hostopia, Their Subcontractors, and SuperMedia Customers*

69.    SuperMedia used Hostopia to build websites from 2009 or 2010 through 2011. (Ward 2/10/14 Depo. at 51:12-14.) Any transfers of the Licensed Images to Hostopia and its subcontractors, and to SuperMedia customers by virtue of giving them access to the images on the web pages, would have taken place during this time frame.

70.    SuperMedia has used Web.com to build websites since September of 2011. (*Id.* at 51:7-9.) Any transfers of the Licensed Images to Web.com and its subcontractors, and to SuperMedia customers by virtue of giving them access to the images on the web pages, would have taken place in or after September of 2011.

### *Transfer to BieMedia*

71.    SuperMedia transferred some of the Licensed Images to BieMedia in 2011. (Trial Ex. 199 (Interrogatory No. 3).)

### *Transfers to Facebook, Google, SuperMedia Customers, and the General Public*

72.    SuperMedia has built Facebook and Google+ pages for customers since 2011. (Ward 2/10/14 Depo. at 73:9-13.) Any transfers of the Licensed Images to Facebook and Google, and to SuperMedia customers and the general public by virtue of SuperMedia posting images on social media pages, would have taken place after 2011.

649002.1 01/28/2016

### I.    Willfulness

73.    In its Post-Trial Opinion, this Court made numerous findings as to the willfulness of SuperMedia's infringement, all of which still stand. (Post-Trial Opinion at 45-46.)

### J.    Yellow Pages' Discovery of the Breaches and Infringement

74.    There was no evidence at trial that at any time prior to 2011 Mr. Moore knew that Verizon, Idearc, or SuperMedia violated the license in any way.

75.    When Mr. Moore and Ms. Lawless discussed the 2007 Amendment, Ms. Lawless did not mention anything about transferring images, or having already transferred images, to contractors. (*Id.* at 236:1-13.)

76.    In early 2011, Yellow Pages discovered that SuperMedia had transferred the Licensed Images to ASEC. (*Id.* at 243:3-244:3.)

77.    At some point in 2011 or later, after discovering the Licensed Images on ASEC's servers, Mr. Moore read in a SuperMedia securities filing about an outsourcing relationship between SuperMedia and Tata and first began to suspect that SuperMedia might have also transferred the Licensed Images to Tata. (*Id.* at 246:8-247:4.) His suspicion was not confirmed until after this litigation was commenced. (*Id.* at 247:5-14.)

78.    At some point in December of 2011 or 2012, Mr. Moore also discovered MPS using some of the Licensed Images in its own advertising and began to suspect that SuperMedia might have also transferred the Licensed Images to MPS. (*Id.* at 247:15-248:5, 248:16-249:23.) His suspicion was likewise not confirmed until after this litigation was commenced. (*Id.* at 248:6-15.)

## IV.    ARGUMENT

### A.    Yellow Pages' Damages.

Section 504(a) of the Copyright Act allows copyright owners to recover damages under two distinct approaches: 1) actual damages and any additional profits of the infringer attributable to the infringement and 2) statutory damages. 17 U.S.C. § 504(a). Yellow Pages is ultimately entitled to choose between recovering actual damages or statutory damages (if this Court determines they are available in this case) and can make its election any time before final judgment is rendered. 17 U.S.C. § 504(c).

### 1.    Actual Damages.

The Copyright Act employs the broad term "actual damages," and "courts and commenters agree that it should be broadly construed to favor victims of infringement." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 164 (2d Cir. 2001). Any ambiguities should be resolved in favor of the copyright owner, and when courts are confronted with imprecision in calculating damages, they favor guaranteeing the copyright owner a full recovery. *Id.* at 164-65; *see also Leonard v. Stemtech Health Sciences, Inc.*, 2015 WL 4778827, *6 (D. Del. Aug. 13, 2015).

There are a number of different ways to calculate actual damages, but one common model is to determine and award the value of the infringer's violative use, which is often expressed in terms of what a reasonable license fee for the infringing use would be. *On Davis*, 246 F.3d at 164; *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357, 360 (7th Cir. 1985) (analyzing actual damages by the value of the infringed work and the advantage the infringement provided to the infringer); *Leonard*, 2015 WL 4778827, *7 (confirming award of reasonable license fee and stating "actual damages may be calculated in different ways"); *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 404-05 (S.D.N.Y. 2003) (discussing that licensing fees are

23

appropriate to award as actual damages); *Joseph J. Legat Architects, PC v. United States Development Corporation*, 1991 WL 38714, *6 (N.D. Ill. March 20, 1991) (recognizing the need to compensate the copyright owner by the "value of the infringer's use" where "traditional measures of actual damages may leave the copyright owner with no recovery at all, even if the infringer acted willfully and deliberately"); *Leonard v. Stemtech Health Sciences, Inc.*, 2013 WL 5311295, *6 (D. Del. Sept. 23, 2013) (stating "it is well settled that actual damages may be determined by examining a fair market value of a license fee that the plaintiff would have obtained for the defendant's use").  Importantly, courts award reasonable license fees to cover the value of the infringer's violative use <u>regardless</u> of whether the infringer would have been willing to pay for a license and regardless of whether the plaintiff would have been willing to license the use. *Getaped.com*, 188 F. Supp. 2d at 405.

Moreover, while an award of actual damages cannot be based on undue speculation, courts also recognize that arriving at the value of a reasonable license fee may involve some uncertainty, and many accepted methods of calculating copyright damages require courts to make uncertain estimates. *On Davis*, 246 F.3d at 166-67; *see also Leonard*, 2015 WL 4778827, *6.  The standard for calculating actual damages is objective, and courts have recognized that a fair market value can be established merely by a plaintiff demonstrating that it previously received compensation for use of the infringed work. *Leonard*, 2013 WL 5311295, *6.

      a.      **The value of SuperMedia's violative transfers of Yellow Pages' images is $132.00 per image.**

Yellow Pages' damages expert, Steven Oscher, prepared an analysis of the economic loss sustained by Yellow Pages as a result of the violative transfers this Court already found in its Post-Trial Opinion. (11/18/15 Tr. at 291:3-6; 298:19-299:6.)  Mr. Oscher is a certified public accountant and economist with over thirty years of experience in determining economic

24

damages, including in intellectual property cases. (*Id.* at 281:14-287:6.) He has provided expert testimony in numerous cases and has never not been qualified as an expert in valuation. *Id.* SuperMedia argues that Mr. Oscher's damages opinions are unreliable because he is a damages expert as opposed to a stock photography expert. (Post-Trial Brief at 46-47.) To the contrary, courts regularly rely on damages opinions from financial experts in copyright infringement cases. *See, e.g., Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004) (affirming use of certified public accountant's testimony concerning lost license fee); *AFL Telecomms. LLC v. SurplusEQ.com Inc.*, 946 F. Supp. 2d 928, 947-48 (D. Ariz. 2013) (denying motion to exclude testimony of damages expert who was a certified public accountant); *Semerdjian v. McDougal Littell*, 641 F. Supp. 2d 233, 242 (S.D.N.Y. 2009) (denying motion to exclude testimony of a damages expert who was an economist); *see also, Leonard*, 2013 WL 5311295, *6 (discussing plaintiff's industry expert in contrast to defendant's financial expert).[7]

Mr. Oscher's ultimate opinion was that the appropriate and most reliable benchmark to use in determining the value of the violative transfers and in calculating Yellow Pages' damages was what SuperMedia itself paid to license Yellow Pages' images—$132.00 per image. While SuperMedia attempts to discredit Mr. Oscher's analysis by claiming his "dubious testimony" and opinions only relate to a simple mathematical equation of $660,000.00 multiplied by 3, the logical analysis of Mr. Oscher demonstrates otherwise.

When confronted with SuperMedia's accusation, Mr. Oscher explained that, as demonstrated by the above-referenced case law, the underlying value of that which is wrongfully taken is the primary consideration in making a valuation. (11/18/15 Tr. at 301:24-302:17); *see*

---

[7]    SuperMedia's *Baker* case in no way supports discrediting Mr. Oscher's testimony. *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 355 (S.D.N.Y. 2003). The excluded expert in that case was not a financial expert, but rather an industry expert that the court determined did not have sufficient experience in the stock photography industry.

*also Deltak*, 767 F.2d at 360. He therefore logically examined various indicia of value of the images, which included documents produced in the case, such as both parties' image licenses, background information provided by Yellow Pages and its counsel, this Court's Post-Trial Opinion, SuperMedia's former damages expert Christian Tregillis' report, and SuperMedia's current damages expert Ellen Boughn's report. In his review, Mr. Oscher logically focused in large part on Yellow Pages' licenses, as those are direct evidence of the value of the specific images at issue and the value of SuperMedia's use. *On Davis*, 246 F.3d at 161 (finding fair market value of copyrighted work could be based on one example of a previous royalty received for that work); *Jarvis v. K2 Inc.*, 486 F.3d 526, 535 (9th Cir. 2007) (approving reliance on amounts previously received for image licenses to determine value of images for actual damages); *Leonard*, 2013 WL 5311295, *6 (stating "fair market value can be established where: '(1) a plaintiff demonstrates that he previously received compensation for use of the infringed work. . .'").

As Mr. Moore testified, although no set price list or standard pricing structure exists for Yellow Pages' images, in determining his license prices, he focused primarily on the market penetration of the licensee, taking into account factors such as 1) the size of the company, 2) the number of artists employed by the company, 3) the number of directories published by the company, and 4) the breadth of the company's directory distribution. (11/18/15 Tr. at 75:4-5, 76:12-78:16, 213:8-22.) Generally, the larger the expected "market penetration" or "market saturation" by the licensee, the higher price Mr. Moore would quote. (*Id.* at 76:12-17, 213:16-22.) This is demonstrated by a comparison of the Romfab and AT&T licenses, both unlimited user licenses, but to companies of drastically different sizes. (*Id.* at 214:5-14, 214:21-215:4; Trial Ex. 509 (Bates No. YPPI-SuperMedia 000072); Trial Ex. 518 (Bates No. YPPI-

26

SuperMedia 000613).)  Romfab was charged approximately $7.00 per image, while AT&T was charged $195 per image.  (*Id.* at 214:15-20, 215:5-6.)

Along those lines, SuperMedia was unquestionably one of Yellow Pages' largest licensees, and in Mr. Oscher's review of Yellow Pages' licenses, he focused on those best representative of what was obtained by SuperMedia.  (*Id.* at 302:5-17.)  Specifically, he focused on:

- SuperMedia (2001--$132/image)
- SBC (2003--$100/image)
- AT&T (2007 and 2008--$100 and $195/image)

(*Id.* at 303:24-306:22; Trial Exs. 55, 509, 519.)  Mr. Oscher's focus on licensees of this size and market penetration makes even more sense when this Court takes into account that SuperMedia's violative transfers were not to small companies, but rather to large, scaleable outsourcers, easily the size of SuperMedia or bigger.  (*Id.* at 265:21-266:21.)  Their market penetration had to be *at least* equal to SuperMedia's, given they were taking on SuperMedia's graphics functions, but conservatively there was no premium added based on that fact.

SuperMedia, however, criticizes Mr. Oscher's focus on these licenses, asserting that he "cherry-picked" data to reach a favorable result for Yellow Pages.  (Post-Trial Brief at 47-48.)  Mr. Oscher, of course, considered all of Yellow Pages' licenses, and while some of them have a lesser per image price, Mr. Oscher chose to focus on the SuperMedia, SBC, and AT&T licenses as they are all in the relevant time period[8] and with comparably-sized yellow pages publishers.  (11/18/15 Tr. at 307:3-12, 362:10-17.)  The relevance of those factors was confirmed for Mr. Oscher through Mr. Moore's testimony on how he determines license prices, and it is difficult to understand how Yellow Pages' licenses with much smaller licensees, often licensing only small

---

[8]     SuperMedia asserts that the transfers of the Licensed Images to print contractors occurred in 2005, 2006, 2009, and 2010.  (Post-Trial Brief at 5-8.)

amounts of images for a very few users, could be anywhere near as relevant in this case as Yellow Pages' larger licenses when it comes to determining the value of SuperMedia's violative transfers. (*Id.* at 321:2-19.) In fact, to suggest that the per image value of a license to a miniscule publisher is reflective of Yellow Pages' damages in this case, or should be simply averaged with the per image value of licenses to larger publishers like SuperMedia, SBC, and AT&T that purchase at much higher prices, in much higher quantities, for use by hundreds of users, without appropriately weighting the average, is where the real "cherry picking" lies. Moreover, SuperMedia's "cherry-picking" challenge is somewhat ironic given that, as discussed further below, its own expert, Ms. Boughn, did not rely on *any* of Yellow Pages' licenses in reaching her fair market per image value; rather she relied on license rates of third party microstock outfits that do not even license Yellow Pages' images. (11/17/15 Tr. at 203:14-204:1, 216:15-217:10.)

The reasonableness of Mr. Oscher's $132 per image value was further supported by SuperMedia's license with Getty Images, which had a $55 per image price for 300 users, or presumably under Mr. Oscher's analysis, $110 per image for 600 users. (11/18/15 Tr. at 305:17-307:12; Trial Ex. 428.) SuperMedia's own former damages expert, Christian Tregillis, provided further corroboration for the $132 per image number. (*Id.* at 307:13-308:8.) Specifically, Mr. Tregillis' opinion, to which Mr. Oscher referred, was that the license value of a Getty Images image, which could be compared to a Yellow Pages image, was $339.00-$699.00 per image. *Id.* Mr. Tregillis' opinions did not change Mr. Oscher's opinions, but only further confirmed for him that his $132.00 per image value was reasonable. (*Id.*; *see also* 309:12-22.) While SuperMedia, not surprisingly, ultimately chose not to utilize Mr. Tregillis and his opinions at the Damages Trial, the fact that its own former expert placed a much higher value on comparable images

28

obviously showcases the reasonableness and reliability of Mr. Oscher's opinions. SuperMedia argues that Mr. Oscher ignored "available alternatives" in the industry (Post-Trial Brief at 48-49), but his evaluation of SuperMedia's other licenses, as well as Mr. Tregillis' report, were examples of him doing just that; moreover, courts have repeatedly approved focusing on license fees actually received by the copyright owner. *Leonard*, 2013 WL 5311295, *6 (stating fair market value can be shown by plaintiff demonstrating previous compensation for the work and that "courts have often analyzed a plaintiff's own licensing fees"); *Jarvis*, 486 F.3d at 534-35 (discussing previous amounts plaintiff received and discounting defendant's expert for focusing on third party amounts received); *On Davis*, 246 F.3d at 156 and 172 (approving plaintiff's evidence of fair market value based on plaintiff's prices and amounts received for the copyrighted work).

In sum, Mr. Oscher arrived at the value of the infringed works by looking at the actual market for the images and what comparable licensees paid for them during the time period of the infringement. His analysis lead him to the conclusion that the value of the images that SuperMedia and its predecessors wrongfully transferred at the time of the infringement was $132.00 per image. In reaching that conclusion, he logically focused on what SuperMedia paid, as well as what SBC and AT&T paid, as they are all comparably-sized yellow pages publishers who licensed images during the relevant time period. SuperMedia's license with Getty Images, as well as SuperMedia's own former damages expert, further corroborated and demonstrate the reasonableness of Mr. Oscher's opinions.

      **b.**    **Yellow Pages is entitled to actual damages in the amount of $132.00 per image for <u>each</u> improper transfer.**

As laid out in detail in the Proposed Findings of Fact, Mr. Oscher's $132.00 number leads to a total actual damages amount of $2,668,248 if this Court does not enter an adverse

29

inference and $5,940,000 if this Court does enter an adverse inference. The totals are a result of taking the $132.00 per image value multiplied by the number of images each time SuperMedia wrongfully transferred them to a third party. The Copyright Act provides copyright holders with the exclusive right to distribute their copyrighted works, and as this Court has already found, SuperMedia was not permitted to transfer the images to any third party under the parties' agreement. 17 U.S.C. § 106; Post Trial Opinion. The images were not transferred to just one party, they were transferred to *numerous* parties, and Yellow Pages is of course entitled to damages for each wrongful distribution. *See e.g., Deltak, Inc.*, 767 F2d at 363-64 (analyzing fair market value of copyrighted work that would be multiplied by 15 as the number of times it was distributed by the infringer); *Bishop v. Wick*, No. 88 C 6369, 1988 WL 166652, *5 (N.D. Ill. Dec. 29, 1988) (awarding actual damages of fair market value of copyrighted work "multiplied by each time that defendants illegally copied or utilized the [copyrighted work]"); *F.E.I. Pub., Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216 (7th Cir. 1985) (awarding actual damages based on a license fee multiplied times the number of parishes that should have paid a license fee).

SuperMedia argues that any calculation of a reasonable license fee must be something less than the full amount it previously paid because its only infringing use was the "physical transfer of the Licensed Images to its third party contractors," and it had the right under the license for contractors to use the images in SuperMedia advertisements. (Post-Trial Brief at 41-42.) First of all, this is incorrect. SuperMedia only had permission to allow its contractors to use the images, within the limited scope of SuperMedia's license, in a SuperMedia-controlled environment, and not otherwise. They did not have the right to use copies of the images that were illegally transferred to them from SuperMedia or any other source. Second, use of Yellow

30

Pages' images was not only by contractors, it was also by subcontractors, which this Court already determined was not permitted. (Post Trial Opinion at 35-36.) Most important, though, Yellow Pages does not dispute that SuperMedia could use the images in its advertisements, but the "infringing use" for which it is entitled to damages does not relate to use of the images in advertisements.[9] It relates to SuperMedia's violation of the right of distribution and the license by transferring the images to numerous contractors and subcontractors located all over the world, in addition to Facebook, Google, customers, and the general public. These transfers were made without permission from Yellow Pages and without even making the transferees aware of Yellow Pages and its license provisions. (4/10/14 A.M. Tr. 73:23-74:9.) On top of that, under SuperMedia's own admission, when it made these numerous transfers, it took no measures to ensure they were only used for SuperMedia. (*Id.* at 63:4-15.) By transferring the images to these third parties, SuperMedia essentially gave each of them the right to do whatever they wanted with the images, including transferring them out even further, with no input or permission from Yellow Pages. In other words, the transfers essentially resulted in a license to each third party. The value of the infringing use, therefore, is what a reasonable license fee would have been for SuperMedia to have a proper license for all of these third parties. None of these third parties paid for a license, and SuperMedia certainly did not pay for any of these third parties to have a license. By asking for the right to transfer Yellow Pages' images to all these third parties, SuperMedia is asking for each of them to be licensed in the same way SuperMedia was; how could the fair market value of such a right be anything less than a reasonable license fee for each third party? Every third party to which the images were transferred for free was obviously one

---

[9]    Ironically, SuperMedia argues that contractors could use the images under the amended Service Agreement, while at the same time arguing that the Amendment permitting that use is invalid because it could only have been entered into by the original Yellow Pages, i.e. AdMedia. SuperMedia obviously cannot have it both ways. If Yellow Pages is not a party to the 2007 Amendment, then it is invalid, meaning contractors never had the right to use the images, and all such use in advertisements would be infringing use in addition to the improper transfers.

31

that Yellow Pages would no longer have the opportunity to license to, regardless of whether any of these third parties would have ever been willing to pay for a license or not. (11/18/15 Tr. at 310:20-25; 364:20-365:3); *see also On Davis*, 246 F.3d at 164 (stating that "a principal objective of the copyright law is to enable creators to earn a living either by selling or by licensing others to sell copies of the copyrighted work"). The fair market value of such infringing use would be $132.00 per image for each time it was transferred. There is no reason why it would have been anything less, and SuperMedia has no evidence of the same, other than to assert the extreme and unsupportable position, as discussed further below, that the fair market value of such infringing use is $0.00.

**c.      In proving actual damages, Yellow Pages is not required to show lost sales or licensing opportunities.**

SuperMedia also argues that Yellow Pages is not entitled to actual damages because it did not lose any sales or licensing opportunities as a result of the infringement. In making this argument, SuperMedia attempts to place a burden on Yellow Pages that very clearly does not exist. While Yellow Pages could pursue lost sales or licensing opportunities as its actual damages if it so desired, it is by no means required to do so, and SuperMedia of course cites to no case stating otherwise. As mentioned, there are many ways to calculate actual damages, and a lost sales or licensing opportunities approach would merely be one choice.[10] *Leonard*, 2015 WL 4778827, *7. The case law repeatedly demonstrates that, in calculating the value of the work, including a reasonable license fee and demonstrating entitlement to the same, the copyright

---

[10] Notably, even the cases SuperMedia cites for supposed support of the requirement to show lost sales or licensing opportunities recognize that other ways of calculating actual damages exist. *See e.g., Baker v. Urban Outfitters*, Inc., 254 F. Supp. 2d 346, 357-359 (S.D.N.Y. 2003) (analyzing not only potential lost sales, but also a reasonable license fee calculation based on the plaintiff's previously obtained license fees); *see also Multitherm Corp. v. Fuhr*, 1991 WL 146233, *14 (E.D. Pa. July 24, 1991) (analyzing not only potential lost sales, but also the "value of use" approach to determine actual damages). In addition, the *Banff* case was pre-*On Davis*, and thus would no longer be good law to the extent SuperMedia is attempting to show the *Banff* case somehow requires Yellow Pages to show lost sales or licensing opportunities. *Banff Ltd. v. Express, Inc.*, 921 F. Supp. 1065 (S.D.N.Y. 1995).

32

owner is not required to prove elements such as lost sales, lost opportunities, or diminution in the value of the copyright. *On Davis*, 246 F.3d at 164-65; *see also Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266, 269 (2d Cir. 1957) (awarding amount of license fee plaintiff would have been entitled to charge); *Ringgold v. Black Enter. Television*, 126 F.3d 70, 81 (2d Cir. 1997) (awarding damages even though infringement likely did not affect sales because that "deserves little weight against a plaintiff alleging appropriation without payment of a customary licensing fee"); *Deltak, Inc.*, 767 F.2d at 363-64 (approving award based on the value of the infringing use even though the plaintiff could show no lost sales); *Joseph J. Legat Architects*, 1991 WL 38714, *6 (discussing need to award actual damages based on the value of the infringing use regardless of ability to show quantifiable loss).

The Second Circuit analyzed this very issue in detail in *On Davis*, recognizing that, "if the court dismisses the claim by reason of the owner's failure to prove that the act of infringement cause economic harm, the infringer will get his illegal taking for free, and the owner will be left uncompensated for the illegal taking of something of value," and "a principal objective of copyright law is to enable creators to earn a living either by selling or by licensing others to sell copies of the copyrighted work." *On Davis*, 246 F.3d at 164-65. In approving the owner's loss of the fair market value of the license fees as a damages amount, regardless of the owner's ability to show loss sales or economic harm, the Second Circuit further stated:

> To rule that the owner's loss of the fair market value of the licensee fees he might have exacted of the defendant do not constitute 'actual damages,' would mean that in such circumstances an infringer may steal with impunity. We see no reason why this should be so.

*Id.* at 166.

In addition, in *Deltak, Inc. v. Advanced Systems, Inc.*, the Seventh Circuit analyzed the actual damages to the plaintiff when the unlicensed defendant took a document of the plaintiff

and copied and distributed it to 15 of the defendant's customers. 767 F.2d at 360. Even though the 15 customers already had a copy of the document from the plaintiff, and there was no evidence that the plaintiff could have licensed the document to the defendant or its customers, the court found actual damages should be paid to the plaintiff based on the value of the infringed work, i.e. the fair market value of the infringed work for each of the 15 copies. *Id.*

SuperMedia's attempt to escape payment for its numerous transfers of Yellow Pages' images by asserting that Yellow Pages failed to show it would have licensed images to each of the third parties is improper under the law and should not be entertained. Indeed, under this theory, for at least some of the transfers, such as, for example, transfers to SuperMedia's customers, the general public, and even Facebook and Google, it would be nonsensical and impossible for Yellow Pages to show lost sales or opportunities. Obviously that does not and should not equate to a "get out of jail free card" for SuperMedia.

Moreover, Mr. Oscher's opinions further corroborated the irrelevance of whether Yellow Pages had any lost licensing opportunities. As he explained, he did not specifically consider what ability Yellow Pages had to sell its images to SuperMedia's contractors and subcontractors at various points in time; what was relevant to him was the sales actually made during the relevant time period and the amounts of them. (11/18/15 Tr. at 309:24-310:19.) He did opine, however, that given the contractors and subcontractors received all 5,000 images for free, they would not likely ever have an economic interest in paying for another set. (*Id.* at 310:20-25.) In addition, publishers would of course have no economic incentive to pay to license Yellow Pages' images if their outsourcers already have them. (*Id.* at 364:20-365:3.) Regardless, Yellow Pages is entitled to significant damages due to SuperMedia's numerous violative transfers, and, under the law, this is the case regardless of an ability to show lost sales or licensing opportunities.

34

d.    **SuperMedia has no testimony, expert or otherwise, to counter Mr. Oscher's valuation of damages for any infringement that occurred prior to 2010.**

SuperMedia's only testimony pertaining to the amount of damages to which Yellow Pages is entitled was from its stock photography expert, Ms. Boughn. In contrast to Mr. Oscher, Ms. Boughn is not a certified public accountant, economist, or any other such financial or damages expert. (11/17/15 Tr. at 200:3-8.) Along those lines, her opinions do not relate to any damages calculation for this case, and she made no attempt to determine Yellow Pages' damages in this case. (*Id.* at 182:16-183:1 ("So you haven't made any attempt to determine Yellow Pages Photos' overall damages in this case? It's not part of my charge to do that.").) The opinions that Ms. Boughn did offer consist only of the following: 1) her opinion on the amount of a hypothetical license fee during the time frame of 2010-2013 for the express right to transfer Yellow Pages' images to contractors; and 2) her opinion on the amount of an entirely new hypothetical license fee for Yellow Pages' images during the time frame of 2010-2013. (*Id.* at 179:17-183:1.) Therefore, neither opinion she offered pertained to the fair market value of any kind of license for Yellow Pages' images prior to 2010.

This limitation makes sense, as SuperMedia's position for about two years in this case was that all the infringing transfers took place in 2009 or later. However, as is often the case with conflicting positions and inconsistent testimony, SuperMedia now finds itself in the untenable position of attempting to assert that the transfers of images to AMDOCS, Office Tiger, and ASEC took place in 2005 and 2006 in order to avoid statutory damages and attorneys' fees, while at the same time having absolutely no expert testimony on the value of any kind of license, no matter the terms, during that time period.[11] This is of course highly significant given the fact

---

[11]    Ms. Boughn's report was served in May 2015, and SuperMedia did not change its story on the timing of the transfers until summary judgment briefing in August 2015, long after the close of discovery or any time

that Ms. Boughn's extreme opinions on the license amounts having such a low value rested in large part on her view that, as of 2010, the stock photography market had drastically changed, leading to lower license fees.   (11/17/15 Tr. at 132:24-133:13 ("The market in 2010 was radically changed.").)   As a result, to the extent the Court gives Ms. Boughn's testimony any weight, it can only be in relation to infringement by SuperMedia in 2010 and later.   Mr. Oscher's opinions of a $132.00 per image value in relation to the alleged earlier pre-2010 transfers stand uncontroverted and are the only expert opinions before this Court on those particular transfers.

> **e.**      **Ellen Boughn's extreme assertions that Yellow Pages' images are essentially worthless fall quickly when compared with the actual facts.**

Now that all else has failed, and SuperMedia is finally faced with the payment of damages, it resorts to attempts to lower its payment amount through a campaign of bashing the quality of the images it has consistently used and profited from for about 15 years.   The star of this campaign was Ms. Boughn, who spent a significant amount of time criticizing Yellow Pages' images for supposedly not meeting various "industry standards," to the point where she ultimately opined that they are unmarketable and of little or no value.

No matter how much stock photography experience Ms. Boughn might have, her extreme positions are immediately belied by the actual facts of this case.   First of all, it is not as if SuperMedia's decision to license Yellow Pages' images and pay $660,000 for them was some kind of fleeting mistake.   As Rick DeLeon, former Manager of Publishing Operations for SuperMedia testified at the Damages Trial, SuperMedia is a large company that puts a great amount of thought into business decisions on whether to engage new vendors, including stock photography vendors.   (11/17/15 Tr. at 19:13-15; 21:4-15.)   SuperMedia has a formal vetting

---

upon which SuperMedia could have attempted to supplement Ms. Boughn's opinions.  This is likely one reason for SuperMedia's attempt to manufacture new evidence in the form of its improper Figure 2.

process for engaging stock photography vendors that includes the input of a number of people. (*Id.* at 22:17-23.) Mr. DeLeon testified in detail about the process, which includes numerous steps with different teams of people, including: searching for vendors; evaluating the images of particular vendors; examining the quality, variety, categories and volume of the images; making a recommendation on whether to license the images; and negotiating the license for an agreeable price. (*Id.* at 22:17-25:3.) In reaching an agreeable price for stock photography, a budget analysis is undertaken and agreements are only entered into if an agreeable price is reached and the agreement is considered advantageous to SuperMedia. (*Id.* at 24:20-25:11.)

Verizon's process in vetting Yellow Pages was no different. Yellow Pages negotiated its deal to license images to Verizon for about 16 or 17 months, a process that included many people and numerous meetings. (11/18/15 Tr. at 224:20-225:21.) In addition to the lengthy negotiation process, Yellow Pages provided Verizon with many images to review before it ever signed an agreement. By the time Verizon signed the Service Agreement in 2001, it had already reviewed 1,000 of the 5,000 images it ultimately licensed. (*Id.* at 225:6-226:4.) Verizon could have rejected images for quality reasons, but it never did. (*Id.* at 228:13-230:15) It kept them, and it paid for them. (*Id.* at 226:5-7, 230:1-15.) Moreover, the later-received images were categories that Verizon specifically requested from Yellow Pages. (*Id.* at 226:19-227:14.) That Verizon made a well-vetted business decision to license the images at $132.00 per image alone contradicts Ms. Boughn's opinions that the images are unmarketable and of little value, not to mention all the other licensees who have paid to license the images, including AT&T at a value of $195.00 per image.[12]

---

[12]    That the images were valuable to SuperMedia is further demonstrated by the fact that, when SuperMedia removed the images from its main library in 2011, it expressed the need internally to purchase new licenses to "make up for the images [SuperMedia] lost from YPPI" and even in 2012 was still focusing "on images

37

Moreover, SuperMedia's decision to license Yellow Pages' images seems to have worked out well given that it has used the images continuously for about 15 years. Despite Ms. Boughn's scathing reviews of the images, and SuperMedia's attempts to show otherwise, it continues to use Yellow Pages' images today, and not just in an advertisement here and there, but rather everywhere. SuperMedia's story has always been that it removed the images from its system in 2011, and it produced less than a thousand advertisements in discovery containing the images, providing the impression that any remaining use of the images would only be re-running older advertisements. (Trial Ex. 654.) However, as Mr. Moore testified, he reviewed a small sampling of current SuperMedia directories from around the country, 61 out of its more than 1700, and found 530 advertisements containing 603 of Yellow Pages' images, only a handful of which were previously produced by SuperMedia in discovery. (11/18/15 Tr. at 163:16-165:24; Trial Ex. 657.) Given that SuperMedia never produced documentation demonstrating these to be older advertisements, they would appear to be brand new uses, and in the case of one directory, Mr. Moore was able to obtain an older version of it and verify that advertisements containing the images in the current directory were not in the previous directory. (*Id.* at 172:7-173:6, 175:1-24; Trial Ex. 659.) Just from Mr. Moore's small sampling of current directories, he found images from 74 of the 100 collections licensed to SuperMedia in use today. (*Id.* at 177:15-23.) Mr. Moore was also able to determine from information available from the Local Search Association that the revenue generated to SuperMedia just from the 530 advertisements he found with his images was approximately $11,700,000.00. (*Id.* at 184:20-185:18, 188:14-190:1.)

The bottom line is this: SuperMedia made a well-vetted decision to license the images; it has used them consistently for 15 years; it continues to use them across the country in new

---

that are in categories that were identified as a gap from YPPI." (11/17/15 Tr. at 27:18-31:21; Trial Exs. 632 & 635.)

advertisements even today; and SuperMedia continues to generate multi-millions of dollars from advertisements containing the images. In light of these facts, none of which Ms. Boughn even took into account, any assertion that Yellow Pages' images have little or no value and are "unmarketable" cannot be taken seriously.

   **f.     Ellen Boughn's subjective opinions on the quality of Yellow Pages' images lack credibility.**

   One of Ms. Boughn's two opinions was that the hypothetical license fee for a new license to all 5,000 Yellow Pages images in the 2010 to 2013 time frame would be in the range of $1,729.00 to $25,935.00 (i.e. a $1.00 to $15.00 value per image). (11/17/15 Tr. at 175:9-14, 199:7-9.) Ms. Boughn provided this per image range, which she only applied to less than half the images at issue due to "quality" issues, despite the fact that: 1) she has no degree in photography; 2) she has never worked as a photographer; 3) she has never worked with a yellow pages publisher in selecting images; 4) she has never had a job with a yellow pages publisher; 5) she has never had a job with a stock photography vendor specializing in images for the yellow pages; and 6) along the same lines, she has never built advertisements as a graphic artist for a yellow pages publisher. (*Id*. at 219:8-12; 178:7-25.)

   The main justification provided by Ms. Boughn for such a low license amount was her opinion on the "quality" of the photographs. (*Id*. at 132:18-133:9.) Indeed Ms. Boughn spent the majority of her testimony marching the Court through cherry-picked examples out of the 5,000 Licensed Images that in her opinion, for various reasons, were of low quality. Over 3,000 of the 5,000 images at issue Ms. Boughn found to be so lacking in quality that she did not even include them in her hypothetical license fee. (*Id*. at 169:9-16.) In other words, even though 5,000 images were licensed by SuperMedia, and all 5,000 images were repeatedly infringed through improper transfers to third parties, because Ms. Boughn did not like the quality of

39

certain images she removed them completely from her license fee calculation.  (*Id.* at 218:4-16.) This was her method despite recognizing that others may have a different opinion on what makes an "acceptable" image.[13]  (*Id.* at 219:4-7.)  And obviously many others do have differing opinions on the issue since Mr. Moore's review of 61 current SuperMedia directories revealed the use of 437 unique Yellow Pages' images, 274 of which Ms. Boughn claimed were "unmarketable." (11/18/15 Tr. at 180:19-181:20.)

While Ms. Boughn may be experienced in the stock photography industry, the complete lack of credibility in her application of quality standards to degrade Yellow Pages' images is glaring.  First and foremost, Ms. Boughn only reviewed 4,750 of the 5,000 images, and did not even include the missing 250 images in her hypothetical license fee. (11/17/15 Tr. at 199:15-200:2.)  However, as the license called for, and as Mr. Moore testified, Yellow Pages provided 5,000 images (100 collections of 50) to SuperMedia, not 4,750.  (11/18/15 Tr. at 209:16-25.) Moreover, the 4,750 images that Ms. Boughn did review were of a completely different DPI and file format than those originally provided by Yellow Pages to SuperMedia.  The images were provided to her by SuperMedia, and she had no idea whether they were in the same format as what Yellow Pages originally supplied.  (11/17/15 Tr. at 237:10-238:12.)  It turns out they were not.  As Mr. Moore testified, the great majority, if not all, of the images he originally provided to SuperMedia were 300 DPI and in a JPEG format.  (11/18/15 Tr. at 210:1-211:10.)  By contrast, Ms. Boughn's list of the images showed that the great majority she reviewed were 250 DPI and in a TIFF format.  (11/17/15 Tr. at 237:10-238:12.)  This is a significant difference because a smaller DPI, and changing the format of an image from JPEG to TIFF, affects the quality of the image, including, for example, the contrast and focus.  (*Id.* at 210:7-211:24.)  Ms. Boughn's

---

[13]    Ms. Boughn also recognized that, regardless of her opinion on the images, they were entitled to copyright protection and that others would generally need to pay for permission to use them. (11/17/15 Tr. at 234:20-235:20.)

opinion regarding the quality of the images is based on a review of images that were not of the same quality and characteristics of those originally supplied to SuperMedia. Her opinion, therefore, does not fit with the facts of the case, which serves as grounds for the Court to strike her opinions completely, or, at a minimum, severely discount them. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 n.13, 764-65 (3d Cir. 1994) (affirming exclusion of expert physician testimony as to patients she did not examine even though the expert examined other similar); *see also Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 789-90 (3d Cir. 2009) (affirming exclusion of expert testimony); *Withrow v. Spears*, 967 F. Supp. 2d 982, 997 (D. Del. 2013) (excluding expert testimony).

As if this was not enough, Ms. Boughn removed images from her hypothetical license fee count in sweeping amounts with no reasonable basis for doing so. As a threshold matter, at least hundreds of the images Ms. Boughn had a problem with are currently being used in advertisements in SuperMedia's directories, so they obviously met someone's "industry standards." Moreover, the specific industry standards she used were applied irrationally and unreliably.[14] For example, 531 images were removed from her calculation as unmarketable because Ms. Boughn claimed they needed a property release, even though she admitted she was not qualified to give legal opinions, was aware of no legal issues with Yellow Pages' images, and had previously said those asserting the need for a property release "had no leg to stand on." (11/17/15 Tr. at 224:8-225:16.) Moreover, when faced with some of the specific image

---

[14]    In evaluating the quality of the images and their marketability, Ms. Boughn considered only whether a stock photography company, such as Getty Images, would have been willing to accept the images to license out to others. (*Id.* at 220:1-5.) She did not evaluate or opine in any way on whether a yellow pages publisher would have been willing to license the images, even though that is the premise of Yellow Pages' entire business. (*Id.* at 220:6-11.) Yellow Pages has only ever licensed straight to end users, the great majority being yellow pages publishers like SuperMedia; it has never even developed its images for, or licensed its images to, microstock photography licensing outlets. Yet, that was the sole criteria invoked by Ms. Boughn to determine the value of the images.

41

examples that she claimed needed property releases, it was quite clear that they did not. One such example was an aerial skyline view of Hawaii, even though Ms. Boughn agreed that skylines do not need property releases. (*Id.* at 227:4-228:4.) Other images included homes owned by Mr. Moore, which quite obviously, despite Ms. Boughn's attempts to show otherwise, would not require a release. (*Id.* at 225:17-226:7.)

Ms. Boughn also completely discounted another 658 of the images due to "technical issues," claiming they were so poorly done that any artist attempting to use them would have serious problems. (*Id.* at 228:5-21.) This opinion is easily defeated by the facts: as mentioned, many of those images were actually used in numerous SuperMedia advertisements. In determining that these images have technical issues, Ms. Boughn did not take into account whether they were actually used in advertisements, and even when confronted with examples of such use, Ms. Boughn refused to change her opinion, asserting that "there is no accounting for taste." (*Id.* at 228:22-229:13.) Ms. Boughn went so far as to say that no matter how many times an image has been used in advertisements, her opinion on it being "unmarketable" would never change. (*Id.* at 229:24-230:2.) The absurdity of that position requires no additional explanation.[15]

---

[15] Ms. Boughn's other criticisms of the images likewise lack credibility. For example, despite not being a lawyer, Ms. Boughn opined that the images were less value because they lacked "sufficient" model releases. (11/17/15 Tr. at 221:2-15.) Not only did she only review a sampling of the releases, but she again was aware of no legal issues caused by the Yellow Pages images. (*Id.* at 221:11-15, 222:6-13.) Moreover, the absurdity of this opinion became clear when many of the images she claimed needed releases were of Mr. Moore himself, as well as his family, none of which she took into account in her opinions. (*Id.* at 222:14-224:7.) Refusing to back off her opinions even when confronted with these issues, Ms. Boughn went so far as to say that Mr. Moore should have signed an agreement with himself in order to appear in the images. (*Id.*) Likewise, Ms. Boughn criticized the images, asserting they were of less value, because they were not programmed with keywords. (*Id.* at 145:13-19, 173:13-174:19.) However, SuperMedia specifically asked that he not use keywords with the images, yet another crucial fact Ms. Boughn ignored. (11/18/15 Tr. at 227:17-228:7.)

42

g.    **Yellow Pages' images cannot be compared to images in the general stock photography industry as a whole.**

Outside of the so-called quality issues with Yellow Pages' images, the only other reasoning Ms. Boughn provided for assigning them such a low value was what she described as changes in the stock photography market over time that lead to lower image licensing prices, such as, for example, the emergence of microstock companies like Shutterstock. (11/17/15 Tr. at 132:24-133:13, 136:16-138:10.) According to Ms. Boughn, in the early 2000's, the microstock business was just beginning and still "trying to find its level" in terms of pricing, but that by 2010, microstock photography was dominating and average license amounts were plummeting. (*Id.* at 136:16-137:2, 137:21-138:10.)

With no real justification, Ms. Boughn unilaterally applied these so-called market changes to the value of Yellow Pages' images, assuming that its licensing prices also would have plummeted by 2010, while at the same admitting that not every market player would be affected in the same way by market trends. (*Id.* at 204:20-205:1.) Ms. Boughn's assumptions are once again belied by the facts. Yellow Pages' images were not being licensed through a microstock outfit like Shutterstock, and they never have been. Rather, Yellow Pages licenses its images straight to its licensees, i.e. yellow pages publishers, and the images are specifically tailored for use in the yellow pages industry. Along those lines, Yellow Pages, unlike a massive outfit like Shutterstock or Getty, is able to give its licensees special attention and respond to specific requests on exactly what categories of images licensees need. For example, at SuperMedia's request, Mr. Moore chartered a helicopter and created a category of Hawaii images. (11/18/15 Tr. at 202:1-12.) He also created categories of Latin and Hispanic people, as well as "everyday" people, specifically at SuperMedia's request. (*Id.* at 226:19-227:14.) As Ms. Boughn herself wrote in 2010, "if stock makes up your sole income and your work is so specialized that only a

43

few could fill your niche, congratulations you're safe for now." (11/17/15 Tr. at 205:20-206:16, 216:11-14.) As Ms. Boughn admitted, in all her experience she is not aware of any other stock photography company that focuses solely on images for the yellow pages industry. (*Id.* at 179:1-4. Yellow Pages very clearly fills a niche and always has, yet Ms. Boughn did not take that into account in any way in setting a hypothetical license value for the images.

Yellow Pages' own licenses further demonstrate that it was not subject to any general shift downward in license prices. For example, Yellow Pages entered into its agreement with SuperMedia, a large publisher, in 2001 with a $132.00 per image value. (11/17/15 Tr. at 210:25-211:14.) In addition, in 2003, Yellow Pages entered into an agreement with SBC (which later merged with AT&T), another large publisher, with a $100.00 per image value. (*Id.* 212:2-7.) Then in 2007, around the time Ms. Boughn claimed the general stock photography market was plummeting, Yellow Pages entered into an agreement with AT&T, another large publisher, for $100.00 an image. (*Id.* at 212:8-213:25.) Still later, in 2008, AT&T amended its agreement with Yellow Pages, agreeing to pay $195.00 an image, nearly twice what it agreed to pay the year before. (*Id.* at 214:1-10.) Therefore, from 2001 to 2008, the time period in which Ms. Boughn claimed the stock photography market radically changed with license amounts plummeting, Yellow Pages was consistently able to get $100.00 or more per image from its larger licensees, and Ms. Boughn was eventually forced to admit the same. (*Id.* at 214:11-19.) Despite having reviewed these licenses, and being aware of the drastic differences between Yellow Pages and the general stock photography market, Ms. Boughn took none of this into account in reaching her value of $1.00 to $15.00 per image. (*Id.* at 215:17-217:10); *see also Leonard*, 2013 WL 5311295, *6 (stating that expert's failure to take the plaintiff's own license fees into account "should affect the weight that the factfinder affords his testimony; it is certainly a decision that

44

provides fodder for vigorous cross-examination"); *Jarvis*, 486 F.3d at 534 (discounting expert when it "relied almost exclusively on the Getty website for his figures" and did not take into account the plaintiff's own license fees). When confronted with these facts, Ms. Boughn's only response was that there must have been "darn good salesmanship going on." (*Id.* at 217:4-10.) Regardless of how Yellow Pages was able to obtain its license fees, Ms. Boughn's failure to take into account what the images were actually selling for in determining the fair market value obviates any weight her opinions may have had.

      **h.**    **Ms. Boughn's opinion that the value of a hypothetical license fee to add the right to transfer is $0.00 is nonsensical.**

Ms. Boughn's only other opinion was that the value of a hypothetical license fee to add the right to transfer the images is $0.00. (11/17/15 Tr. at 183:15-19.) Her only basis for this opinion was that she was not familiar with charging for that right when the image would only be transferred as part of the "work flow," and that Yellow Pages itself did not appear to charge more for the right to transfer. (*Id.* at 127:2-128:10, 130:15-132:17.) First, Ms. Boughn's opinion of a $0.00 value applies only to the consideration of transferring to contractors under agreement that are in the "work flow" of the licensee. Here, SuperMedia not only transferred the images to contractors, it also transferred images to subcontractors who do not even have an agreement with SuperMedia (i.e. MPS and AMDOCS), as well as parties completely outside of any "work flow," such as Facebook, Google, customers and the general public. Ms. Boughn's opinion would not even apply to any of these impermissible transfers.

Moreover, none of the numerous parties to which SuperMedia transferred the images had "work flow" restrictions on the images; they were not even aware of Yellow Pages or its licensing terms. (4/10/14 Tr. 63:4-15, 73:23-74:9.) As Ms. Boughn admitted, if the transfer right was not narrowly tailored with restrictions, it would make a difference in her opinion, yet

45

she did not take any of this into account; how could she if she did not even know who received the images through the improper transfers? (*Id.* at 185:17-186:1; *see also* 194:19-23 ("Q: You don't mean to say that it's standard in the industry for a licensee to be able to take the standalone image file that it has licensed and transfer them out to any third party that it wants, do you? A: No, I don't mean that.").) She did not even know how many different parties SuperMedia transferred the images to, who the third parties were, or how large they were, and was not even told that some of the transfers were to parties with which SuperMedia had no agreement, and thus there would be no restrictions at all.[16] (*Id.* at 183:2-14, 183:20-184:8, 186:2-8.) Whether the transfer would be made to a one-man company or a Fortune 500 company, Ms. Boughn stuck with her $0.00 value. (*Id.* at 184:3-8.) This is nonsensical. Yellow Pages' entire business is based on obtaining license fees for the use of its images; in determining its damages, it is obviously highly relevant to examine all the different parties the images went to and their size, as well as how many times they were transferred. The value of allowing SuperMedia to transfer to however many parties it wanted without restriction could essentially resort in a forfeiture of any further licensing on the part of Yellow Pages, a right that would have obviously come at a higher price than $0.00. The narrow right Ms. Boughn was evaluating was not so narrow when SuperMedia made the various transfers, and given that she had no information on the actual transfers and lack of restrictions on use of the images, her opinion must be discounted.[17]

The only other basis for Ms. Boughn's $0.00 value on the right to transfer was that Yellow Pages did not appear to charge more for that right in its agreements. (*Id.* at 186:14-18.)

---

[16]    For those contractors with which SuperMedia did have agreements, the provisions did nothing to protect Yellow Pages' images. *See* Section 2(c) below.

[17]    SuperMedia's *Bruce* case does not help Ms. Boughn. *Bruce v. Weekly World News, Inc.*, 310 F.3d 25 (1st Cir. 2002). In that case, the court in fact awarded the plaintiff licensing fees for improper use, not improper transfers, and merely made the point that, while it would be allowed damages to cover the infringer's use, it would not be entitled to more damages for repeated uses of the same work when the industry did not typically pay per use. This is no different than Yellow Pages' licenses, which allow for images to be used an unlimited amount of times by a particular user for one license fee.

46

However, a quick look at the agreements she referenced shows no such transfer provision. For example, the so-called transfer language in the RomFab agreement stated only that "***ads and their linked images*** may be transferred only in those instances where the purchasing publisher outsources web hosting, pagination and/or printing." (*Id.* at 186:19-187:21; Trial Ex. 518.) (emphasis added). As Mr. Moore explained, this provision did not grant RomFab a right to transfer stand-alone copies of Yellow Pages' images to anyone, contractor or otherwise, and Ms. Boughn admitted the same. (*Id.* at 192:20-193:4; 11/18/15 Tr. at 278:16-24.) Rather it addressed the specific and limited need to provide *already-built advertisements*, that might have images in them, to vendors such as paginators, web-hosters and printers, none of whom would have access to or be using the stand-alone images for any purpose. (*Id.*; *see also* 11/18/15 Tr. at 72:22-73:7, 221:3-223:9.) The few other Yellow Pages agreements that Ms. Boughn relied on that contained similar language likewise only allowed already-built ads that might have images in them to be provided to printers, etc.; no such agreement allowed for the transfer of stand-alone images to any third party for any reason. (11/18/15 Tr. at 222:24-223:11.) As a result, Ms. Boughn had zero basis for opining that Yellow Pages would not have charged SuperMedia for the right to transfer its images to third parties.

### 2.    Statutory Damages.

The second type of damages available under the Copyright Act are statutory damages, for which the Act sets a range of $750 to $30,000 per work, and up to $150,000 per work if the infringement was willful. 17 U.S.C. § 504. Here, there is no dispute that there are 100 works at issue. The amount of statutory damages to be awarded is within the discretion of this Court, and they are often utilized when actual damages are uncertain. *Teri Woods Pub., LLC v. Williams*, 2013 WL 6179182, *3-4 (E.D. Pa. Nov. 25, 2013); *F.W. Woolworth Co. v. Contemporary Arts*,

47

*Inc.,* 344 U.S. 228, 231-33 (1952). This Court may award statutory damages even when there is no specific evidence of actual damages. This is because statutory damages are designed not only to compensate the plaintiff, but also to deter and punish the infringer. *Microsoft Corp. v. Gonzales,* 2007 WL 2066363, *5 (D.N.J. July 13, 2007); *see also F.W. Woolworth,* 344 U.S. at 233 (holding that statutory policy of discouraging wrongful conduct permits finding of liability "[e]ven for uninjurious and unprofitable invasions of copyright").

In this case, although actual damages can be calculated with some precision by evaluating the value of the infringing use, statutory damages are particularly fitting due to this Court's ability to increase the damages range. Yellow Pages' entire business is based on licensing its images in exchange for a license fee and being able to control its licensees' use through contractual transfer restrictions. Here, SuperMedia knowingly transferred Yellow Pages' images to numerous third parties that are not in privity of contract with Yellow Pages or bound by Yellow Pages' license terms, and many of which are not even in privity of contract with SuperMedia itself. While a reasonable license fee can be determined, it cannot compensate Yellow Pages for the hard reality that these third parties—some of whom, such as MPS and Office Tiger, are in other countries—now have the images without restriction. *See A & N Music Corp. v. Venezia,* 733 F.Supp. 955, 958 (E.D. Pa. 1990) ("statutory damages should exceed the unpaid license fees so that defendant will be put on notice that it costs less to obey the copyright laws than to violate them"). Moreover, this Court has already found SuperMedia's infringement to be willful; indeed it was particularly willful in this case given SuperMedia's lies to Yellow Pages about the fact that it breached the license and infringed, and then its continued infringement for years after Yellow Pages' inquiry letters. While actual damages cannot account for willful behavior, statutory damages can. *Universal City Studios, Inc. v. Ahmed,* 1994 WL

48

185622, at *3 (E.D. Pa. May 13, 1994) (recognizing defendant's conduct as a preeminent factor and stating that statutory damages award escalates in direct proportion to blameworthiness); *see also Int'l Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir. 1988) ("deterrence of future violations is a legitimate consideration" because "defendants must not be able to sneer in the face of copyright owners and copyright laws").

There is no dispute that to be entitled to statutory damages and attorneys' fees, a copyright owner must register the copyrights in its work before infringement. *See Leonard v. Stemtech Health Sciences, Inc.*, 2011 WL 6046701, *12 (D. Del. Dec. 5, 2011), adopted at 2012 WL 1133185 (D. Del. March 28, 2012). There is also no dispute that Yellow Pages registered the copyrights in the Licensed Images in January-June of 2007. (Trial Ex. 1.) The dispute is when the first infringement occurred, with specific focus on the AMDOCS/Office Tiger[18] and ASEC transfers. Given the representations made to the Idearc bankruptcy court which allowed SuperMedia to assume the license for the Licensed Images without curing any default that existed under the license as of December 31, 2009, SuperMedia is today judicially estopped from asserting there was any pre-assumption default under the license. Moreover, the weight of the evidence at trial showed that even if there was any pre-assumption default, it occurred after the registration of Yellow Pages' copyrights in the Licensed Images.

> a. **SuperMedia is judicially estopped from asserting that there was any default under the Service Agreement prior to its assumption in the Idearc Bankruptcy.**

SuperMedia argues that it is entitled to the benefit of its assumption of the Service Agreement at a $0.00 cure amount in the Idearc Bankruptcy. (Post-Trial Brief at 35-37.) At the same time, SuperMedia argues that, prior to assumption, there existed a number of uncured

---

18    Given this portion of the dispute is not as to which of these two parties Idearc supposedly transferred the Licensed Images, but when, Yellow Pages will refer to them collectively in this Section.

defaults as a result of SuperMedia's breaches of the Service Agreement in 2005, 2006, and 2009. (Post-Trial Brief at 5-8.) Thus, SuperMedia would like to proverbially both have its cake and eat it, too.

SuperMedia spins its illogic as follows. In the first instance, Idearc scheduled the Service Agreement as an executory contract, asserted to its bankruptcy court and all creditors and parties in interest that it had not breached the Service Agreement prior to the Idearc petition date, proposed a $0.00 cure amount, and ultimately confirmed its Plan, which, in part, included an assumption of the Service Agreement. Now, by contrast, SuperMedia argues that, notwithstanding the conflicting admissions made in this case and related contested matters, Idearc actually breached the Service Agreement prior to its assumption in the Idearc Bankruptcy but, because it scheduled the cure claim at $0 and thus misled its bankruptcy court, creditors, and parties in interest about the breaches, Yellow Pages has somehow agreed that Idearc owed $0.00 for its pre-assumption breaches or is otherwise bound to that figure. The law, however, does not allow this kind of litigation gamesmanship.

As the Third Circuit has explained, "the basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir. 1996) (explaining that the doctrine of judicial estoppel is "designed to prevent litigants from playing fast and loose with the courts").[19] That is precisely what SuperMedia is attempting

---

[19]    The Fifth Circuit, within which the Idearc bankruptcy was pending, has similarly held that "[t]he doctrine of judicial estoppel is 'a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position,' particularly in situations where

to do here, having previously taken the position in the Idearc Bankruptcy that no pre-assumption defaults existed under the Service Agreement, and thus no cure payments were owed, in order to pave the way for its assumption of the Service Agreement, but now attempting to prove and rely on the pre-assumption timing of the very same defaults it previously disclaimed to avoid statutory damages and attorneys' fees. As the relevant Third Circuit authority makes clear, SuperMedia is judicially estopped from asserting inconsistent positions in this way, and is instead bound by its original contention—which the Idearc bankruptcy court accepted—that no uncured defaults existed at the time the Service Agreement was assumed in the Idearc Bankruptcy as of December 31, 2009.

> **i.    Idearc took the position in the Idearc bankruptcy that there were no uncured monetary or non-monetary defaults under the Service Agreement, and no other compensation for actual pecuniary loss was owed, and thus Idearc was permitted to assume the Service Agreement.**

A debtor may not assume an executory contract unless it "cures, or provides adequate assurance that [it] will promptly cure," all existing defaults. 11 U.S.C. § 365(b)(1)(A). This includes the need to cure both monetary and non-monetary defaults. *See id; see also In re Empire Equities Capital Corp.*, 405 B.R. 687, 690 (Bankr. S.D.N.Y. 2009) (holding that the 2005 Amendments to the Bankruptcy Code require curing of non-monetary defaults in order to assume a lease or executory contract); *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029 (9th Cir. 1997). Further, the Bankruptcy Code requires that, as a prerequisite to assumption, the debtor must "compensate[], or provide adequate assurance that the [debtor] will compensate[], a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default." 11 U.S.C. § 365(b)(1)(B). Finally, "[w]hen a bankruptcy court

---

'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" *In re Oparaji*, 698 F.3d 231, 235 (5th Cir. 2012).

approves the assumption of an executory contract, it necessarily finds that no uncured defaults exist." *In re Cellnet Data Sys., Inc.*, 313 B.R. 604, 608 (Bankr. D. Del. 2004) (citing *In Re Lykes Bros. Steamship Co.*, 221 B.R. 881, 883 (Bankr. M.D. Fla. 1997)).

In the Idearc Bankruptcy, the Plan, as confirmed by the Idearc bankruptcy court ("Confirmed Plan"), provided that "any contract or lease to which a Debtor is a party as of the Petition Date shall be deemed to be and treated as though it is an executory contract . . . subject to Section 365 of the Bankruptcy Code; and . . . each Debtor shall be deemed to have assumed such contracts and leases to which it is a party . . . ." (Trial Ex. 423, Sec. 6.1(a).) The Confirmed Plan further provided that "[a]ny *monetary* amounts by which each contract and lease to be assumed pursuant to the Plan is in default shall be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount." (Trial Ex. 423, Sec. 6.2 (emphasis added).) Moreover, the Notice of Proposed Cure Amounts for Assumption of Executory Contracts and Leases ("Notice of Proposed Cure Amounts") filed in the Idearc bankruptcy includes the exact same language and memorialized Idearc's contention that no cure payment was owed to Yellow Pages on account of monetary defaults under the Service Agreement. (Trial Ex. 563, Exhibit 10.) Thus, by virtue of the language in its Confirmed Plan and the Notice of Proposed Cure Amounts, Idearc made clear that it was taking the position that it had not engaged in any breaching or infringing transfers of the Licensed Images prior to assumption of the Service Agreement, and thus there were no monetary defaults under the Service Agreement in need of cure.

With respect to any potential non-monetary defaults under the Service Agreement, the Confirmed Plan makes no provision whatsoever for any cure payment or other action to be taken by Idearc as a pre-requisite to assumption of the Service Agreement. Similarly, the Confirmed

52

Plan makes no provision for compensation for "any actual pecuniary loss" resulting from any default under the Service Agreement, as required pursuant to 11 U.S.C. § 365(b)(1)(B). By its complete silence on the question of non-monetary defaults and compensation for pecuniary loss resulting from any default, the Confirmed Plan reflects Idearc's position that there were no defaults under the Service Agreement in need of cure prior to it being assumed, nor was any compensation owed for pecuniary loss resulting from any default. *See In re Cellnet Data Sys., Inc.*, 313 B.R. at 608 ("When a bankruptcy court approves the assumption of an executory contract, it necessarily finds that no uncured defaults exist."). Accordingly, regardless of whether Idearc's transfers of the Licensed Images in violation of the provisions of the Service Agreement constituted monetary or non-monetary defaults under that agreement, it is readily apparent that Idearc took the position, in order to assume the Service Agreement in the Idearc bankruptcy, that there were *no defaults* in need of cure.

        **ii.    SuperMedia is judicially estopped from now taking the position that there *were* monetary or non-monetary defaults under the Service Agreement prior to assumption of the Service Agreement in the Idearc bankruptcy.**

Judicial estoppel precludes SuperMedia from now taking the position that there were defaults in existence prior to Idearc's assumption of the Service Agreement—whether monetary or non-monetary—which could and should have been cured. The Third Circuit in *Krystal Cadillac* identified "certain criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine" of judicial estoppel, explaining:

> First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent.* Second, judicial estoppel is unwarranted unless the party *changed his or her position "in bad faith* -i.e., with intent to play fast and loose with the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm

> identified" and *no lesser sanction would adequately remedy the damage*
> done by the litigant's misconduct.

*Id.* at 319-320 (emphasis in original).

In holding that the debtor was judicially estopped from pursing claims that it had previously failed to adequately disclose in its bankruptcy case, the court in *Krystal Cadillac* found that the debtor's positions were irreconcilably inconsistent because the debtor knew about but failed to disclose the claims it later pursued, and limited its reference to the claims in its disclosure statement "in order to conceal the claims from creditors in the hope of retaining any recovery for itself." *Id.* at 320. The existence of "both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose" led the Third Circuit to affirm the Bankruptcy Court's finding of bad faith on the part of the debtor in applying judicial estoppel. *Id.* at 321. The *Krystal Cadillac* court further held that application of any lesser sanction than dismissal of the debtor's complaint "would reward Krystal for what appears to be duplicitous conduct in the course of its bankruptcy proceeding" through "use [of] sleight of hand to show its cards to its creditors," compromising "the integrity of both the bankruptcy process and the judicial process." *Id.* at 325.

The requisite elements for application of judicial estoppel are readily apparent and warrant a similar result here. In light of the evidence upon which SuperMedia now relies as to transfers of the Licensed Images in 2005, 2006, and 2009—including the testimony of Valerie Dale, who has been employed by SuperMedia since 1989 (11/16/15 Tr. at 69:24-25)—there can be no question that Idearc was aware of the breaches of the Service Agreement when it nevertheless sought to assume that agreement by representing to Yellow Pages and the Idearc bankruptcy court that there were no defaults (whether monetary or non-monetary) and that no cure payment or other curative action on the part of Idearc was required as a condition to

54

assumption. Further, Idearc, like the debtor in *Krystal Cadillac,* was obligated to adequately disclose its assets and liabilities for the consideration of its creditors—especially with respect to executory contract defaults, which the Bankruptcy Code requires be cured in full as a condition of assumption. And, given the extent of the breaches which Yellow Pages now knows existed— multiple transfers of all 5,000 of the Licensed Images—no imagination is required to understand Idearc's motivation for not disclosing those breaches prior to confirmation. Finally, as in *Krystal Cadillac,* this Court should not entertain any "lesser sanction" than estopping Idearc's present contentions that it breached the Service Agreement in 2005, 2006, and 2009, for doing so would only be to reward Idearc for its improper conduct. Accordingly, SuperMedia should be judicially estopped from deviating from its earlier position, that there were no pre-assumption defaults under the Service Agreement, and thus precluded from now arguing or presenting evidence that any transfers of the Licensed Images occurred before December 31, 2009.[20]

> **b.    All of SuperMedia's breaches occurred after the registration of Yellow Pages' copyrights in the Licensed Images.**

There was no direct evidence at the Damages Trial of the date of either the AMDOCS/Office Tiger or ASEC transfer. There was no documentary evidence reflecting the transfers, nor was there testimony from individuals with personal knowledge of the transfers. To support its claim, SuperMedia produced the testimony of Valerie Dale, whom it somehow was unaware of when the parties were conducting discovery in 2014 and the first half of 2015. She was supposedly the ***project manager*** for both projects. Ms. Dale testified contrary to SuperMedia's interrogatory answers, other SuperMedia witnesses, documents produced by

---

[20]    SuperMedia should also be precluded, under the doctrine of judicial *admission*, from now arguing or presenting evidence that any transfers of the Licensed Images occurred before December 31, 2009, given its contention in the Idearc bankruptcy that no uncured defaults existed and no compensation was owed for pecuniary loss resulting from any defaults under the License Agreement. *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 211 n.20 (3d Cir. 2006)("Judicial admissions are concessions in pleadings or briefs that bind the party who makes them.").

SuperMedia, even her own testimony as a SuperMedia 30(b)(6) witness. Nothing corroborated

Ms. Dale's suspect testimony.

In response to an interrogatory served at the very beginning of this case in December

2013 requesting that SuperMedia:

> Please identify every entity, whether affiliated or unaffiliated, that has provided services to SuperMedia *related to the creating and/or building of Advertisements that may use photographic imagery from 2001 to the present.* For each listed entity, please identify the services it has provided to SuperMedia *and the time frame for which it has provided such services for SuperMedia.*

The substantive portion of SuperMedia's response was, without temporal limitation:

> Subject to and without waiver of these objections, SuperMedia answers: The following entities provided services to SuperMedia *between December 22, 2009 to date* relating to the creation of print advertisements: *ASEC Group, LLC…*, Tata Consultancy Services Limited…, MPS Limited…, *AMDOCs/Office Tiger…* .
>
> The following entities provided services to SuperMedia between December 22, 2009 to date relating to the creation of non-print advertisements: bieMedia, web.com, Motorola, Hostopia.

(Trial Ex. 199 (Interrogatory No. 9) (emphasis added).) The timing of when the relationship

with a third party commenced is probative of the earliest date on which images would have been

transferred to that party. This interrogatory answer was never amended.

At the 2014 Trial, SuperMedia's witness, Lori Lawless, unequivocally testified on direct

by SuperMedia's counsel that in July 2007, when she approached Trent Moore about the 2007

Amendment, Idearc was only "contemplating outsourcing." (4/10/14 P.M. Tr. at 101:17-102:5.)

The next year, at the Damages Trial, Ms. Lawless attempted to downplay her previous testimony

by claiming that her previous unequivocal statement of Idearc "contemplating outsourcing" in

mid-2007 was just something she heard from SuperMedia's lawyer, Sue Harris—but, critically,

Ms. Lawless did not claim that her prior testimony was erroneous, nor did Ms. Harris appear at

the Damages Trial to explain. (11/17/16 Tr. at 51:4-13, 79:18-25.)  Ms. Lawless further testified

at the Damages Trial that when she contacted Mr. Moore about the 2007 Amendment, she was

not aware, and no one mentioned to her, that Idearc had already outsourced ad production work

or transferred the Licensed Images to third parties.  (*Id.* at 78:14-80:4.)  There is no dispute,

though, that Ms. Lawless certainly knew in 2007 that Idearc needed to amend the Service

Agreement to expand its rights to add the right for contractors to use the Licensed Images.

(4/10/14 P.M. Tr. at 102:1-9; 11/17/15 Tr. at 75:23-77:14.)

     Ms. Lawless' testimony was consistent with that of Stephen Kurth.  Prior to the 2014

Trial, Mr. Kurth testified at SuperMedia's 30(b)(6) deposition that Idearc first began to outsource

its graphics work and shut down onshore resources in 2009.  (Kurth 2/3/14 Depo. 40:8-41:12.)

This testimony is consistent with <u>contemplated</u> outsourcing in mid-2007 and SuperMedia's

interrogatory answer that it began outsourcing in late 2009.  Mr. Kurth further testified that the

Licensed Images were provided to MPS in 2010 and Tata the following year.  (*Id.* at 90:5-10.)

He also testified that he investigated when the Licensed Images were transferred to ASEC but

"couldn't find anyone that would have done that that still worked for either company."  (*Id.* at

97:7-14.)  Mr. Kurth worked with Valerie Dale on the Tata/MPS project in 2009-2010.  He knew

who she was, and she knew who he was.  (11/16/15 Tr. at 115:21-116:8, 155:19-156:1; Trial Ex.

700 (Interrogatory No. 4).)

     Turning to Ms. Dale, she testified at the Damages Trial that she was the none other than

the project manager for a project known as the "APLL 1" project, whereby Verizon supposedly

outsourced certain print ad production services to a company named AMDOCS and its

subcontractor Office Tiger located in Chennai, India.  (11/16/15 Tr. at 71:1-10, 72:12-73:15.)

Ms. Dale testified that the APLL 1 project began in late 2005 and was completed in early 2006.

(*Id.* at 72:22-25.)  Ms. Dale maintained a project plan for the APLL 1 project that showed various tasks that were contemplated as part of the project, their target completion dates, and their completion percentages.  (*Id.* at 85:22-86:2; Trial Ex. 433.)  The APLL 1 project plan did not list as a task that was part of the APLL 1 project in 2006 the transfer of any images or library of images to AMDOCS or Office Tiger.  (*Id.* at 109:13-15; Trial Ex. 433.)  Interestingly, the APLL 1 project plan also does not reflect that the APLL 1 project was ever completed.  (Trial Ex. 433.)  Ms. Dale testified that the APLL 1 project was in fact completed in early 2006, but that she just did not update the project plan. (11/16/15 Tr. at 94:1-10.)  The fact is, however, that the uncorroborated testimony of Ms. Dale that the APLL 1 project was completed and that Verizon was already outsourcing ad production work by early 2006 conflicts with 1) what the APLL 1 project plan shows, 2) Ms. Lawless' testimony that Idearc was only contemplating outsourcing in mid-2007, 3) Mr. Kurth's testimony that Idearc only began outsourcing in 2009, and 4) SuperMedia's interrogatory answer that AMDOCS/Office Tiger provided print ad production services only from December 22, 2009 forward.  Another explanation is that the APLL 1 project plan is correct and the APLL 1 project was never completed.  Verizon's Statement of Work with AMDOCS (Trial Ex. 451) was nothing but an expression of what the parties intended to do, not conclusive proof of what they in fact did.  The remaining evidence all points to a different conclusion.

In addition, SuperMedia produced its invoices from AMDOCS in discovery.  These invoices only date back to early 2009.  (Trial Ex. 663.)  The absence of earlier invoices also conflicts with the testimony of Ms. Dale that the APLL 1 project was completed and that Verizon was already outsourcing ad production work by early 2006.  Ms. Dale's only explanation for the absence of earlier invoices was that SuperMedia must have just not produced

58

them despite them being requested in discovery. (11/16/15 Tr. at 120:22-122:10, 142:8-13, 143:7-9.) SuperMedia does not get the benefit of the doubt if it has withheld documents. If, on the other hand, they do not exist, as would appear to be the case from their absence, this further corroborates that SuperMedia did not begin outsourcing, and so probably did not transfer the Licensed Images to AMDOCS/Office Tiger, until 2009.

Ms. Dale also testified at the Damages Trial that she was the project manager for another project referred to as the "APLL 2" project, whereby Verizon supposedly outsourced certain print ad production services to ASEC in Manila, Philippines. (11/16/15 Tr. at 71:1-10, 94:21-95:10.) Ms. Dale testified that the APLL 2 project began and ended in 2006. (*Id.* at 95:4-6, 97:25-98:3.) Like the APLL 1 project, Ms. Dale maintained a project plan for the APLL 2 project. (*Id.* at 99:18-24; Trial Ex. 434.) However, unlike the APLL 1 project plan, the APLL 2 project plan reflected that Verizon would "Provide Art Lib (on HD)" to ASEC on April 24, 2006. (Trial Ex. 434 (line 99).) Notably, the APLL 2 project plan reflects that this task was not completed at all. (11/16/15 Tr. at 108:25-109:4; Trial Ex. 434 (line 99).) Ms. Dale testified that this entry in the APLL 2 project plan is just inaccurate (*Id.* at 109:5-12.) The APLL 2 project plan further reflects that the APLL 2 project, like the APLL 1 project, was not completed. (Trial Ex. 434.) As with the APLL 1 project, the testimony of Ms. Dale that the APLL 2 project was completed and that Verizon was already outsourcing ad production work by 2006 conflicts with what the APLL 2 project plan shows. It further conflicts with SuperMedia's interrogatory answer that ASEC, similar to AMDOCS/Office Tiger, provided print ad production services only from December 22, 2009 forward. It also conflicts with the testimony of Lori Lawless that Idearc was only contemplating outsourcing in July 2007, and Mr. Kurth's testimony that Idearc

began outsourcing in 2009. Another explanation is that the APLL 2 project plan is correct that the project was not completed and the images were not transferred.

Ms. Dale completely forfeited all credibility, though, when she testified at the Damages Trial to how the Licensed Images were supposedly provided to Office Tiger in 2006. (*Id.* at 77:2-5, 85:1-8.) At trial Ms. Dale out of the blue claimed that *she personally asked* two Verizon employees, Elaine Dutcher and Rodney Smith, to deliver a hard drive with the Licensed Images on it to Office Tiger in Chennai, India as part of the APLL 1 project. (*Id.* at 77:2-6, 78:8-17.) She further testified that when the APLL 2 project came around, she asked Ms. Dutcher and Mr. Smith to deliver another drive with the Licensed Images on it to ASEC in the Philippines. (*Id.* at 96:4-19.) This was shocking because, in response to an interrogatory months earlier requesting of SuperMedia:

> For each transfer of Yellow Pages' images covered by SuperMedia's response to Yellow Pages' Third Set of Interrogatories [which included the AMDOCS/Office Tiger and ASEC transfers], please identify what documents support the alleged date of the transfer, which of Yellow Pages' images were transferred and in what manner, and *identify all individuals with either firsthand knowledge of such facts or personally involved in the transfer* and describe their specific roles in the transfer.

SuperMedia only identified Ms. Dale and Stephen Kurth, and specifically not Ms. Dutcher and Mr. Smith. (*Id.* at 113:14-115:20; Trial Ex. 700 (Interrogatory No. 4) (emphasis added).) This material omission effectively precluded depositions of Ms. Dutcher and Mr. Smith as to their roles, if any, in the APLL 1 and APLL 2 projects. These are individuals that would have supposedly had firsthand knowledge of the timing of the transfers at issue in this case according to Ms. Dale, and SuperMedia hid their identities. Even worse, Ms. Dale testified at trial that Ms. Dutcher and Mr. Smith took the hard drives to AMDOCS/Office Tiger and ASEC at her personal request, but at her deposition she testified that *she did not know who was involved in the transfer*

*of the images to AMDOCS/Office Tiger.* (Dale 7/22/15 Depo. at 57:13-15 (Q: You don't know who was involved in the transfer of those images? A: No.).)[21]  She further testified she had no personal knowledge of the transfers to AMDOCS/Office Tiger and did not know when they were made. (*Id.* at 57:6-18.)  Of course, Ms. Dutcher and Mr. Smith were not brought to trial and there was nothing else to corroborate Ms. Dale's claims—no airplane tickets, no receipts, no communications, no testimony from AMDOCS, Office Tiger, or ASEC.

As a whole, Ms. Dale's testimony at trial was unreliable and conflicted with all other testimony and documentary evidence.  The weight of the evidence indicates that Idearc transferred all 5,000 of the Licensed Images to AMDOCS/Office Tiger and ASEC at some point after the 2007 Amendment, likely in 2009, which is what SuperMedia previously represented in this case for over two years.  Since the 2007 Amendment was after the registration of Yellow Pages' copyrights in the Licensed Images, Yellow Pages is entitled to statutory damages and attorneys' fees under the Copyright Act.

      **c.**     **SuperMedia's copyright infringement was willful, and statutory damages should be enhanced.**

This Court already found that SuperMedia's infringement was "certainly willful." (Post-Trial Opinion at 46.)  This Court's finding was based on nearly three pages of cited evidence, *all of which still stands.* (*Id.* at 44-46.)  This evidence can be summarized as follows:

- SuperMedia knew of Yellow Pages' copyrights and the terms of the license;
- SuperMedia, given its line of business and sophistication, is well aware of copyright law, and its own Code of Conduct refers to the same;
- SuperMedia approached Yellow Pages for a second amendment to the license, which Yellow Pages did not agree to, yet SuperMedia proceeded with use of the images not just on websites, but on social media pages, with no protective

---

[21]  The parties stipulated that Ms. Dale's deposition testimony was all information known or reasonably available to SuperMedia on the topic of "the date(s) of, individuals involved in, and specific circumstances of SuperMedia's transfer(s) of the Licensed Images to AMDOCS/Office Tiger," and SuperMedia adopted it as its 30(b)(6) testimony (Adv. D.I. 78). This deposition testimony was designated and is part of the record irrespective of whether Ms. Dale testified. Fed. R. Civ. P. 32(a)(3).

measures, placing the language on which Yellow Pages did not agree to on such websites;

- SuperMedia breached the license and infringed the copyrights repeatedly for years, even after being put on notice of such breaches by Yellow Pages; and
- When Yellow Pages approached SuperMedia about a potential breach, SuperMedia lied, representing that it did not violate the license, and then proceeded to ignore Yellow Pages' additional letters, while continuing to breach and infringe.

*Id.* This evidence is more than enough to establish willfulness. *Webloyalty.com, Inc. v. Consumer Innovations, LLC*, 388 F. Supp. 2d 435, 441 (D. Del. 2005) (stating that defendant acts willfully when it "actually knew it was infringing the plaintiffs' copyrights or recklessly disregarded that possibility"); *Broadcast Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F. Supp. 2d 537, 542 (E.D. Pa. 2008) (finding willful infringement when defendant infringed after being put on notice of infringement).

SuperMedia did not attempt to contradict any of this evidence at trial, nor could it have. Instead, remarkably, it argues for a smaller statutory damages award "based on the absence of any evidence that it acted willfully." (Post-Trial Brief at 50.) The above list is anything but an absence of evidence. Moreover, ironically, under SuperMedia's claim that its infringement began prior to 2007, its willfulness becomes all the more blatant because, if its new theory is to be believed, then when SuperMedia approached Yellow Pages for the 2007 Amendment to allow use by contractors it had already breached and hid the same from Yellow Pages.

SuperMedia cites to only three "new" pieces of evidence in an attempt to negate willfulness, the first of which is testimony of Ms. Dale that SuperMedia "checked with the legal department" before transferring the images to contractors. (Post-Trial Brief at 50.) The credibility of this testimony is questionable, given that this information was not disclosed at the 2014 Trial or in any deposition, including that of Ms. Dale, and the "legal" advisor remains unidentified. If SuperMedia intended to rely on some kind of "innocent infringement defense"

based on advice of counsel, the same was required to have been disclosed prior to trial. *See, e.g.*, *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001); *Inmuno Vital, Inc. v. Telemundo Grp., Inc.*, 203 F.R.D. 561, 564 (S.D. Fla. 2001). This alone serves as grounds for the testimony to be stricken or at least discounted. Moreover, it is difficult to comprehend how or believe that any lawyer could have ever advised that images could be transferred, since during the time frame Ms. Dale supposedly received such advice (prior to the 2007 Amendment), not only did the license expressly prohibit transfers, but it also restricted users to only SuperMedia employees. (Trial Ex. 55.)

The second "new" piece of evidence on which SuperMedia relies is provisions in some of the contractor agreements that allegedly put restrictions on the contractors' use of the images. (Post-Trial Brief at 50-51.) First of all, SuperMedia had no agreement at all with many of the transferees, such as MPS and Office Tiger. Second, SuperMedia ignores its own employees' testimony that, when it provided Yellow Pages' images to the contractors and subcontractors, it took no measures to ensure the images were only used for SuperMedia and did not even provide any of them with a copy of Yellow Pages' license or any information at all about Yellow Pages. (Apr. 10 A.M. Tr. 63:4-15; 73:23-74:9.) Third, the restrictions to which SuperMedia points cover only AMDOCS, ASEC, and Tata, and the provisions in the AMDOCS and ASEC agreements do not pertain at all to licensed images such as those of Yellow Pages—they apply only to images specifically owned by SuperMedia, with no mention at all of SuperMedia's image licensors. (Trial Ex. 451 at Section I(B) & X(B); Trial Ex. 462 at Section I(B) & X(B).) And in the case of Tata, the provision to which SuperMedia points refers specifically to the need for

SuperMedia to obtain required consents from third parties such as Yellow Pages, which SuperMedia of course never did.[22] (Trial Ex. 65 at 13.3(a)(i).)

The last argument is that SuperMedia's SEC filings show that it did not believe it was infringing since it publicly announced its outsourcing. (Post-Trial Brief at 51.) SuperMedia presumably was required under law to disclose its agreements with the contractors whether it wanted to or not, but either way, SuperMedia never disclosed that it was transferring Yellow Pages' images to anyone, it merely disclosed the use of outsourcers. None of these new assertions by SuperMedia change the plethora of evidence on which this Court already found willfulness, and Yellow Pages' statutory damages award should be enhanced accordingly.

**B.    Yellow Pages is a party to the Service Agreement and entitled to damages for SuperMedia's breaches of the Agreement, as well as attorneys' fees and costs under the Agreement.**

During the 2014 Trial, SuperMedia never contested that Yellow Pages is a party to the 2001 Service Agreement; to the contrary, the fact that both SuperMedia and Yellow Pages were parties to the Service Agreement, and that Yellow Pages signed the 2007 Amendment, were listed as agreed-upon facts requiring no proof in the parties' Joint Pre-Trial Order. (SuperMedia, LLC D.I. 113). However, after SuperMedia lost on liability, and the Damages Trial drew near, SuperMedia devised a new argument that Yellow Pages is not a party to the Service Agreement and thus cannot take advantage of its attorneys' fee provision.

First, SuperMedia's arguments about the lack of a formal assignment from AdMedia to Yellow Pages are rendered moot by the 2007 Amendment, which substituted Yellow Pages for AdMedia. (Trial Exh. 55.) SuperMedia argues that the 2007 Amendment can have no such

---

[22]    The Rajamani testimony to which SuperMedia cites fairs no better, as in the next line of testimony, he testified that he was not aware of any such protections being undertaken by the subcontractors to which the images were also transferred. (Rajamani Dep. at 80:18-21.) Moreover, notably absent from trial was testimony from any contractor or subcontractor testifying about any protective measures taken in relation to Yellow Pages' images.

effect because it never used the specific words "assignment" or "assign." (Post-Trial Brief at 33.) SuperMedia is merely arguing form over substance. The use of such language was unnecessary given that the Service Agreement was simply amended to be with Yellow Pages instead of AdMedia. This is clear from the face of the 2007 Amendment, as it was entered into with "Yellow Pages Photos, Inc." and the only Yellow Pages Photos, Inc. in existence on that date was the current Yellow Pages in this case. (Trial Exh. 55.) The 2007 Amendment further stated that "all references to 'Contractor' in the Agreement are hereby replaced with 'YPPI'" and it expanded SuperMedia's license rights to use the images, which is something only the current copyright owner, i.e. Yellow Pages, would have had the right to grant. (*Id.*) Similarly, it makes no sense for SuperMedia to argue that there was no "consent" to the substitution of Yellow Pages for AdMedia given Idearc prepared and signed the operative document that effected the substitution of parties. A signed agreement is a consensual act. Here the parties merely accomplished by an amendment what they could have also accomplished by an assignment.

Second, SuperMedia clearly had knowledge that the Yellow Pages entity entering into the 2007 Amendment was not the same entity as AdMedia. Mr. Moore had discussions with both Gary Hruska, a top-level executive at SuperMedia, and Russ Dixon, the graphics services administrator/manager at SuperMedia, about the original Yellow Pages Photos, Inc. changing its name to AdMedia Systems, Inc. (11/18/15 Tr. at 234:3-22.) In addition, when Lori Lawless, Category Manager in the Sourcing Department of SuperMedia, contacted Mr. Moore about entering into the 2007 Amendment, she also was already aware of that name change. (11/17/15 Tr. at 71:11-16, 83:9-23; Trial Ex. 612, 613.) When she spoke with Mr. Moore, he even told here again about the corporate name change. (*Id.* at 42:25-43:2, 49:1-2.) Ms. Lawless and SuperMedia's counsel Sue Harris initially set the Amendment up to be with "AdMedia Systems,

65

Inc., f/k/a Yellow Pages Photos, Inc.," further reflecting their knowledge of the name change. (*Id.* at 83:24-84:13; Trial Exh. 614.)  Mr. Moore then instructed Ms. Lawless to change the draft Amendment to put it in the name of "Yellow Pages Photos, Inc." rather than "AdMedia Systems, Inc.", and again, the only Yellow Pages that existed at that time is the current Yellow Pages in this case.  (*Id.* at 84:14-17.)  Simply put, if the company has a different name, it is not the same company.  These documents disprove Ms. Lawless' convenient trial testimony that she believed Yellow Pages and AdMedia to be the same company, although, it is unclear how Ms. Lawless' understanding even matters, given that she did not sign the Amendment and was merely instructed by others to obtain the Amendment from Mr. Moore.  (*Id.* at 77:18-78:12; Trial Exh. 55.)  Moreover, any understanding of Ms. Lawless not communicated to Mr. Moore is uncommunicated subjective intent that this Court cannot consider. *Jacobson v. DP Partners Ltd. P'ship*, 245 S.W. 3d 102, 109 (Tex. Ct. App. 2008) ("the court will not 'ask about the subjective intent of the parties. . .'"); *Williams v. Metzler*, 132 F.3d 937, 947 (3d Cir. 1997) ("in the process of interpreting a contract . . . that inquiry however, does not require a search for the subjective intent of the parties, but rather centers on the intent embodied in the language . . .").  The only relevant consideration in this case is who Idearc did enter into the Amendment with, not who it thought it entered into the Amendment with.  In addition, SuperMedia's knowledge of the current Yellow Pages was further confirmed after the 2007 Amendment in the Idearc bankruptcy and current bankruptcy, when it served Yellow Pages, not AdMedia.

Third, the Amendment must be construed to follow the intent of the parties.  "The cardinal rule to be observed in the construction of contracts is to ascertain and give effect . . . to the intention of the parties, as that intention is revealed by the language used in the agreement." *Sundaram v. Nemeth*, 2008 WL 80017 at *9 (E.D. Tex. Jan. 7, 2008) (citing *Lacy v. Ticor Title*

*Ins. Co.,* 794 S.W.2d 781, 786 (Tex. App.-Dallas 1990)). Idearc was the party that wanted to amend the Service Agreement in order to expand its license rights; obviously it intended to enter into the 2007 Amendment with Yellow Pages, the copyright owner who had the power to grant additional rights. In addition, Idearc (and now SuperMedia), would want the 2007 Amendment to be valid and enforceable given the expanded rights it provides. If Yellow Pages was not a party to the 2007 Amendment, it is invalid both because no other Yellow Pages existed at that time and because it lacked consideration if Yellow Pages did not receive the benefits of its protective provisions. Any argument that Idearc had different intentions is plainly disingenuous, given its clear objectives with respect to the 2007 Amendment and the complete absence of any prejudice to SuperMedia resulting from this intended substitution. Moreover, to the extent SuperMedia wants to argue any ambiguities in the 2007 Amendment, Idearc drafted it, and accordingly, it is to be construed against SuperMedia.[23] (11/17/15 Tr. at 84:8-9); *Cottman Trans. Sys., LLC v. FVLR Enter., LLC,* 295 S.W.3d 372, 378 (Tex. App. 2009).

Fourth, the doctrines of ratification, waiver and related equitable considerations preclude SuperMedia's new argument. SuperMedia simply cannot rely on inconsequential technicalities—which, it should be noted, have in no way prejudiced SuperMedia—in an attempt to escape liability under the agreement when its conduct has, for the better part of a decade, belied the position it now argues. *Smith v. Stericycle, Inc.,* 538 F. Supp. 2d 960, 968 (W.D. Tex. 2008) ("[I]f a party to a contract, by its conduct, recognizes a contract is valid, having knowledge of all relevant facts, it ratifies the contract"); *Sun Exploration and Production Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987) ("waiver is an intentional relinquishment of a known right or

---

[23]     SuperMedia's argument that Mr. Moore should have signed the Amendment on behalf of both AdMedia and Yellow Pages fairs no better. This is a distinction without a difference as Mr. Moore was and is the sole owner, officer and director of both AdMedia and Yellow Pages. 11/18/15 Tr. at 190:7-17, 233:11-18. The only way this could possibly present an issue is if AdMedia somehow objected to being replaced by Yellow Pages, which obviously is not the case since AdMedia, i.e. Mr. Moore, has no objection.

intentional conduct inconsistent with claiming that right"); *see also Eckland Consultants, Inc. v. Ryder, Stilwell Inc.,* 176 S.W. 3d 80, 87 (Tex. App. 2004) (internal citations omitted) ("The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party.  This doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it has acquiesced, or from which it has accepted a benefit").

    **C.**    **No claims for SuperMedia's breaches of the Service Agreement and ensuing infringement were discharged in the Idearc bankruptcy.**

    SuperMedia's claim that breaches of the Service Agreement or ensuing infringement which pre-date Plan confirmation in the Idearc bankruptcy were discharged in that proceeding fail.  First, the record is clear that neither Yellow Pages nor AdMedia received adequate notice of Idearc's intent to assume the Service Agreement and the corresponding cure proposal.  Second, neither Yellow Pages nor AdMedia were aware, or had reason to be aware, of the breaches and infringement which SuperMedia now contends pre-dated confirmation in the Idearc bankruptcy.  And third, a plain reading of 11 U.S.C. § 365 does not support SuperMedia's position.

    **1.**    **Neither Yellow Pages nor AdMedia received adequate notice of Idearc's intent to assume the Service Agreement nor of the cure amount proposed in connection with such assumption.**

    In order for a confirmation order purporting to authorize the assumption of an executory contract to be binding on the non-debtor party as to the debtor's proposed cure amount:

> [T]he debtor [has the] responsibility to assure that the non-debtor party was on notice of the debtor's *specific intent* to assume the contract.  Unless there is a showing that the non-debtor [otherwise] possessed actual knowledge of a sufficiently refined degree, the debtor must demonstrate delivery of the proposed plan of reorganization or some other court-ordered notice that set forth [the debtor's] *intent to assume the [contract] with a $0 cure amount*.

*In re National Gypsum,* 208 F.3d 498, 513 (5th Cir. 2000) (emphasis added); *see also In re Texas Rangers Baseball Partners*, 521 B.R. 134, 181 (Bankr. N.D. Tex. 2014) (endorsing *National Gypsum*, noting that "if the debtor's notice to the counterparty to the executory contract of its intent to assume the executory contract with a $0 cure amount via plan provision was inadequate, then the ultimate confirmation order could not be *res judicata* as to the cure amount").

Here, there is no question that, in the Idearc bankruptcy, Idearc failed to provide the "adequate notice" required by *National Gypsum* and its progeny to either Yellow Pages or AdMedia sufficient to bind them to a $0.00 cure and discharge of debts arising from existing defaults under the Service Agreement.  As supposed evidence of the adequacy of the notice given by Idearc in connection with its proposed assumption of executory contracts, SuperMedia relies on the Declaration of Evan Gershbein ("Gershbein Declaration") which, through its 553 pages of explication and attachments, illustrates perfectly the conflicting and confusing messages regarding the proposed assumption delivered to executory contract holders in the Idearc bankruptcy. (Trial Ex. 563).  In particular, the Gershbein Declaration makes clear that the only notification regarding Idearc's intention to assume the Service Agreement, and that no cure payments were owed, which was actually served on Yellow Pages was the Notice of Non-Voting Status-Contract/Lease Counterparties ("Notice of Non-Voting Status"), which is attached to the Gershbein Declaration (along with a number of other notices not provided to executory contract holders) as Exhibit V.  (Trial Ex. 563, ¶¶ 13-15 and Trial Ex. 563's Ex. V).

The Notice of Non-Voting Status served on Yellow Pages[24] —and on which SuperMedia hangs its hat with respect to the adequacy of notice given regarding its intent to assume the Service Agreement—can only be described as a model of obfuscation, if not a document

---

[24]    SuperMedia does not contend, and the evidence adduced at trial does not indicate, that the Notice of Non-Voting Status was served on AdMedia.

intended to downright mislead or confuse its reader-recipients.  The second paragraph of the

Notice of Non-Voting Status, which SuperMedia quotes from only selectively in its Post-Trial

Brief, actually provides as follows:

> You are receiving this notice because you are a party to an executory
> contract or unexpired lease with the Debtors.  Under the terms of the Plan
> your executory contract or unexpired lease is being assumed by the
> Debtors, and thus, you have no Claim against the Debtors and are not
> entitled to vote on the Plan. Accordingly, this notice and the *"Notice of (I)*
> *Confirmation Hearing and Objection Deadline with Respect to the*
> *Debtors' Plan, and (II) Solicitation and Voting Procedures"* are being
> sent to you for informational purposes only.

(emphasis in original.)   Notably, this paragraph (the first substantive paragraph in the Notice of

Non-Voting Status) informs Yellow Pages and other similarly situated recipients that, because

their "executory contract or unexpired lease is being assumed by the Debtors": i) they "have no

claim against the Debtors"; ii) they "are not entitled to vote on the Plan"; and iii) they have

received the Notice of Non-Voting Status "for informational purposes only."   Thus, any

reasonable person receiving the Notice of Non-Voting Status would naturally conclude that they

need take no action.  Further, and critically, this paragraph in the Notice of Non-Voting Status

appears *before* any reference to a "proposed Cure amount." Thus, the reader who concluded that

they need not read any further, since the Notice of Non-Voting Status afforded them "no Claim"

and no opportunity to "vote on the Plan" and was being provided "for informational purposes

only," likely never even saw the language in the ensuing paragraphs describing the website or

other resources such reader might avail themselves of in order to discover the "proposed Cure

amount" for their executory contract, as such proposed cure amounts were not actually included

in the Notice of Non-Voting Status that was served on executory contract holders.

The Gershbein Declaration also makes mention of the Notice of Proposed Cure Amounts

for Assumption of Executory Contracts and Unexpired Leases ("Notice of Proposed Cure

Amounts"), which was docketed in the Idearc bankruptcy but *never served* on Yellow Pages, AdMedia, or any other executory contract holder. Trial Ex. 563, ¶ 19. The Notice of Proposed Cure Amounts provides that "[a]ny *monetary* amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount." The Notice of Proposed Cure Amounts goes on to indicate that the cure amount proposed to be paid to Yellow Pages on account of any monetary default under the Service Agreement is $0.00. There are at least two reasons why the Notice of Proposed Cure Amounts, standing alone or in connection with the Notice of Non-Voting Status, failed to give Yellow Pages the "adequate notice" of Idearc's intention to assume the Service Agreement with a $0.00 cure payment as required under applicable authority.

First, the Notice of Proposed Cure Amount purports to address only monetary defaults under the executory contracts at issue; it makes no provision for a cure payment or other curative action to be provided by Idearc with respect to non-monetary defaults, such as those resulting from Idearc's unauthorized transfers of the Licensed Images to third parties. Ironically, since SuperMedia's predecessor, Verizon, paid the amounts due under the Service Agreement in full well before the filing of the Idearc bankruptcy, Idearc's proposal of a $0.00 cure for *monetary* defaults may have been appropriate. But the $0.00 cure proposal and related notices filed in connection with Idearc's assumption of the Service Agreement failed to address or provide for cure of the non-monetary defaults resulting from any violative pre-assumption transfers of the Licensed Images, and thus cannot bind Yellow Pages or AdMedia.

Second, the Notice of Proposed Cure Amounts was not actually served on Yellow Pages. As the Gershbein Declaration makes clear, the only notification that Yellow Pages would have

received regarding Idearc's intent to assume the Service Agreement with a $0.00 cure payment was the Notice of Non-Voting Status (which was, in and of itself, defective and confusing for the reasons set forth above). Accordingly, neither Yellow Pages nor AdMedia received the requisite notice of both: i) Idearc's intent to assume the Service Agreement, and ii) Idearc's contention that no cure payment was owed in connection with such assumption, as required by *National Gypsum*. As a result, the Confirmed Plan's provision for Idearc's assumption of the Service Agreement without any cure payment does not discharge the actual defaults concealed from Yellow Pages and AdMedia and is not binding on them.

    **2.**    **Even if Yellow Pages or AdMedia did receive adequate notice of Idearc's intent to assume the Service Agreement and the cure amount proposed, they were not otherwise aware of the potential existence of defaults which Idearc needed to cure in order to assume the Service Agreement and thus cannot be bound by the $0.00 cure amount.**

Even if this Court were to determine that Yellow Pages or AdMedia did receive adequate notice of Idearc's contention that a $0.00 cure payment was required to cure any monetary or non-monetary defaults under the Service Agreement, and thus no actual payment was owed in connection with Idearc's assumption of the Service Agreement, the law is clear that *res judicata* does not apply to Idearc's proposed $0.00 cure payment because Yellow Pages and AdMedia did not have "knowledge of facts sufficient to place [them] on notice that a potential pre-confirmation breach [had] occurred . . . ." *In re Sportsman's Warehouse, Inc.*, 2013 WL 492554 at *8 (Bankr. D. Del. Feb. 7, 2013) (citing *In re Cellnet Data Sys., Inc.*, 313 B.R. 604, 608 (Bankr. D. Del. 2004)); *see also In re Hathaway*, 401 B.R. 477, 484 (Bankr. W.D. Wash. 2009) (requiring that non-debtor counterparty have "knowledge of facts sufficient to give the party notice of a pre-petition claim prior to assumption" in order for "claim preclusion [to] bar[] that party's later assertion of a claim based upon a pre-petition breach").

72

In *Sportsman's Warehouse*, the court affirmed the binding effect of a lease assumed with a $0.00 cure amount where the non-debtor landlord failed to object to the assumption or proposed cure amount on the grounds that the debtor failed to timely exercise its purchase option under the lease. *Id.* at *7. In light of the landlord's awareness of the default, along with its receipt of appropriate notice of the debtor's intention to assume with a $0.00 cure amount and failure to object to same, the court granted the debtor summary judgment on its declaratory judgment count which sought determination that the $0.00 cure amount was binding. *Id.* at *8. Similarly, in *Cellnet*, the court held that where the non-debtor party "was aware, or reasonably should have been aware," of the debtor's failure to take certain actions giving rise to a pre-petition breach of the executory contract, and the non-debtor received appropriate notice of the debtor's intention to assume with a $0.00 cure amount and failed to object, the non-debtor was later precluded from pursuing claims as a result of the pre-petition breach. 313 B.R. at 608-09.

In this case, by contrast, the evidence at trial, discussed in detail in Section D, below, makes clear that Yellow Pages and AdMedia were not aware, and did not have reason to be aware, of facts which should have placed them on notice that Idearc transferred the Licensed Images to third parties prior to Idearc's proposed assumption of the Service Agreement.[25] As a result, even if this Court were to determine that Yellow Pages or AdMedia received adequate notice of Idearc's contention that there were no defaults under the Service Agreement, and thus no cure payment was owed in connection with Idearc's assumption of the Service Agreement, because Yellow Pages and AdMedia had no "knowledge of facts sufficient to place [them] on notice that a potential pre-confirmation breach [had] occurred," they cannot be bound by the

---

[25] This is especially true of the transfer of the Licensed Images to Tata, which SuperMedia contends occurred not earlier than December 2009—after the deadline for executory contract-holders and other parties in interest to object to assumption of their executory contracts and to confirmation of the Plan had passed on November 13, 2009—and which this Court previously found occurred after the transfer to MPS in 2010.

$0.00 cure amount proposed by Idearc in connection with its assumption of the Service Agreement and the concomitant assertion that the undisclosed breaches are now discharged.

**3.    SuperMedia's contention that Idearc's proposed $0.00 cure amount is binding on Yellow Pages or AdMedia is also belied by a plain reading of the Bankruptcy Code.**

SuperMedia's argument that it is insulated from damages for its undisclosed transfers of the Licensed Images, which constituted a breach of the Service Agreement, by virtue of the confirmation order in the Idearc bankruptcy also fails under a plain reading of the Bankruptcy Code.  11 U.S.C. §365(b) provides that a debtor-in-possession may not assume an executory contract if there is a default at the time of assumption, unless the trustee "cures, or provides adequate assurance that the trustee will promptly cure, such default..."    11 U.S.C. § 365(b)(1)(A).  So, if a debtor-in-possession wants to assume a contract, they must first cure the default or make adequate assurance of a prompt cure.  In this case, this Court determined that transfers of the Licensed Images to third parties constituted a breach of the Service Agreement. Any such transfers which predated assumption of the Service Agreement in the Idearc bankruptcy must have been cured prior to assumption.  There is no alternative through which Idearc could conceal the existence of the breaching transfers of the Licensed Images and secure a determination that $0.00 was owed to cure such defaults, if payment of $0.00 did not actually cure the default.  Accordingly, neither Yellow Pages nor AdMedia are bound by the $0.00 cure amount proposed in connection with Idearc's assumption of the Service Agreement as to any undisclosed breaches or infringement in existence prior to such assumption.

74

**D.    Neither Yellow Pages nor AdMedia knew, or had reason to know, of any of SuperMedia's or its predecessors' breaches or ensuing copyright infringement until 2011.**

Pursuant to 17 U.S.C. § 507, "[n]o civil action shall be maintained under [the Copyright Act] unless it is commenced within three years after the claim accrued." However, under the widely recognized "discovery rule," the statute of limitations on a claim for copyright infringement begins to run upon plaintiff's actual or constructive discovery of the relevant infringing conduct. *William A. Graham Co. v. Haughey*, 646 F. 3d 138, 150 (3d Cir. 2011). Similarly, Texas' four year statute of limitations for breach of contract actions, Tex. Civ. Prac. & Rem. Code Ann. § 16.004, is tolled until such time as a plaintiff "knew or should have known with reasonable diligence" of the existence of a claim. *Hoover v. Gregory*, 835 S.W.2d 668, 674 (Tex. App. 1992). SuperMedia cannot satisfy the burden of its statute of limitations defense. The record in this case makes clear that neither Yellow Pages nor AdMedia knew, or had reason to know, of any of SuperMedia's or its predecessors' breaches or ensuing infringement until 2011, well within the applicable statutes of limitations.

First, it is undisputed that Yellow Pages did not first learn of any violative transfers by SuperMedia or its predecessors until the spring of 2011 when Mr. Moore discovered the Licensed Images on the servers of ASEC in unrelated litigation. There is no evidence to the contrary. This is well within the 3-year statute of limitations for copyright actions and 4-year statute of limitations for breach of contract actions.

Second, Yellow Pages had no reason to know that SuperMedia or its predecessors had transferred the Licensed Images to third parties until 2011. SuperMedia's argument is that Mr. Moore, in his mind, equated a licensee outsourcing ad production services with the licensee transferring images licensed from Yellow Pages, and so if he was on notice of a licensee

outsourcing, he was on notice of a potential violative transfer. While Yellow Pages disagrees with this precept, the record is undisputed that Yellow Pages' first awareness of SuperMedia or its predecessors doing business with any outsourcer was in the fall of 2010, when Yellow Pages first contacted SuperMedia regarding ASEC and SuperMedia's potential violations of the license. (11/18/15 Tr. at 242:1-20; Trial Ex. 20.) It is also undisputed that whatever securities filing Mr. Moore read that referenced an outsourcing relationship between SuperMedia and Tata, he read it in 2011 or later. (*Id.* at 246:8-247:4.) And it is also undisputed that Mr. Moore's discovery of MPS using Yellow Pages' images, and suspicion that MPS might be tied to SuperMedia, was in late 2011 or 2012. (*Id.* at 247:15-248:5, 248:16-249:23.) Therefore, whatever knowledge Mr. Moore had of SuperMedia outsourcing ad production was not acquired until well within the 3-year statute of limitations. *See Haughey*, 568 F.3d at 438-39 (rejecting the notion that "a copyright owner has a duty to investigate infringement 'in the offing'").

As a fallback, SuperMedia points to the requests from Lori Lawless and Don Vincent of Idearc for amendments to the Service Agreement in 2007 and 2008 as putting Mr. Moore on notice of potential violative transfers, but that flies in the face of reason. Mr. Moore had a good, trusting past relationship with Verizon/Idearc, and Ms. Lawless approached him asking for permission, not forgiveness. (*Id.* at 230:5-231:19, 236:10-13.) This conversation did not lead Mr. Moore to believe that Idearc transferred, or was planning to transfer, the Licensed Images to contractors, but just the opposite, since Ms. Lawless could easily have asked for that additional permission and did not. (*Id.* at 239:1-13.) And when Don Vincent approached Mr. Moore about a further amendment a year later, the reaction was the same given Mr. Vincent was asking for permission to do something Idearc was not contractually permitted to do. (*Id.* at 240:13-23.)

76

Neither of these amendment requests gave Yellow Pages reason to suspect any violative transfer. In fact, if after 2007 Mr. Moore heard anything about Idearc or its successors using outsourcers for ad production, there would have been no reason to believe it was anything other than within the scope of the permission granted in the 2007 Amendment. Idearc asked for that right, and Yellow Pages agreed. So when Mr. Moore learned that SuperMedia was outsourcing ad production to ASEC in the fall of 2010, his inquiry was not whether there had been a transfer, but instead whether SuperMedia needed to expand its number of users. (Trial Ex. 20.)

Third, SuperMedia's and its predecessors' breaches were not inherently discoverable and SuperMedia concealed them. Every transfer that occurred took place without Yellow Pages' knowledge or consent, and as this Court has seen, even today the facts of the transfers are being obfuscated by SuperMedia. SuperMedia claims today that its predecessors defaulted as far back as 2005 and 2006, but when Idearc filed for bankruptcy in 2009 and was required to notify Yellow Pages of such defaults it claimed there were none and that it owed Yellow Pages no cure. (Trial Ex. 563, ¶ 19 and Ex. X.) Later, in the fall of 2010, when Yellow Pages contacted SuperMedia about having potentially exceeded its permitted number of users by virtue of its relationship with ASEC, SuperMedia denied any default. This, we now know, was at the time untrue. So even if this Court believes Yellow Pages should by 2010 have made some sort of inquiry, the fact is that it did and was told there was no default. *See Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983) ("In any event, there is no doubt that the copyright statute of limitations is tolled by 'fraudulent concealment' of the infringement.").

## V.    CONCLUSION

As this Court already ruled, the product at issue, Yellow Pages' collection and index of photo images, is of substantial value. The evidence at trial further confirmed that to be the case.

649002.1 01/28/2016

Yellow Pages clearly demonstrated at trial that it was economically damaged by SuperMedia's and its predecessors' violative transfers and infringement of Yellow Pages' copyrights in an amount no less than $2,668,248. Depending on how this Court rules on Yellow Pages' Motion for Contempt and Sanctions (Adv. D.I. 128), that amount should be increased to as much as $5,940,000. SuperMedia has not offered any credible damages opinion to support a lesser amount, and none of SuperMedia's "gating issues" bar any of these damages—they all fail.

Furthermore, Yellow Pages is entitled to statutory damages. SuperMedia's infringement was previously found to have been willful, and no evidence or argument offered by SuperMedia changes any previous finding. If anything, SuperMedia's conduct appears, on its face, to have been even more willful than once thought. This Court should set statutory damages above the actual damages awarded in a range up to $15,000,000 given the willfulness of SuperMedia's infringement in order to punish SuperMedia's conduct and deter it from such misconduct in the future.

649002.1 01/28/2016

Dated:  January 28, 2016

Lucian B. Murley (DE No. 4892)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone:  (302) 421-6898
Facsimile:  (302) 421-5864
lmurley@saul.com

-and-

Steven M. Berman (FL Bar No. 856290)
Hugo S. "Brad" deBeaubien (FL Bar No. 058100)
J. Todd Timmerman (FL Bar No. 0956058)
Mindi M. Richter (FL Bar No. 0044827)
**SHUMAKER, LOOP & KENDRICK, LLP**
Bank of America Plaza
101 E. Kennedy Boulevard, Suite 2800
Tampa, FL  33602
Telephone:  (813) 229-7600
Facsimile:  (813) 229-1660
sberman@slk-law.com
bdebeaubien@slk-law.com
ttimmerman@slk-law.com
mrichter@slk-law.com

*Co-Counsel to Yellow Pages Photos, Inc.*

649002.1 01/28/2016